**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| ADAMS & BOYLE, P.C., on behalf of itself and its patients; MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself and its patients; PLANNED PARENTHOOD GREATER MEMPHIS REGION, on behalf of itself and its patients; PLANNED PARENTHOOD OF MIDDLE AND EAST TENNESSEE, on behalf of itself and its patients; and KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself and its patients, | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION |
| | | CASE NO. 3:15-cv-00705 |
| | | JUDGE FRIEDMAN |
| Plaintiffs, | ) ) ) | MAGISRATE JUDGE FRENSLEY |
| v. | ) ) | |
| HERBERT H. SLATERY III, Attorney General of Tennessee, in his official capacity; JOHN DREYZEHNER, M.D., Commissioner of the Tennessee Department of Health, in his official capacity; MICHAEL D. ZANOLLI, M.D., President of the Tennessee Board of Medical Examiners, in his official capacity; GLENN R. FUNK, District Attorney General of Metropolitan Nashville and Davidson County, in his official capacity; AMY WEIRICH, District Attorney General of Shelby County, in her official capacity; BARRY P. STAUBUS, District Attorney General of Sullivan County, in his official capacity; and CHARME P. ALLEN, District Attorney General of Knox County, in her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT

Plaintiffs Adams & Boyle, P.C., Memphis Center for Reproductive Health, Planned

Parenthood Greater Memphis Region, Planned Parenthood of Middle and East Tennessee, and

Knoxville Center for Reproductive Health, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1. In recent years, Tennessee politicians have engaged in a relentless attack on abortion rights, enacting a multitude of restrictions designed to impose unnecessary obstacles on women seeking abortions and shutter clinics that have provided safe and affordable abortion care for decades.

2. Plaintiffs—who represent the remaining clinics in the state that provide abortion care—challenge Tennessee's requirement that women seeking an abortion make an additional, medically unnecessary trip at least 48 hours before they can obtain an abortion in order to attend an in-person meeting with the physician. At that meeting, the woman must receive certain state-mandated information that she would have already received under Tennessee's general informed consent law, and that could otherwise be provided by phone, videoconference, mail, or website. 2015 Tenn. Pub. Acts Chapter 473, § 1(a)-(h) (codified at Tenn. Code Ann. § 39-15-202(a)-(h)) (attached hereto as Ex. A) (the "Delay Requirement").

3. Plaintiffs bring this lawsuit on behalf of themselves and their patients under 42 U.S.C. § 1983. They seek declaratory and injunctive relief from this unconstitutional law.

4. As originally filed, this lawsuit challenged the Delay Requirement as well as two additional abortion restrictions: the "ASTC Requirement," which requires doctor's offices that perform abortions to become licensed as ambulatory surgical treatment centers ("ASTCs"), 2015 Tenn. Pub. Acts Chapter 419 (codified at Tenn. Code Ann. § 68-11-201); and the "Admitting-Privileges Requirement," which requires doctors who perform abortions to have hospital admitting privileges even though less than one-quarter of one percent of abortion patients ever

need treatment at a hospital, 2012 Tenn. Pub. Acts Chapter 1008 (codified at Tenn. Code Ann. § 39-15-202(j)).

5.    In *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), the Supreme Court struck down a pair of burdensome and medically unnecessary Texas laws as unconstitutional violations of a woman's right to privacy.  The Court recognized that the provisions caused the closures of multiple abortion clinics in Texas.  The substantively identical ASTC Requirement and Admitting-Privileges Requirement would have led to similar clinic closures in Tennessee.  In fact, one clinic in Knoxville did close as a result of the Admitting Privileges Requirement and, to date, has not been able to reopen.

6.    If the ASTC Requirement had taken effect on July 1, 2015, it would have forced Plaintiff Adams & Boyle's Bristol and Nashville clinics to close, further reducing women's options for obtaining safe, legal abortion care in Tennessee.

7.    Following the Supreme Court's decision in *Whole Woman's Health*, this Court entered final judgment on Plaintiffs' challenge to the ASTC Requirement and Admitting-Privileges Requirement, and those provisions are permanently enjoined.  *See* Partial J. on Consent [Dkt. No. 60].

8.    The Delay Requirement, like the ASTC and Admitting-Privileges Requirements, is not part of standard medical practice and does nothing to further the health of abortion patients. Instead, it harms women's health by delaying their access to abortion—or, in some cases, preventing them from obtaining an abortion altogether.

9.    Tennessee law does not impose any such waiting period on other procedures— including medical procedures that pose far greater risks than abortion.

10. By singling out abortion from all other medical care for uniquely burdensome treatment, the Delay Requirement stigmatizes abortions and the women who seek them. Although the Delay Requirement imposes burdens on all patients seeking abortion care in Tennessee, it is particularly onerous for low-income women, victims of sexual assault or intimate partner violence, women who are seeking abortion care due to a diagnosis of a severe or lethal fetal anomaly, women who must travel outside of their community to reach a clinic or provider, and women seeking medication abortions.

## JURISDICTION AND VENUE

11. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

12. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

13. Venue is appropriate under 28 U.S.C. § 1391(b)(1) because Defendants reside in this district and § 1391(b)(2) because two clinics operated by Plaintiffs are located here.

## PLAINTIFFS

14. Plaintiff Adams & Boyle, P.C., is a professional corporation organized under the laws of Tennessee. It is a holding company for Bristol Regional Women's Center in Bristol, Tennessee (the "A & B Bristol Clinic"), and The Women's Center in Nashville, Tennessee (the "A & B Nashville Clinic"). The A & B Bristol Clinic has operated continuously since 1980. It provides an array of gynecological and reproductive health services in a private physician's

4

office atmosphere, including surgical abortions up to 13.6 weeks LMP[1] and medication abortions up to 10 weeks LMP.  The A & B Nashville Clinic has operated continuously since 1990.  It also provides a broad range of gynecological reproductive health services in a private, supportive environment, including surgical abortions up to 16 weeks LMP and medication abortions up to 10 weeks LMP.  Adams & Boyle, P.C., sues on its own behalf and on behalf of its patients.

15.    Plaintiff Memphis Center for Reproductive Health is a nonprofit organization that operates CHOICES, a women's health clinic in Memphis, Tennessee ("Choices Memphis").  In operation since 1974, Choices Memphis strives to empower individuals to make informed decisions about their reproductive health; the clinic offers a full range of sexual and reproductive health care, including fertility services, health care services for lesbian, gay, and transgender individuals, surgical abortions up to 15 weeks LMP, and medication abortions up to 10 weeks LMP. Choices Memphis sues on its own behalf and on behalf of its patients.

16.    Plaintiff Planned Parenthood Greater Memphis Region ("PPGMR") is one of the oldest and largest private, nonprofit health care agencies in Tennessee, in operation since 1938. PPGMR provides high-quality and comprehensive reproductive health care to patients at two health centers in Memphis: PPGMR-Memphis Midtown and PPGMR-Memphis East.  PPGMR-Memphis Midtown currently provides surgical abortions up to 16 weeks LMP and medication abortions up to 10 weeks LMP.  PPGMR also recently began providing medication abortions up to 10 weeks LMP at its new Memphis East health center.  PPGMR sues on its own behalf and on behalf of its patients.

---

[1] "LMP" denotes the first day of a pregnant woman's "last menstrual period."  It is the standard measure of gestational age used by medical professionals.

17.     Plaintiff Planned Parenthood Middle and East Tennessee ("PPMET") and its predecessor organizations have been providing high-quality reproductive health care services to patients since 1961.  It operates two health centers in Tennessee, one in Nashville ("PPMET-Nashville") and one in Knoxville ("PPMET-Knoxville").  PPMET-Nashville currently provides surgical abortions up to 18 weeks LMP and medication abortions up to 10 weeks LMP.  PPMET-Knoxville provides medication abortions up to 10 weeks LMP.  PPMET sues on its own behalf and on behalf of its patients.

18.     Plaintiff Knoxville Center for Reproductive Health ("The Knoxville Center") is a non-profit reproductive health center that has been providing high-quality reproductive health care services to patients since 1975.  The Knoxville Center provides a range of reproductive health services, including cancer screenings, testing and treatment for sexually transmitted infections, surgical abortions up to 15 weeks LMP, and medication abortions up to 10 weeks LMP.  The Knoxville Center sues on its own behalf and on behalf of its patients.

## **DEFENDANTS**

19.     Defendant Herbert H. Slatery III is the Attorney General of Tennessee.  He is responsible for defending Tennessee laws against constitutional challenge.  *See* Tenn. Code Ann. § 8-9-109(b)(9).  Further, he has exclusive authority to prosecute criminal violations of the challenged requirements in Tennessee's appellate courts.  *See* Tenn. Code Ann. § 8-6-109(b)(2); *State v. Simmons*, 610 S.W.2d 141, 142 (Tenn. Crim. App. 1980).  He is sued in his official capacity.

20.     Defendant John Dreyzehner is the Commissioner of the Tennessee Department of Health (the "Department"), and has general supervisory duties to protect the interests of health

and life of the citizens of Tennessee. *See* Tenn. Code Ann. § 68-1-204. Commissioner Dreyzehner is sued in his official capacity.

21. Defendant Michael D. Zanolli, M.D., is the President of the Tennessee Board of Medical Examiners. The Board of Medical Examiners is empowered to take disciplinary action against a physician who violates the Delay Requirement, Tenn. Code Ann. § 39-15-202(h), or any "of the laws governing abortion," Tenn. Code Ann. § 63-6-214(b)(6). Dr. Zanolli is sued in his official capacity.

22. Defendant Glenn R. Funk is the District Attorney General for Nashville. He is responsible for prosecuting all violations of the state criminal statutes occurring in Metropolitan Nashville and Davidson County. Tenn. Code Ann. § 8-7-103. Mr. Funk is sued in his official capacity.

23. Defendant Amy Weirich is the District Attorney General for Shelby County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Shelby County, which includes Memphis. Tenn. Code Ann. § 8-7-103. Ms. Weirich is sued in her official capacity.

24. Defendant Barry P. Staubus is the District Attorney General for Sullivan County. He is responsible for prosecuting all violations of the state criminal statutes occurring in Sullivan County, which includes Bristol. Tenn. Code Ann. § 8-7-103. He is sued in his official capacity.

25. Defendant Charme P. Allen is the District Attorney General for Knox County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Knox County. Tenn. Code Ann. § 8-7-103. She is sued in her official capacity.

# FACTUAL ALLEGATIONS

## I. Background on Abortion

26. Abortion is one of the safest and most common medical procedures performed in the United States. Less than a quarter of one percent of abortion patients experience a complication that requires hospitalization.[2]

27. In 2015, the last year for which statistics are currently available, 11,411 women obtained abortions in Tennessee.[3]

28. Nationwide, roughly three out of every ten women will have had an abortion by the age of 45.[4]

29. In the United States, roughly 39% of women obtaining abortions are white; 28% are black; 25% are Hispanic; and 9% come from other racial or ethnic backgrounds. Three-fourths of all abortion patients are low-income (i.e. have incomes less than 199% of the federal poverty level).[5]

30. Most women having abortions in the U.S. report a religious affiliation, including 30% who identify as Protestant and 24% who identify as Catholic.[6]

---

[2] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 180 (2015), https://www.ansirh.org/sites/default/files/publications/files/upadhyay-jan15-incidence_of_emergency_department_visits.pdf.

[3] Tenn. Dep't of Health, Div. of Policy, Planning & Assessment, *Selected Induced Termination of Pregnancy (ITOP) Data, According to Age and Race of Woman, Tennessee and Department of Health Regions, Resident Data, 2015*, at 1 (2015), https://www.tn.gov/assets/entities/health/attachments/ITOP2015.pdf (hereinafter TN ITOP Report).

[4] Rachel K. Jones & Megan L. Kavanaugh, *Changes in Abortion Rates Between 2000 and 2008 and Lifetime Incidence of Abortion*, 117 Obstetrics & Gynecology 1358, 1364 (2011), http://journals.lww.com /greenjournal/fulltext/2011/06000/Changes_in_Abortion_Rates_Between_2000_and_2008.14.aspx.

[5] Jenna Jerman, et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Inst. 7, 11 (2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.

[6] *Id*. at 7.

Case 3:15-cv-00705   Document 70   Filed 08/22/17   Page 8 of 25 PageID #: 430

31.     Nearly 60% of women having abortions already have at least one child;[7] most also report plans to have children (or additional children) when they are older, financially able to provide for them, and/or in a supportive relationship with a partner so their children will have two parents.[8]

32.     The reasons women give for having an abortion underscore their understanding of the responsibilities of parenthood and family life.  Three-fourths of women cite responsibility to other individuals (such as children or elderly parents); most also say they cannot afford to become a parent or to add to their families, and that having a baby would interfere with work, school or the ability to care for dependents.[9]

33.     A 2006 study found that 58% percent of abortion patients in the U.S. say they would have liked to have had their abortion earlier in the pregnancy.  Nearly 60% of these women who experienced a delay in obtaining an abortion cited the time it took to make necessary arrangements and the difficulty they faced in raising money to pay for the procedure and attendant costs.[10]

34.     Women in Tennessee can obtain either a medication abortion or a surgical abortion. Medication abortion is a method of ending an early pregnancy by taking pills to induce a miscarriage.  Surgical abortion is a method of ending a pregnancy by using instruments to gently evacuate the contents of the uterus.  Surgical abortion is identical to the care provided to a

[7] *Id.*

[8] Stanley K. Henshaw & Kathryn Kost, *Abortion Patients in 1994-1995: Characteristics and Contraceptive Use*, 28 Fam. Plan. Persp. 140, 144 (1996), https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/2814096.pdf.

[9] Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37(3) Perspectives on Sexual and Reproductive Health 110, 117 (2005), https://www.guttmacher.org/journals/psrh/2005/reasons-us-women-have-abortions-quantitative-and-qualitative-perspectives.

[10] Lawrence B. Finer, et al., *Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States*, 74 Contraception 334, 335 tbl.1, 341 (2006), https://www.guttmacher.org/sites/default/files/pdfs/pubs/2006/10/17/Contraception74-4-334_Finer.pdf.

Case 3:15-cv-00705   Document 70   Filed 08/22/17   Page 9 of 25 PageID #: 431

woman experiencing an incomplete miscarriage; it is as safe or safer than many procedures regularly performed in an outpatient setting, such as colonoscopies or endometrial biopsies.[11]

35.    Some women prefer medication abortion because it feels less invasive and more natural, and provides patients with more privacy and control over the process.  Others seek medication abortion because they have a history of sexual trauma, and having instruments inserted vaginally will cause them emotional distress.  And for some women with certain medical conditions, medication abortion is medically preferable.

36.    Because medication abortion is only available in Tennessee for women who are no more than 10 weeks LMP, the Delay Requirement pushes some women seeking medication abortion who are close to the gestational age limit past the timeframe when this method is available.  These women are then faced with two undesirable options: either foregoing an abortion altogether, or undergoing the surgical abortion that they were seeking to avoid.

37.    Abortion is far safer than the alternative—carrying a pregnancy to term. Nationwide, the risk of death from carrying a pregnancy to term is approximately 14 times higher than the risk of death from having a legal abortion.[12]

38.    While abortion is extremely safe, and safer than many other common medical procedures, both the cost of the procedure and the risks of complications increase as gestational age advances.[13]

---

[11] *Whole Woman's Health,* 136 S. Ct. at 2315 (noting medical treatment for "incomplete miscarriage often involves a procedure identical to that involved in a nonmedical abortion"); *id*. at 2302 (highlighting district court's finding that abortion is "much safer, in terms of minor and serious complications, than many common medical procedures not subject to such intense regulation and scrutiny").

[12] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States,* 119 Obstetrics & Gynecology 215, 216 (2012) http://journals.lww.com/greenjournal/fulltext/2012 /02000/The_Comparative_Safety_of_Legal_Induced_Abortion.3.aspx.

39. As a result, delaying a woman who seeks an abortion to a later point in pregnancy will both expose her to increased medical risks and impose greater financial costs. And delaying a woman seeking an abortion beyond the cutoff point at which abortion services are available, and forcing her to either travel out of state to obtain an abortion, attempt a medically unsupervised abortion, or carry an unwanted pregnancy to term, increases her risks of complications and death.

40. When legal abortion is inaccessible or unavailable to women, they may turn to illegal or unsafe methods to terminate a pregnancy.

## II. Preexisting Statutory Framework

41. Apart from the Delay Requirement, Tennessee law already imposes an obligation on all physicians to obtain a patient's informed consent prior to performing any medical procedure. Tenn. Code Ann. § 29-26-118. To satisfy this obligation, a physician must "supply appropriate information to the patient . . . in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the [physician] practices in the community in which the [physician] practices and in similar communities." *Id.*

42. Tennessee's generally applicable informed consent law ensures that patients participate in a robust informed-consent process prior to obtaining an abortion, and that they receive "appropriate information" about the risks, benefits, and alternatives to abortion. Accordingly, the Delay Requirement is either duplicative of Tenn. Code Ann. § 29-26-118, or it requires something that is not part of "the recognized standard of acceptable professional practice." *Id.*

---

[13] Linda A. Bartlett, et al., *Risk Factors for Legal Induced Abortion-Related Mortality in the United States*, 103 Obstetrics & Gynecology 729, 735 (2004) https://www.researchgate.net/publication/8648767_Risk_Factors_for_Legal_Induced_Abortion-Related_Mortality_in_the_United_States.

43.     Before the Delay Requirement went into effect, Plaintiffs were already ensuring, consistent with accepted standards of medical practice, that every patient seeking an abortion received appropriate information to allow her to make an informed and voluntary decision about the abortion procedure.    Plaintiffs' patients were counseled on the risks, benefits, and alternatives, and Plaintiffs' physicians confirmed with each patient that her decision to have an abortion was voluntary and fully informed.

44.     The Delay Requirement is modeled on an earlier Tennessee statute that was held unconstitutional.  In 2000, the Tennessee Supreme Court held that a law imposing a mandatory delay for abortion care violated the Tennessee Constitution, and that it imposed an undue burden on abortion access under the Due Process Clause of the Fourteenth Amendment.  *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 22, 24 (Tenn. 2000).

45.     The Tennessee Constitution has since been amended to state: "Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion.  The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother."  Tenn. Const. Art. 1 § 36.  However, under the Federal Constitution, a law restricting a woman's access to a pre-viability abortion is unconstitutional if the burdens the law imposes outweigh its benefits.  *Whole Women's Health*, 136 S. Ct. 2292.

## III. Passage of the Delay Requirement

46.     The Delay Requirement was signed into law by Governor Bill Haslam on May 18, 2015, and went into effect on July 1, 2015.

47.      It has three components: (1) it requires that an abortion patient receive certain information "orally and in person" prior to her procedure; (2) it requires that the information be

provided by "the attending physician who is to perform the abortion" or "the referring physician"; and (3) it delays the patient from having an abortion "until a waiting period of forty-eight (48) hours has elapsed after the attending physician or referring physician has provided the information required [by the statute]." Tenn. Code Ann. § 39-15-202(b), (d)(1).

48. The sole exception to the Delay Requirement is if a woman is experiencing a "medical emergency," which is defined as "a condition that, on the basis of the physician's good faith medical judgment, so complicates a medical condition of a pregnant woman as to necessitate an immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of major bodily function." Tenn. Code Ann. § 39-15-202(f).

49. Women who suffer from medical complications that do not pose an immediate threat of either death or serious risk of substantial and irreversible impairment of major bodily function are not covered by this narrow exception.

50. In fact, the Tennessee Legislature rejected an amendment that would have created a broader exception for a patient experiencing a condition that "so complicates a medical condition" that she would face "serious risk of substantial psychological harm" if denied or forced to wait for an abortion. *See* H.B. 0977 Legislative History, Am. No. 6, attached hereto as Ex. B-1.

51. Likewise, no exception exists for a woman who is seeking an abortion because of a diagnosis of a severe or lethal fetal anomaly.

52. Nor does the Delay Requirement include an exception for a woman whose pregnancy is the result of rape or incest. Indeed, the Legislature rejected two amendments that would have created such an exception. *See* S.B. 1222 Legislative History, Am. No. 3, attached

13

hereto as Ex. B-2; H.B. 0977 Legislative History, Am. No. 7, attached hereto as Ex. B-3.

53.    The Delay Requirement also lacks an exception for a woman who is a victim of intimate partner violence, and who may face additional threats to her safety if her partner becomes aware of her pregnancy or intention to have an abortion.  The mandatory delay and additional visit requirements impose exceptionally high burdens on such patients by increasing the likelihood that the abusive partner will learn these facts.

54.    The Legislature also rejected amendments that would have mitigated the harm to women with other vulnerabilities by eliminating the requirement that patients receive the mandated information in person, *see* S.B. 1222 Legislative History, Am. No. 5, attached hereto as Ex. B-4; H.B. 0977 Legislative History, Am. No. 2, attached hereto as Ex. B-5, or allowing the information to be conveyed "by means of telehealth," H.B. 0977 Legislative History, Am. No. 3, attached hereto as Ex. B-6.

55.    Eliminating the in person requirement would have saved women from having to make an additional trip, thereby easing some of the financial and travel burdens the Delay Requirement imposes upon patients, including arranging for time off work and/or caretaking duties, the need to make additional travel arrangements, and the added costs, including lost wages, associated with these arrangements.

56.    In addition, eliminating the need for an additional trip would have lessened the negative impact of the Delay Requirement on appointment availability.  A telemedicine or telephonic option would have ameliorated spacing constraints on the Plaintiff clinics, the need for additional clinic personnel, and other logistical difficulties imposed by the Delay Requirement that have resulted in fewer available abortion appointments.

57.    Likewise, permitting a registered nurse or a physician's assistant, working in

conjunction with a physician, to provide patients the state-mandated information would have also alleviated many of the logistical and scheduling difficulties imposed by the requirement that a physician meet with each patient, in person, on the day of her initial visit. Yet the Legislature rejected an amendment that would have removed the in person requirement and allowed other licensed healthcare professionals or "the physician's agent" to provide the state-mandated information. *See* H.B. 0977 Legislative History, Am. No. 2, attached hereto as Ex. B-5.

58. A number of other states with mandatory delay laws, including Tennessee's neighbors Alabama, Georgia, Kentucky, North Carolina, and Virginia, have adopted measures that reduce the burdens on women imposed by such laws. For example, many states allow women to receive the counseling information by phone, mail, or website, thus eliminating the additional trip requirement, or allow a qualified person other than the physician performing the abortion procedure to provide the required information.[14] And other states' laws provide exemptions for certain women facing particularly difficult circumstances.[15]

---

[14] *See* Ala. Code § 26-23A-4(a)-(b) (by mail and by "qualified person"); Alaska Stat. Ann. § 18.16.060(b)-(c) (by telephone, email, mail, or fax, and by "member of the physician's staff who is a licensed health care provider"); Ga. Code Ann. § 31-9A-3(1) (by telephone and by "qualified agent"); Idaho Code § 18-609(5) (by telephone and by "an agent of the physician"); Kan. Stat. Ann. § 65-6709(a)-(b) ("informed . . . in writing"); Ky. Rev. Stat. Ann. §§ 311.724, 311.725(1)(a) (by "real-time visual telehealth services," and by other professionals, including social workers); Mich. Comp. Laws Ann. § 333.17015(3) (by "qualified person," including social workers); Minn. Stat. Ann. § 145.4242(a)(1) (by telephone); Neb. Rev. Stat. Ann. § 28-327(2) (by telephone and by "an agent of either physician"); N.C. Gen. Stat. § 90-21.82(1)-(2) (by telephone and by "qualified professional"); N.D. Cent. Code § 14-02.1-02(11) (by "physician's agent"); Okla. Stat. Ann. tit. 63 § 1-738.2(B)(a) (by telephone and by "agent of either physician [or referring physician]"); 18 Pa. Stat. and Cons. Stat. Ann. § 3205(a)(1) ("orally informed"); S.C. Code Ann. § 44-41-330(D) (by mail); Utah Code Ann. § 76-7-305(2)(a) (by other professionals, including registered nurses); Va. Code Ann. § 18.2-76(B) (by "qualified medical professional trained in sonography"); W. Va. Code Ann. § 16-2I-2(a) (by telephone and by "health care professional to whom the responsibility has been delegated by the physician"); Wis. Stat. Ann. § 253.10(3)(c)(2) (by "qualified person assisting the physician," including social workers).

[15] *See* Tex. Health & Safety Code Ann. § 171.012(a)(4) (allowing information to be provided by telephone for patients who live at least 100 miles from the nearest abortion provider); Utah Code Ann. § 76-7-305(7)(b) (providing for an exception in cases of lethal fetal anomaly); Va. Code Ann. § 18.2-76(B) (providing for a two-hour waiting period for patients traveling at least 100 miles to obtain an abortion).

59.     A physician who fails to comply with the Delay Requirement is subject to criminal penalties and loss of licensure. Tenn. Code Ann. § 39-15-202(h).

## IV.     The Delay Requirement Imposes Significant Burdens and Offers No Health Benefits To Abortion Patients.

60.     Because abortion is a time-sensitive procedure, it is crucial for women to be able to access the procedure in a timely manner.  According to a recent study, the average wait time in the United States for an appointment, from the day that a woman calls to schedule her appointment, to the initial visit, is 7.6 days.[16]  However, wait times for women in Tennessee seeking abortion care can be far longer as a result of the Delay Requirement.

61.     A recent study focused on women who were denied abortion care because they exceeded the provider's gestational age limit found that "travel and procedure costs" were the most common reasons for women's delays in seeking abortion care.  As noted by the study's authors, "[o]nce a woman is beyond the first trimester, raising the funds to pay for the abortion can lead to further delays and create a cycle of increasing cost and delay." [17]

62.     In Tennessee, approximately 96% of counties lack an abortion provider, and 63% of Tennessee women live in those counties.[18]  Traveling to access abortion care poses both logistical and economic burdens for these women, especially for those who are low-income and/or who lack safe and reliable transportation.  For example, a woman without reliable transportation may need to use multiple methods of transportation in order to reach a clinic or

---

[16] Rachel K. Jones and Jenna Jerman, *Time to Appointment and Delays in Accessing Care Among U.S. Abortion Patients*, Guttmacher Inst. 8 (2016), https://www.guttmacher.org/report/delays-in-accessing-care-among-us-abortion-patients.

[17] Ushma D. Upadhyay, et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, 104 Am. J. Pub. Health 1687, 1692 (2014), http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH. 2013.301378.

[18] Rachel K. Jones and Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Persp. on Sexual & Reprod. Health 17, 23 tbl.4 (2017), https://www.guttmacher.org/sites/default/files/article_files/ abortion-incidence-us.pdf.

provider.[19]   A woman already struggling to make ends meet will face further difficulties in raising funds to pay for the procedure itself, arranging and paying for transportation and child-care, and taking time off from work or other responsibilities.  These obstacles are particularly challenging for a woman working at a low-wage job that does not offer sick days or a flexible work schedule.

63.   These challenges, experienced by many Tennessee women, are exacerbated by the Delay Requirement, which forces women to travel for and attend two separate appointments— the first to receive the state-mandated information, and the second to undergo the procedure or obtain the medication.  Because of the scheduling difficulties imposed by the Delay Requirement and the time it takes women to arrange and pay for transportation, child care, and time off work, women can be substantially delayed in obtaining their initial appointment visit, and the delay between the two visits is often significantly longer than 48 hours.  These delays may push some women to a later point in pregnancy, which in turn requires them to save up even more money to pay for a more complex and expensive procedure, as well as other associated expenses.

64.   These delays also make it more difficult for a woman to obtain a medication abortion, which is only available to patients who are no more than 10 weeks LMP.  A woman who is delayed past 10 weeks LMP as a result of the Delay Requirement will be unable to obtain a medication abortion in Tennessee.  Similarly, because surgical abortions are unavailable in Tennessee after 18 weeks LMP, a woman who is delayed past 18 weeks LMP may be prevented from obtaining an abortion altogether or forced to travel out of State in order to access care.

---

[19] Jenna Jerman, et al., *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, 49 Persp. on Sexual & Reprod. Health 95, 98 (2017), http://onlinelibrary.wiley.com/doi/10.1363/psrh.12024/epdf.

65.     The burdens imposed as a result of the Delay Requirement are also heightened for victims of domestic violence. An abuser may subject a woman to increased violence if the abuser knows she is pregnant, or try to prevent her from obtaining an abortion altogether.  Forcing a woman in this situation to make an additional trip increases the likelihood that her plans will be discovered by the abuser, which may in turn subject her to further abuse.

66.     And for a woman seeking an abortion after receiving a diagnosis of a severe or lethal fetal anomaly, the burden of making a separate, medically unnecessary visit, and delaying her procedure until after the requisite waiting period has elapsed, is especially cruel.  Forcing a woman in this situation to postpone her abortion for days, or even weeks, after she has already made the difficult decision to end her pregnancy only serves to make the experience that much more painful and distressing.

67.     Before the Delay Requirement went into effect, many of Plaintiffs' clinics and medical offices were already stretched thin in trying to schedule patients with only minimal wait times.  Women in some parts of Tennessee already had to wait at least several days, and in some cases, up to a week, in order to obtain an appointment for abortion services.

68.     As a result of the Delay Requirement, abortion clinics must now schedule an additional, medically unnecessary counseling visit for each patient.  The physician time and clinic space needed for these medically unnecessary appointments has reduced the physician time and clinic space available to serve patients who are there for other services and procedures, including abortion procedures.  In addition, some Plaintiffs have had to increase the cost of the abortion procedure in order to help offset the overhead costs to the clinic of arranging for and staffing the mandatory additional visit.

69.     Despite Plaintiffs' best efforts, since the Delay Requirement has taken effect, many women have been forced to wait a week, and sometimes two weeks or more, for their initial appointment to receive the state-mandated information.   After this initial visit, many of Plaintiffs' patients must now wait over a week for their appointment to return to the clinic to obtain the abortion.

70.     Thus, the Delay Requirement has forced some women seeking abortions in Tennessee to delay their abortion procedure by two to three weeks, and in some cases, even longer, from the time they initially call to schedule an appointment to the time they are actually able to obtain their abortion procedure.

71.     Plaintiffs cannot simply increase the number of appointments per day and/or extend their hours in an attempt to reduce these wait times, both because they do not have the staff and/or physical space available to do so, and because it would require further raising the cost of the procedure, putting abortion out of reach for even more Tennessee women.

72.     Rather than improving patient care, the Delay Requirement has burdened women with an additional, medically unnecessary visit to the health center, reduced the capacity of abortion clinics to provide timely, patient-centered, individualized care, and increased the health risks to patients.   In addition, it has often increased the cost of the procedure itself as well as significant ancillary costs such as transportation expenses, childcare expenses, and lost wages.

73.     It has also made it harder for a woman who wants to keep her healthcare decision private to prevent her employer, colleagues, family members—including an abusive partner— and others from finding out about her pregnancy and her decision to obtain an abortion.   Women may choose not to disclose their pregnancy or abortion for any number of personal reasons, including concerns about their own safety.

74.     Finally, the Delay Requirement is causing medical, psychological, and emotional harms to Tennessee women who have made the decision to end their pregnancies. It forces a woman to remain pregnant against her wishes for at least 48 hours, and often longer—even if she is suffering a pregnancy-related illness; even if the pregnancy is the result of rape or incest; and even if she has received a diagnosis of a severe, or lethal, fetal anomaly.

75.     Moreover, by imposing a mandatory delay for women seeking abortion—one that is not imposed on any other medical procedure—the Delay Requirement sends a message to women that the State does not trust women's decision-making capability. Singling out women seeking abortions from patients seeking all other types of medical procedures perpetuates the stereotype that women do not think carefully about this decision, and that they are less capable of making thoughtful and informed decisions about their health care than men.

76.     The burdens on women as a result of the Delay Requirement are compounded by other restrictions on abortion under Tennessee law that make abortion more costly and less accessible, including Tenn. Code Ann. § 56-26-134, which prohibits many private health insurance plans from providing abortion coverage—including for medically-necessary procedures; Tenn. Code Ann. § 9-4-5116, which limits abortion coverage in public health insurance plans; and Tenn. Code Ann. § 63-6-241, which prohibits abortion patients from utilizing telemedicine services despite the fact that Tennessee otherwise promotes telemedicine as a means of improving access to healthcare.

77.     Since going into effect, the Delay Requirement has drastically impacted abortion access in Tennessee by significantly increasing wait-times for appointments and the costs of the procedure at many clinics. These delays have in turn pushed some women to have an abortion at a later point in pregnancy, which increases the risks of the procedure and its costs; denies some

women the option of a medication abortion; and prevents others from accessing an abortion at all, forcing them to carry an unwanted pregnancy to term.

78.     While the travel and financial burdens imposed by the Delay Requirement harm all Tennessee women, they are particularly burdensome for low-income women who are already struggling to make ends meet, women experiencing intimate partner violence whose safety depends on whether they can keep their abortion decision confidential, women who must travel outside of their community in order to access care, women who are seeking abortion care due to a diagnosis of severe or lethal fetal anomaly, and women whose pregnancies impose health risks that do not pose an immediate threat of death or serious risk of substantial and irreversible impairment of a major bodily function.

## CLAIMS FOR RELIEF

### COUNT I
### (Substantive Due Process)

79.     The allegations of paragraphs 1 through 78 are incorporated as though fully set forth herein.

80.     The Delay Requirement imposes an undue burden on access to previability abortion by imposing substantial obstacles on women seeking previability abortions in Tennessee, without providing any corresponding benefit, in violation of the Due Process Clause of the Fourteenth Amendment.

### COUNT II
### (Equal Protection)

81.     The allegations of paragraphs 1 through 80 are incorporated as though fully set forth herein.

82.     The Delay Requirement denies equal protection of the laws to Plaintiffs and their

patients by singling out abortion for onerous and medically unnecessary restrictions not imposed on other medical procedures, and by discriminating against women on the basis of sex and gender stereotypes, in violation of the Equal Protection Clause of the Fourteenth Amendment.

## **<u>REQUEST FOR RELIEF</u>**

Plaintiffs respectfully request that this Court:

A.   Issue a declaratory judgment that the Delay Requirement is unconstitutional and unenforceable:

    a.   on its face; and/or

    b.   as applied to any woman or group of women entitled to relief; and/or

    c.   insofar as it requires a woman to be informed "in person" of certain information; and/or

    d.   insofar as it requires certain information to be provided by "the attending physician who is to perform the abortion" or "the referring physician"; and/or

B.   Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing the Delay Requirement:

    a.   on its face; and/or

    b.   as applied to any woman or group of women for whom it would serve as an undue burden on access to previability abortion services; and/or

    c.   insofar as it requires a woman to be informed "in person" of certain information; and/or

    d.   insofar as it requires certain information to be provided by "the attending physician who is to perform the abortion" or "the referring physician"; and/or

C.   Grant Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988; and/or

D. Grant such other and further relief as this Court may deem just, proper, and equitable.

Respectfully submitted,

*/s/ Scott P. Tift*
DAVID W. GARRISON (No. 24968)
SCOTT P. TIFT (No. 27592)
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202
Fax: (615) 252-3798
stift@barrettjohnson.com
dgarrison@barrettjohnson.com

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605
Tel: (423) 928-7175
jjlaw@jesseeandjessee.com

*Attorneys for Plaintiffs*

Autumn Katz*
Madeline Gomez*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3600
Fax: (917) 637-3666
akatz@reprorights.org
mgomez@reprorights.org

*Attorneys for Plaintiffs Adams & Boyle, P.C. and Memphis Center for Reproductive Health*

Jennifer Keighley**
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4749
Fax: (212) 247-6811
jennifer.keighley@ppfa.org

*Attorney for Plaintiffs Planned Parenthood*
*Greater Memphis Region and Planned Parenthood*
*Middle and East Tennessee*

Julia Kaye**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
jkaye@aclu.org

Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorneys for Plaintiff Knoxville Center for*
*Reproductive Health*

*Admitted *pro hac vice*
**Application for admission *pro hac vice*
forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing *Second Amended Complaint*

has been served on the following counsel of record through the Electronic Filing System on this

26th day of July, 2017:

**Alexander Stuart Rieger**
**Michael Alan Meyer**
**Steven Ashley Hart**
**Sue A. Sheldon**
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207
(615) 741-2408
Fax: (615) 532-5683
alex.rieger@ag.tn.gov
michael.meyer@ag.tn.gov
steve.hart@ag.tn.gov
sue.sheldon@ag.tn.gov

I further certify that a true and correct copy of the forgoing *Second Amended Complaint*

will be served on counsel for Defendant Allen in conjunction with the issuance and service of a

summons.

 */s/ Scott P. Tift*
Scott P. Tift