# Exhibit 1

| | | |
|---|---|---|
| ADAMS & BOYLE, P.C., on behalf of itself and its patients; MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself and its patients; PLANNED PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI, on behalf of itself and its patients; KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself and its patients; and DR. KIMBERLY LOONEY, on behalf of herself and her patients, | ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION |
| | ) | CASE NO. 3:15-cv-00705 |
| Plaintiffs, | ) ) | JUDGE FRIEDMAN |
| v. | ) ) | MAGISTRATE JUDGE FRENSLEY |
| HERBERT H. SLATERY III, Attorney General of Tennessee, in his official capacity; LISA PIERCEY, M.D., Commissioner of the Tennessee Department of Health, in her official capacity; W. REEVES JOHNSON, JR., M.D., President of the Tennessee Board of Medical Examiners, in his official capacity; GLENN R. FUNK, District Attorney General of Metropolitan Nashville and Davidson County, in his official capacity; AMY WEIRICH, District Attorney General of Shelby County, in her official capacity; BARRY P. STAUBUS, District Attorney General of Sullivan County, in his official capacity; CHARME P. ALLEN, District Attorney General of Knox County, in her official capacity; WILLIAM LEE, Governor of Tennessee, in his official capacity; and RENE SAUNDERS, M.D., Chair of the Tennessee Board for Licensing Health Care Facilities, in her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) | |

## [PROPOSED] SUPPLEMENTAL COMPLAINT FOR TEMPORARY AND INJUNCTIVE RELIEF

Plaintiffs Adams & Boyle, P.C., Memphis Center for Reproductive Health, Planned Parenthood of Tennessee and North Mississippi, Knoxville Center for Reproductive Health, and Dr. Kimberly Looney (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this complaint against the above-named Defendants, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.    Plaintiffs Adams & Boyle, P.C., Memphis Center for Reproductive Health, and Planned Parenthood of Tennessee and North Mississippi challenged Tennessee's requirement that women seeking an abortion make an additional, medically unnecessary trip at least 48 hours before they can obtain an abortion in order to attend an in-person meeting with the physician and receive certain state-mandated information. Tenn. Code Ann. § 39-15-202(a)-(h) (the "Delay Requirement").

2.    The Delay Requirement forces every woman seeking an abortion in Tennessee to remain pregnant against her will and against her physician's medical judgment, even after she has made the decision to terminate her pregnancy. It subjects women to increased medical risk, emotional harms, protracted delays, increased costs, and other burdens.

3.    The Court held a trial on the merits of the constitutional challenge to the Delay Requirement in September 2019, and the parties subsequently submitted proposed findings of fact and conclusions of law for the Court's consideration. A decision is pending.

4.    Plaintiffs now supplement their case to bring a constitutional challenge under 42 U.S.C. § 1983 to Governor Bill Lee's April 8, 2020 Executive Order 25, "An Order To Reduce The Spread Of Covid-19 By Limiting Non-Emergency Healthcare Procedures" (the "Executive Order" or the "Order"), as it applies to procedural abortions in Tennessee. The Executive Order is attached as Exhibit A. It took effect on April 9, 2020, and will remain in effect until 12:01 a.m., Central Daylight Time, on April 30, 2020. The Executive Order will operate as a complete ban on

procedural (sometimes called "surgical") abortions in the State for some women. For others, it will impose extreme burdens by forcing them to travel long distances (including out of state) in the midst of the COVID-19 pandemic, delaying their ability to access care for weeks (and potentially even longer), and exposing them to increased medical risk.

5. Citing the ongoing COVID-19 pandemic and the need to "preserv[e] personal protective equipment for emergency and essential needs" and prevent "community spread of COVID-19 through non-essential patient-provider interactions," the Order states that "[a]ll healthcare professionals and healthcare facilities in the State of Tennessee shall postpone surgical and invasive procedures that are elective and non-urgent." Executive Order at 2. Elective and non-urgent procedures are defined as "those procedures that can be delayed until the expiration of this Order because they are not required to provide life-sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider." *Id*. at 2-3.

6. The Executive Order carries severe, including criminal, penalties. In light of its broad restrictions, Plaintiffs were forced to cancel dozens of procedural abortion appointments that were scheduled to take place after the Executive Order took effect, including for patients who had already been forced by the Delay Requirement to travel to the Plaintiffs' clinics to receive state-mandated counseling and then returned home to wait the required 48 hours before obtaining an abortion. Numerous future appointments scheduled for this month are now being cancelled, throwing abortion access in Tennessee into disarray.

7. Application of Tennessee's Executive Order to ban all procedural abortions contravenes the guidance of leading medical and health authorities regarding the provision of health care during the COVID-19 pandemic. The American College of Obstetricians and

Gynecologists ("ACOG") has issued a joint public statement with numerous major medical organizations in response to the COVID-19 pandemic, explaining that abortion is essential health care for which a delay of weeks, "or in some cases days," increases the risks to patients' health and safety. The American Medical Association ("AMA") also issued a statement denouncing efforts to "ban or dramatically limit women's reproductive health care" at this time.

8. For nearly fifty years, the U.S. Supreme Court has recognized the fundamental federal constitutional right to make the profoundly personal decision whether to terminate a pregnancy. *See Roe v. Wade*, 410 U.S. 113 (1973). The Supreme Court has repeatedly recognized that this right is foundational to equality and to respect for the dignity, autonomy, and bodily integrity of all people.

9. By prohibiting procedural abortions in Tennessee, the Executive Order clearly violates the fundamental right of Plaintiffs' patients to seek an abortion before viability, in contravention of this long-standing Supreme Court precedent. *Roe*, 410 U.S. at 163–64; *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992). Even if the Order is scrutinized under the "undue burden" test that applies to laws regulating (not banning) abortion, the burdens on patients far outweigh any state interest here and constitute "a plain, palpable invasion of rights" under *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (explaining that a state's exercise of police power is invalid where it intrudes upon fundamental rights or fails to actually further the asserted aims).

10. Indeed, federal courts have blocked similar measures banning abortion during the COVID-19 pandemic. *See Robinson v. Marshall*, No. 2:19-cv-365 (M.D. Ala. Apr. 12, 2020) (ECF No. 137); *Planned Parenthood Ctr. for Choice v. Abbott*, No. A-20-CV-323-LY, 2020 WL

1815587 (W.D. Tx. April 9, 2020);[1] *Southwind Women's Center LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094, at *3 (W.D. Okla. Apr. 6, 2020), *appeal dismissed*, No. 20-6045 (10th Cir. Apr. 13, 2020); *Pre-Term Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360, slip op. at 6 (S.D. Ohio Mar. 30, 2020), *appeal dismissed*, No. 20-3365, 2020 WL 1673310 (6th Cir. Apr. 6, 2020).

11.     As explained *infra*, forcing pregnant patients to remain pregnant against their will for weeks, or more likely months, furthers no state interests while imposing significant and, in many cases, insurmountable burdens on patients seeking essential health care. The Executive Order, in combination with the Delay Requirement, will compound the burdens already faced by women seeking abortion in Tennessee.  Some will be not be able to obtain an abortion at all because they will pass the limit at which abortion is provided in the State while the Executive Order is in effect.  And even after the Executive Order is lifted, there will be an extreme backlog of patients in need of care, some of whom may be forced to obtain a costlier, more complex, and longer procedural abortion, or who may be close to the point at which abortion is no longer available in Tennessee.  The additional delay imposed by the Delay Requirement—forcing women to make two separate trips to the clinic with all of the attendant hurdles that entails—will make it even more difficult for women to access abortion, delaying many and preventing some patients from accessing abortion at all.

---

[1] The Fifth Circuit has granted a partial administrative stay of the District Court's order, leaving in place the temporary restraining order as to medication abortion and "abortions for women who would be past Texas's legal limit—22 weeks LMP—for abortion by April 22." *In re Abbott*, No. 20-50296, at 3, 5 (5th Cir. Apr. 13, 2020). Plaintiffs have filed an emergency application with the Supreme Court to vacate the stay. *See* Applicants' Emergency Application to Justice Alito to Vacate Administrative Stay of Temporary Restraining Order Entered by the United States Court of Appeals for the Fifth Circuit, *Planned Parenthood Center for Choice, et al., v. Greg Abbott, Governor of Texas, et al.*, No. 19A1019 (Apr. 11, 2020).

12.     Without injunctive relief, Plaintiffs will be forced to continue turning away patients seeking time-sensitive abortion care, thereby inflicting immediate and irreparable harm for which no adequate remedy at law exists. At a minimum, those patients will be prevented from obtaining an abortion for several weeks, and likely longer, given that the COVID-19 pandemic is predicted to last far beyond the Order's stated expiration date. Some will not be able to access abortion at all and will be forced to carry pregnancies to term.

13.     Not only will these patients be deprived of their constitutional right to essential healthcare and self-determination, but forcing them to continue their pregnancies will undermine the very goals identified in the Order: "preserving personal protective equipment for emergency and essential needs" and preventing "community spread of COVID-19 through non-essential patient-provider interactions." Executive Order at 2. Forcing a patient to remain pregnant imposes far greater strains on an already-taxed healthcare system, as prenatal care and delivery involve more patient-provider interactions, including prenatal visits, additional screening tests, and, ultimately, hospital admission and labor and delivery, including a potential caesarean section, which is major abdominal surgery.  Alternatively, some patients who have the means will attempt to obtain care by traveling to another state, thus increasing the risk of COVID-19 transmission but ultimately conserving no personal protective equipment ("PPE"). Under either scenario, preventing patients from accessing abortion in Tennessee will, contrary to the stated goals of the Executive Order, *increase* the risks, both to patients and the rest of Tennessee's population, of contracting COVID-19 and result in much greater depletion of essential items needed to care for patients, including hospital beds and PPE. For all these reasons, the Executive Order's ban on pre-viability procedural abortion does nothing to further the Order's asserted goals. Plaintiffs therefore seek declaratory and injunctive relief.

6

## JURISDICTION AND VENUE

14.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

15.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

16.    Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PLAINTIFFS

17.    Plaintiff Adams & Boyle, P.C., is a professional corporation organized under the laws of Tennessee.  It is a holding company for Bristol Regional Women's Center in Bristol, Tennessee (the "A & B Bristol Clinic"). The A & B Bristol Clinic has operated continuously since 1980.  It provides an array of gynecological and reproductive health services in a private physician's office atmosphere, including procedural abortions up to 12 weeks, 6 days LMP[2] (prior to the Executive Order) and medication abortions up to 9 weeks, 6 days LMP.  Adams & Boyle, P.C., sues on its own behalf and on behalf of its patients.

18.    Plaintiff Memphis Center for Reproductive Health is a nonprofit organization that operates CHOICES, a women's health clinic in Memphis, Tennessee ("Choices Memphis").  In operation since 1974, Choices Memphis strives to empower individuals to make informed decisions about their reproductive health; the clinic offers a full range of sexual and reproductive health care, including gynecology care, fertility services, health care services for lesbian, gay, and transgender individuals, testing and treatment for sexually transmitted infections, HIV testing and

---

[2] "LMP" denotes the first day of a pregnant woman's "last menstrual period." It is the standard measure of gestational age used by medical professionals.

7

referrals, midwifery care, medication abortions up to 11 weeks LMP, and, prior to the Executive Order, procedural abortions up to 15 weeks LMP. Choices Memphis is a member of the National Abortion Federation. Choices Memphis sues on its own behalf and on behalf of its patients.

19.     Planned Parenthood of Tennessee and North Mississippi ("PPTNM") or ("Planned Parenthood") was formed in June 2018 by the merger of two prior Planned Parenthood entities: Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET"). Planned Parenthood has four health centers in Tennessee at which abortion is provided; two in Memphis, one in Nashville, and one in Knoxville. The first Memphis health center provides medication abortion up to 11 weeks 0 days LMP and, prior to the Executive Order, procedural abortion up to 19 weeks, 6 days LMP; the second Memphis health center and the Knoxville health center provide medication abortion up to 11 weeks 0 days LMP; and the Nashville health center provides medication abortion up to 11 weeks 0 days LMP and, prior to the Executive Order, procedural abortion up to 19 weeks, 6 days LMP. Planned Parenthood provides approximately 6,500 abortions in Tennessee per year. In addition to abortion care, Planned Parenthood provides well-person care, contraception, testing and treatment for sexually transmitted infections, gender affirming care, and care for other gynecological concerns. Planned Parenthood's philosophy of care is to provide nonjudgmental sexual and reproductive healthcare to all, ensuring patients receive unbiased and complete information. PPTNM sues on its own behalf and on behalf of its patients.

20.     Plaintiff Knoxville Center for Reproductive Health ("The Knoxville Center") is a non-profit reproductive health center that has been providing high-quality reproductive health care services to patients since 1975.  The Knoxville Center provides a range of reproductive health services, including cancer screenings, testing and treatment for sexually transmitted infections,

procedural abortions up to 15 weeks LMP (prior to the Executive Order), and medication abortions up to 11 weeks LMP. The Knoxville Center sues on its own behalf and on behalf of its patients.

21.    Plaintiff Dr. Kimberly Looney is an obstetrician/gynecologist licensed to practice in the State of Tennessee. She has been the Chief Medical Officer of Plaintiff PPTNM since 2019, and has provided care at PPTNM since 2008. Dr. Looney provided procedural abortions at PPTNM up to 19 weeks, 6 days LMP prior to the Executive Order, and provides medication abortions at PPTNM up to 11 weeks LMP. Dr. Looney faces misdemeanor criminal penalties for violations of the Executive Order and potential medical licensure penalties. Dr. Looney sues on behalf of herself and her patients.

## DEFENDANTS

22.    Defendant Herbert H. Slatery III is the Attorney General of Tennessee. He is responsible for defending Tennessee laws against constitutional challenge. *See* Tenn. Code Ann. § 8-9-109(b)(9). Further, he has exclusive authority to prosecute criminal violations in Tennessee's appellate courts. *See* Tenn. Code Ann. § 8-6-109(b)(2); *State v. Simmons*, 610 S.W.2d 141, 142 (Tenn. Crim. App. 1980). He is sued in his official capacity.

23.    Defendant Lisa Piercey, M.D. is the Commissioner of the Tennessee Department of Health, and has general supervisory duties to protect the interests of health and life of the citizens of Tennessee. *See* Tenn. Code Ann. § 68-1-204. Commissioner Piercey has advised that failure to comply with Executive Order 25 is a "class A misdemeanor and may result in possible disciplinary action by [health care providers'] respective board." Apr. 10, 2020 Letter from Commissioner Lisa Piercey, Tenn. Dep't of Health, to Health Care Providers (attached as Exhibit B). Commissioner Piercey is sued in her official capacity.

24.    Defendant W. Reeves Johnson, Jr., M.D., is the President of the Tennessee Board of Medical Examiners. The Board of Medical Examiners is empowered to take disciplinary action

against a physician who violates various laws and regulations including those "governing abortion," Tenn. Code Ann. § 63-6-214(b).  Dr. Johnson is sued in his official capacity.

25.    Defendant Glenn R. Funk is the District Attorney General for Nashville.  He is responsible for prosecuting all violations of the state criminal statutes occurring in Metropolitan Nashville and Davidson County.  Tenn. Code Ann. § 8-7-103. Violation of an executive order is a class A misdemeanor. Tenn. Code Ann. § 58-2-120.  Mr. Funk is sued in his official capacity.

26.    Defendant Amy Weirich is the District Attorney General for Shelby County.  She is responsible for prosecuting all violations of the state criminal statutes occurring in Shelby County, which includes Memphis.  Tenn. Code Ann. § 8-7-103. Violation of an executive order is a class A misdemeanor. Tenn. Code Ann. § 58-2-120. Ms. Weirich is sued in her official capacity.

27.    Defendant Barry P. Staubus is the District Attorney General for Sullivan County.  He is responsible for prosecuting all violations of the state criminal statutes occurring in Sullivan County, which includes Bristol.  Tenn. Code Ann. § 8-7-103. Violation of an executive order is a class A misdemeanor. Tenn. Code Ann. § 58-2-120. Mr. Staubus is sued in his official capacity.

28.    Defendant Charme P. Allen is the District Attorney General for Knox County.  She is responsible for prosecuting all violations of the state criminal statutes occurring in Knox County, which includes Knoxville.  Tenn. Code Ann. § 8-7-103. Violation of an executive order is a class A misdemeanor. Tenn. Code Ann. § 58-2-120. Ms. Allen is sued in her official capacity.

29.    Defendant William Lee is the Governor of Tennessee and the author of the Executive Order, which he issued pursuant to his emergency authority.[3] He is sued in his official capacity.

---

[3] Tenn. Code Ann. § 58-2-107(e).

He has authority to enforce violations of the Executive Order pursuant to Tenn. Code Ann. § 58-2-107.

30.    Defendant Rene Saunders, M.D. is the Chair of the Board for Licensing Health Care Facilities. The Board for Licensing Health Care Facilities has the authority to discipline licensed ambulatory surgical treatment centers ("ASTCs") for, among other things, violations of laws and regulations; permitting, aiding or abetting the commission of any illegal act in the ASTC; or conduct or practice found by the board to be "detrimental to the health, safety, or welfare of the patients of the ASTC." Tenn. Comp. R. & Regs. 1200-08-10-.03(1); Tenn. Code Ann. § 68-11-207. Dr. Saunders is sued in her official capacity.

## FACTUAL ALLEGATIONS

### I. Background on Abortion

31.    Legal abortion is a vital, safe, and common form of healthcare. There is no typical abortion patient: individuals seek abortions for a multitude of personal and often complex reasons. Nearly one in four women in the United States will obtain an abortion by age forty-five.

32.    Pregnancy is commonly measured from the first day of the pregnant person's last menstrual period ("LMP"). A full-term pregnancy has a duration of approximately forty weeks LMP.

33.    There are generally two methods of providing abortion care: medication abortion and procedural abortion.

34.    Medication abortion involves taking two medications—mifepristone, which is ingested in the clinic, and misoprostol, which is taken 24 to 48 hours later at a location of the patient's choosing, typically at home. The pregnancy is passed outside the facility, in a process similar to miscarriage. The use of mifepristone in combination with misoprostol is safe and effective to terminate pregnancies up to 11 weeks (or 77 days) LMP.

11

35.     Although procedural abortion is often referred to as "surgical" abortion, it is not what is commonly understood to be surgery, as procedural abortion involves no incision, no need for general anesthesia, and no sterile field.  Procedural abortion involves the use of instruments to gently dilate the cervix and evacuate the contents of the uterus.  Procedural abortion is a straightforward and brief procedure; it is almost always performed in an outpatient setting and may at times involve local anesthesia or conscious sedation to make the patient more comfortable. Up to about 14 to 16 weeks LMP, procedural abortion is performed by the aspiration technique, which takes about five to ten minutes and uses gentle suction to empty the uterus.

36.     Procedural abortion beyond this point requires some additional provider skills and equipment. After 14 to 16 weeks LMP, physicians use the dilation and evacuation ("D&E") technique to adequately dilate the cervix and empty the uterus, which involves more in-clinic time and additional staff.  Starting around 18 weeks LMP, procedural abortion is performed as a two-day procedure because the patient receives medications to dilate her cervix the day before the procedure.

37.     Up to 11 weeks LMP, patients wishing to terminate their pregnancy may choose between medication and procedural abortion. However, after 11 weeks LMP, only procedural abortion is available. For some patients, such as those who are at increased risk of bleeding, procedural abortion is medically indicated over medication abortion. The Executive Order, by banning all procedural abortions, prevents these patients from obtaining the care they need.

38.     Because pregnancy is not a static condition, abortion is necessarily time-sensitive healthcare. In Tennessee, abortion is not generally accessible past 19 weeks, 6 days LMP.

39.     Both medication and procedural abortion are extremely safe, and safer than many other common medical procedures.  Complications are rare and seldom result in the need for

hospital care. However, the risks of complications increase as gestational age advances, as do the health risks associated with pregnancy itself.[4]

40. Abortion is far safer than the alternative—carrying a pregnancy to term. Nationally, the risk of death associated with childbirth is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions.[5] The risk of death from childbirth in Tennessee is even higher, and the state has one of the highest maternal mortality rates in the United States.[6] In 2019, the maternal mortality ratio in Tennessee was 35.8 deaths per 100,000 live births reported.[7] For Black women, the disparity is even more stark: 55 deaths for every 100,000 births.[8] By comparison, there are 0.6 deaths per 100,000 legal abortions.[9] Thus, even with an uncomplicated pregnancy in an otherwise healthy individual, carrying a pregnancy to term and giving birth poses serious medical risks and can have medical and physical consequences.

---

[4] Linda A. Bartlett, et al., *Risk Factors for Legal Induced Abortion-Related Mortality in the United States*, 103 Obstetrics & Gynecology 729, 735 (2004), https://www.researchgate.net/publication/8648767_Risk_Factors_for_Legal_Induced_Abortion-Related_Mortality_in_the_United_States.

[5] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Am. J. Obstetrics & Gynecology 215, 217 (2012), http://unmfamilyplanning.pbworks.com/w/file/fetch/119312553/Raymond%20et%20al-Comparative%20Safety.pdf (hereinafter "Raymond et al.").

[6] *See* United Health Found., *America's Health Rankings: Maternal Mortality in Tennessee* (2019), https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality_a/state/TN.

[7] *Id.*

[8] *Id.*

[9] Raymond et al.; *see also* Tara C. Jatloui et al., *Abortion Surveillance—United States, 2015*, 67 Morbidity & Mortality Weekly Rep. Surveillance Summaries 1, 45 tbl. 23 (2018), https://www.cdc.gov/mmwr/volumes/67/ss/pdfs/ss6713a1-H.pdf (ranging from 0.00052% to 0.00078% for approximately five-year periods from 1978 to 2014).

41.     Delaying a woman who seeks an abortion to a later point in pregnancy will expose her to increased medical risks, force her to undergo a more complex, lengthier procedure, and impose greater financial costs.  And delaying a woman seeking an abortion beyond the cutoff point at which abortion services are available—forcing her to either travel out of state to obtain an abortion, attempt a medically unsupervised abortion, or carry an unwanted pregnancy to term—increases her risks of complications and death.

## II.     The COVID-19 Pandemic and Plaintiffs' Health and Safety Measures in Response

42.     COVID-19, first identified in December 2019,[10] has grown to a worldwide pandemic.  The disease has spread to over 180 countries, infecting millions of people and killing more than 119,000.[11]  In the United States, the virus has reached every state, including nearly 5500 confirmed cases and over 110 deaths in Tennessee as of the time of filing.[12]  Federal and state officials and medical professionals expect a surge of infections that may last for a year or eighteen months[13] and test the limits of the healthcare system.[14] Vanderbilt University Medical Center researchers predict that in Tennessee COVID-19 hospitalizations will peak in May or June.[15]

---

[10] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. Times, https://www.nytimes.com/article/coronavirus-timeline.html (updated Apr. 7, 2020).

[11] Johns Hopkins Univ. of Med., *Coronavirus COVID-19 Global Cases by the Centers for Systems Science and Engineering (CSSE) at John Hopkins University (JHU)*, https://coronavirus.jhu.edu/map.html (last visited Apr. 13, 2020).

[12] N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states (last visited Apr. 13, 2020).

[13] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[14] Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, https://www.cdc.gov/2019-ncov/healthcare-facilities/guidance-hcf.html (last updated Feb. 29, 2020).

[15] Jake Lowary, *Vanderbilt Health Policy COVID-19 model finds evidence of flattening curve,*

43.     Since the COVID-19 crisis began, Plaintiffs have been diligent in protecting the health of their patients and staff while providing high-quality, timely abortion care.  Even before the Executive Order was issued, they proactively adopted recommendations and guidelines published by the Centers for Disease Control and Prevention ("CDC"), the World Health Organization, the Centers for Medicare and Medicaid Services, and the National Abortion Federation regarding COVID-19, while continuing to comply with all relevant Tennessee laws and regulations governing abortion. Plaintiffs had already implemented measures specifically designed to serve the stated goals of the Order—conserving needed medical resources and preventing the spread of the virus—while continuing to ensure access to essential care.

44.     Procedural abortions do not require the use of any hospital resources that may be needed for the COVID-19 response, such as hospital beds, ICU beds, or ventilators.  Indeed, procedural abortion takes place in an outpatient setting—either a clinic or a physician's office. Procedural abortion involves only minimal use of PPE: typically gloves, a surgical mask or reusable plastic face shield, and either reusable scrubs or a disposable gown or smock. None of Plaintiffs' physicians use the N95 respirators that are in short supply during this COVID-19 pandemic to provide abortion care. Moreover, because procedural abortions are exceedingly safe, need for hospital-based care following a complication is exceedingly rare.

45.     A procedural abortion at a later stage in pregnancy requires more PPE and essential resources than a procedural abortion at an earlier stage. This is particularly true of two-day procedures, which involve more PPE and greater patient-provider interactions. However, the PPE

---

recommends social distancing policies continue, VUMC Reporter (Apr. 9, 2020), https://news.vumc.org/2020/04/09/vanderbilt-health-policy-covid-19-model-finds-evidence-of-flattening-curve-recommends-distancing-policies-continue/ (predicting that, with regard to Tennessee, "if the current social distancing policies continue to reduce the spread of the disease, there would be an estimated peak of hospitalizations in mid-June. If the state were to experience additional gains from social distancing, under that more optimistic scenario the peak of hospitalizations could be lower and could be as early as mid-May").

required for procedural abortion at any stage in pregnancy is substantially less than that required for a woman who needs prenatal care during pregnancy, and of course, one who carries a pregnancy to term and gives birth.

46.     Thus, the Plaintiffs' provision of abortion care does not burden Tennessee hospitals or divert hospital resources, equipment, or bed capacity away from the fight against COVID-19. Nevertheless, Plaintiffs have made every effort to reduce person-to-person contact and conserve PPE while at the same time balancing the need to provide essential healthcare to patients. For example, where medically appropriate, and based on the particularized needs of the facilities, Plaintiffs have reduced the number of staff in the clinic at any given time and restricted the staff who can be present in the procedure room during procedural abortion to only those that are medically essential or required by law. They have postponed or cancelled non-essential procedures, such as wellness visits, and are providing services via telephone whenever possible and in accordance with the law. When providing procedures which cannot be delayed, Plaintiffs are making every effort to conserve PPE and other essential resources and to reduce the possibility of spread and transmission of COVID-19.

47.     The Plaintiffs are also screening patients for symptoms over the telephone prior to their appointment and when they arrive for their appointments, prior to entering the facilities. Any person exhibiting a fever or any other symptoms of COVID-19 is not permitted in the Plaintiffs' clinics. Plaintiffs' staff are maintaining social distancing by, for example, staggering appointments, not allowing patients to bring a support person to their appointment unless absolutely necessary (such as for minors), and keeping patients in separate rooms whenever possible. Additionally, Plaintiffs' staff continuously disinfect surfaces, doorknobs, and other frequently touched surfaces throughout the day.

48.     At any given time, the Plaintiffs have fewer people inside their healthcare facilities than they normally had before the COVID-19 pandemic.

### III.     Governor Lee's Executive Order

49.     On March 12, Governor Bill Lee declared a State of Emergency in Tennessee "to facilitate the treatment and containment of COVID-19."[16] This invoked the Governor's emergency powers to temporarily suspend "any law, order, rule or regulation prescribing the procedures for conduct of state business or the orders or rules or regulations of any state agency" if strict compliance would prevent, hinder or delay necessary action in coping with the emergency. Tenn. Code Ann. § 58-2-107(e)(1).

50.     On March 23, 2020, Governor Lee signed Executive Order No. 18 ("EO 18"), which prevented hospitals and ambulatory surgical treatment centers from performing non-essential procedures, but explicitly exempted "pregnancy-related visits and procedures" as well as "emergency or trauma-related procedures where postponement would significantly impact the health, safety, and welfare of the patient."[17] EO 18 defined non-essential procedures as "any medical procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient, as determined by a licensed medical provider."

51.     Before the expiration of EO 18, Governor Lee signed Executive Order 25, which supersedes the provisions of EO 18. *See* Executive Order at 3. Executive Order 25 states that its purpose is to "preserv[e] personal protective equipment for emergency and essential needs" and

---

[16] TN Office of the Governor, *Gov. Bill Lee Issues Executive Order Declaring State of Emergency in Response to COVID-19* (Mar. 12, 2020), https://www.tn.gov/governor/news/2020/3/12/gov--bill-lee-issues-executive-order-declaring-state-of-emergency-in-response-to-covid-19.html.

[17] Governor Bill Lee, *Executive Order No. 18, An Order To Reduce the Spread of COVID-19 By Limiting Non-Emergency Healthcare Procedures* (Mar. 23, 2020), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee18.pdf.

prevent "community spread of COVID-19 through non-essential patient-provider interactions." *Id.* at 2.

52.    The Executive Order explains that "the American College of Surgeons has recommended that each hospital, health system, and surgeon thoughtfully review all scheduled elective procedures with a plan to minimize, postpone, or cancel electively scheduled operations, endoscopies, or other invasive procedures and to immediately minimize use of essential items needed to care for patients, including, but not limited to, ICU beds, personal protective equipment, terminal cleaning supplies, and ventilators." Executive Order at 1.

53.    The Executive Order describes personal protective equipment as including, but not limited to, "medical gowns, N95 masks, surgical masks, TYVEK suits, boot covers, gloves, and/or eye protection." *Id*. at 3.

54.    The Executive Order took effect at 12:01 a.m., Central Daylight Time, on April 9, 2020, and is in effect until 12:01 a.m., Central Daylight Time, on April 30, 2020. A violation of an executive order is a class A misdemeanor and can lead to various civil penalties, including possible disciplinary action by a licensing board. *See* Exhibit B; Tenn. Code Ann. § 58-2-120.

55.    In a previous executive order, Governor Lee observed that "providing essential healthcare services in a manner that minimizes the continued spread of COVID-19 requires the use of alternative delivery mechanisms to protect healthcare providers and patients," and suspended several restrictions on the practice of telemedicine in Tennessee, including laws governing who may provide services via telehealth.[18]

---

[18] *See* Governor Bill Lee, *Executive Order 20, An Order Amending Executive Order No. 15 Suspending Provisions of Certain Statutes and Rules and Taking Other Necessary Measures in order to Facilitate the Treatment and Containment of COVID-19* (Mar. 26, 2019), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee20.pdf.

56. However, unlike other healthcare providers, it is unlawful for Plaintiffs to transition abortion services to telehealth, as a result of separate, medically unnecessary abortion-specific statues and regulations. State law prohibits the use of telehealth for medication abortion. Tenn. Code Ann. § 63-6-241.

## IV. The Executive Order Will Harm Patients

57. As trusted healthcare providers, Plaintiffs understand their responsibility to be there when their patients need them most. Abortion was essential healthcare before COVID-19, and the economic upheaval, housing insecurity, and rising unemployment that so many are now experiencing have only increased patients' needs for abortion care and made timely access even more vital.

58. Within the last month, a group of preeminent national medical and leading health organizations issued a joint statement on "Abortion Access During the COVID-19 Outbreak." The guidance instructs that abortion is an essential healthcare service and abortion services should not be delayed during this public health emergency. Specifically, ACOG stated: "To the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks or potentially make it completely inaccessible."[19] These groups emphasized that "[t]he consequences of being unable to

---

[19] Am. Coll. of Obstetricians & Gynecologists, Am. Board of Obstetrics & Gynecology, Am. Ass'n of Gynecologic Laparoscopists, Am. Gynecological & Obstetrical Soc'y, Am. Soc'y for Reprod. Med., Soc'y for Acad. Specialists in Gen. Obstetrics & Gynecology, Soc'y of Fam. Plan., and Soc'y for Maternal-Fetal Med., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak [hereinafter "Joint Statement on Abortion Access During the COVID-19 Outbreak"]; *see also* Am. Coll. of Obstetricians & Gynecologists, Am. Ass'n of Gynecologic Laparoscopists, Am. Soc'y for Reprod. Med., Am. Urogynecologic Soc'y, Soc'y of Fam. Plan., Soc'y of Gynecologic Surgeons, Soc'y for

obtain an abortion profoundly impact a person's life, health, and well-being."[20]

59.     The AMA, American Nurses Association, and American Hospital Association also issued a statement "urging the public to #StayHome as we reach the critical stages of our national response to COVID-19," but stressed that "[o]f course, those with urgent medical needs, including pregnant women, should seek care as needed."[21]   And the AMA went further, issuing a separate statement lamenting as "unfortunate that elected officials in some states are exploiting this moment to ban or dramatically limit women's reproductive health care, labeling procedures as 'non-urgent.'"[22] The AMA stated that "[a]t this critical moment and every moment, physicians—not politicians—should be the ones deciding which procedures are urgent-emergent and need to be performed, and which ones can wait, in partnership with patients."[23]

60.     Contrary to this guidance from leading medical organizations, the Executive Order has effectively banned abortion after eleven weeks of pregnancy, and even earlier for those patients who are ineligible for medication abortion.

61.     Although the Order currently remains in force until April 30, 2020, experts believe the coronavirus pandemic will last a year to eighteen months.[24] Given the criminal and other penalties attached to violations of the Order, Plaintiffs have been and will continue to be forced to

---

Maternal-Fetal Med., and Soc'y of Gynecologic Oncology, *Joint Statement on Elective Surgeries* (Mar. 16, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-elective-surgeries (pregnancy-related procedures for which delay will negatively affect patient health and safety should not be delayed).

[20] Joint Statement on Abortion Access During the COVID-19 Outbreak, *supra* note 19.

[21] Am. Med. Ass'n, Am. Hosp. Ass'n, and Am. Nurses Ass'n: *#StayHome to confront COVID-19* (Mar. 24, 2020), https://www.ama-assn.org/press-center/press-releases/ama-aha-ana-stayhome-confront-covid-19.

[22] Am. Med Ass'n, *AMA statement on government interference in reproductive health care* (Mar. 30, 2020), https://www.ama-assn.org/press-center/ama-statements/ama-statement-government-interference-reproductive-health-care.

[23] *Id.*

[24] *See* Grady, *supra* note 13.

cancel appointments and turn away patients in need of care, with no guarantee or indication that the Order will not be extended even further.

62. Meanwhile, the Delay Requirement already imposes significant burdens on patients. Indeed, for those patients seeking care after the Executive Order is lifted, the Delay Requirement will further delay patients' ability to access abortion care in Tennessee, preventing some patients from accessing care at all.

63. In addition, Tennessee prohibits Medicaid and insurance coverage of abortion in state exchanges established by the Affordable Health Act. Tenn. Code Ann. § 56-26-134. Patients seeking abortions under the age of 18 must obtain parental consent or a judicial bypass, either of which can delay access to care. Tenn. Code Ann. § 37-10-303. During the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity, minimal public transit availability, and limited childcare assistance due to mandatory social-distancing and shelter-in-place orders.

64. Abortion care is only available during a limited window of time during a pregnancy, and these legal restrictions make abortion harder to access with each passing week. While patients generally seek abortion as soon as they are able, most of Plaintiffs' patients are low-income and many face financial and logistical obstacles that can delay their access to abortion. For example, low-wage workers often have no paid time off or sick leave, so even if a pregnant worker is able to get time off work for an abortion appointment, they will likely have to forgo part of a paycheck. And if patients have lost their jobs it will be even more difficult to afford an abortion. Patients facing long travel distances typically must arrange and pay for transportation and arrange to take time off work, and also arrange and pay for childcare while they travel to their abortion appointments.

65.     Of course, for many women who seek abortion, leaving the state for care is entirely out of reach. Women seeking abortion are disproportionately poor: approximately 75 percent of women having abortions in the United States in 2014 were poor or low-income  (i.e., have incomes of less than 199 percent of the federal poverty level).[25]  Similarly, many of Plaintiffs' patients are poor or low-income—indeed, the majority have incomes at or below 110 percent of the federal poverty level. Poor and low-income patients routinely face barriers to accessing health care.

66.     All of these obstacles are exacerbated by the COVID-19 crisis, as patients seeking abortion care grapple with layoffs and other work disruptions, and the closure of schools and childcare facilities.[26] Unemployment claims are soaring; indeed, during the week ending on April 4, 2020, the number of unemployment claims in Tennessee rose to 116,141 initial claims – a 23,641 increase from the 92,500 initial claims filed the previous week.[27] People who receive health insurance through their employers are being laid off and left without coverage for themselves and their families.[28] And limitations placed on travel as a result of COVID-19 further exacerbate the obstacles faced by patients.

----

[25] Jenna Jerman, Rachel K. Jones, & Tsuyoshi Onda, *Characteristics of Abortion Patients in 2014 and Changes Since 2008* at 11, Guttmacher Inst. (May 2016*)*, https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[26] *See, e.g.*, Dylan Aycock, *Tennessee residents have filed nearly 250,000 unemployment claims in past three weeks*, Apr. 9, 2020, https://communityimpact.com/nashville/southwest-nashville/economy/2020/04/09/tennessee-residents-have-filed-nearly-250000-unemployment-claims-in-past-three-weeks/; *Gov. Lee asks schools to remain closed through late April,* News Channel 11, Mar. 24, 2020, https://www.wjhl.com/local-coronavirus-coverage/gov-lee-asks-schools-to-remain-closed-through-late-april/; Carley Gordon, *Parents still paying for daycare centers that are closed during coronavirus pandemic*, Mar. 24, 2020, https://www.wsmv.com/news/parents-still-paying-for-daycare-centers-that-are-closed-during-coronavirus-pandemic/article_39b22308-6e34-11ea-af7e-f7b64a4786cf.html.

[27] U.S. Dep't of Labor, *Unemployment Insurance Weekly Claims Report* (Apr. 9, 2020), https://www.dol.gov/ui/data.pdf.

[28] Jason Lemon, *Over 7 Million Americans to Lose Health Insurance During Coronavirus Pandemic, 1.5 Million Have Already Lost Coverage, New Study Predicts*, Apr. 8, 2020,

67.     Although abortion is extremely safe throughout pregnancy, the risk, complexity, duration, and thus cost increase as pregnancy progresses. As a result, patients who are delayed in obtaining care as they save money for the procedure may find that even more money is needed for the delayed procedure, necessitating even more delay.

68.     Timing is critical for patients having a procedural abortion, because there are certain points in pregnancy at which abortion may become more complex or fewer options may be available.  In addition, the later in pregnancy a patient accesses a procedural abortion the more likely she is to experience a rare complication like hemorrhage, uterine perforation, cervical laceration or retained products of conception. Patients who are pushed beyond the window for medication abortion must either obtain either an aspiration procedure, a one-day D&E procedure involving more in-clinic time and more staff, or eventually a two-day D&E procedure, requiring increased PPE and contacts with the healthcare system, as compared to a one-day procedure.

69.      Aside from the increased risks of the procedure, it is also distressing for patients to be forced to delay their abortion, and remain pregnant, once they are certain of their decision.

70.     The Executive Order's ban on procedural abortion will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families. Patients will be delayed, and in some cases, unable to access abortion at all in Tennessee.

71.     Forcing a woman to continue a pregnancy against her will, particularly during a global pandemic, can pose risks to her physical, mental, and emotional health. Even an uncomplicated pregnancy can put patients at increased medical risk, including the increased risks associated with caesarean or vaginal delivery, which entails risks of hemorrhage, infections like chorioamnionitis or endometriosis, and increased risks of preeclampsia or eclampsia.  Moreover,

---

https://www.newsweek.com/over-7-million-americans-lose-health-insurance-during-coronavirus-pandemic-15-million-have-1496925.

pregnancy, childbirth, and an additional child may exacerbate an already difficult situation for those who have suffered trauma, such as sexual assault or domestic violence, and the pandemic has only exacerbated these risks—domestic violence hotlines have reported a substantial increase in calls since the COVID-19 crisis began.[29] Research has found that women denied an abortion were four times more likely than women who received an abortion to experience economic hardship and insecurity lasting for years, with serious consequences for those women and their families.[30] As a result of the COVID-19 pandemic, unemployment rates are soaring, meaning that families are losing not only their income but in many cases their employer-provided health insurance; the medical and economic hardships of pregnancy and childrearing, for many families, are thus more acute now than ever.

## V. Impact of Executive Order on Patients and the Medical System

72. Delaying abortion also harms public health and is counterproductive to the purposes of the Executive Order. The Executive Order's stated goals are to "preserv[e] personal protective equipment for emergency and essential needs" and "prevent[] community spread of COVID-19 through non-essential patient-provider interactions." Executive Order at 2. But pregnant people who are delayed in obtaining an abortion, or unable to obtain abortion care at all, will have far more contact with the healthcare system than if they were able to obtain an abortion.

73. At a minimum, this includes prenatal visits—at least once a month, and more for patients with high-risk pregnancies or preexisting conditions—as well as pregnancy-related screenings and tests, including repeat ultrasounds and blood tests.[31] Unlike abortion, for which

---

[29] *See, e.g.*, Kasey Freeman, *YWCA sees increase in domestic violence calls amid COVID-19 outbreak*, Apr. 1, 2020, https://www.newschannel5.com/news/ywca-sees-increase-in-domestic-violence-calls-amid-covid-19-outbreak.

[30] Diana G. Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J. Public Health 407 (2018).

[31] *See also* Rupsa C. Boelig et al*., Expert Review: MFM Guidance for COVID-19*, Am. J.

complications are extremely rare and almost never require hospital transfers, one in five pregnant women will visit a hospital during pregnancy *prior* to delivery, and every time they do they will be interacting with more people and increasing the hospital's use of PPE. Women who develop pregnancy-related diabetes or other pregnancy-related health conditions will also require even greater interactions with the health system. Moreover, 20 percent of pregnancies end in miscarriage, for which patients often seek care at a hospital emergency room.

74.    For those who are blocked from obtaining a desired abortion, pregnancy will end with childbirth. Labor and delivery, and in particular, a caesarean section procedure, which occurs commonly, require vastly more PPE, hospital resources, and patient-provider contact than procedural abortion. A hospital birth—attended by multiple medical care providers—could involve anywhere from seven to ten gowns, masks, and sterile gloves. For an uncomplicated pregnancy, the patient will remain in the hospital at least 24-48 hours, for a caesarean section even longer, and for a more complicated pregnancy, potentially even longer still.  Again, this means that the patient will require the use of a hospital bed or room, and will require the time and attention of hospital staff, who will have to use PPE during interactions with the patient.

75.    Moreover, the COVID-19 crisis has increased the likelihood that pregnant people will be sent to an emergency department. ACOG has advised that, "given the lack of data and experience with other coronaviruses such as SARS-CoV and MERS-CoV, diligence in evaluating and treating pregnant women is warranted." Accordingly, ACOG recommends that pregnant patients reporting certain potential COVID-19 symptoms—including those common during pregnancy for unrelated reasons, such as difficulty breathing—should "immediately seek care in

---

Obstetrics & Gynecology MFM (Mar. 19, 2020) (recommending that, even during the COVID-19 pandemic, pregnant people should have multiple in-person visits for routine ultrasounds and laboratory work throughout pregnancy).

an emergency department or equivalent unit that treats pregnant women," be isolated if possible, and "adhere to local infection control practices regarding personal protective equipment."[32] This, of course, will involve significantly more strained hospital resources and PPE than the provision of abortion care.

76. Some patients with the means and resources will seek abortion care in other states that have not banned it. Forcing patients seeking reproductive healthcare to travel outside of their communities does nothing to protect or advance their health and only imposes additional risks and burdens on their ability to obtain care. In fact, such travel would be wholly inconsistent with government guidelines and directives to reduce transmission of COVID-19 by practicing social distancing and avoiding travel and other contacts, as it will require patients to have contacts with many individuals to obtain childcare, transportation, food, and lodging necessary to make the trip. Forcing patients to travel out of state to obtain care, sometimes hundreds of miles away, would also result in their obtaining abortions at later gestational ages than if they had been able to obtain care in-state, resulting in increased risks, use of PPE, and interactions with the healthcare system.

77. Tennessee's existing legal restrictions on abortion also impose burdens that undermine Defendants' stated goal of preserving PPE. For example, the Delay Requirement requires patients to make at least two in-person appointments for an abortion, even though there is no benefit to the first visit, and most patients could obtain care just as safely in one visit. This directly undermines the Executive Order's stated goal of "preventing community spread of COVID-19 through non-essential patient-provider interactions." Executive Order at 2.

---

[32] *See* Am. Coll. of Obstetricians & Gynecologists, *Outpatient Assessment and Management for Pregnant Women With Suspected or Confirmed Novel Coronavirus (COVID-19)* (Apr. 10, 2020), https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/clinical-guidance/practice-advisory/covid-19-algorithm.pdf?la=en&hash=2D9E7F62C97F8231561616FFDCA3B1A6.

78.     When patients cannot access services to terminate a pregnancy within the healthcare system, some will find ways to do so outside the healthcare system, not all of which may be safe. If attempts to self-induce give rise to additional health problems, some patients may be forced to seek emergent medical care, increasing their interactions with the outside world and further taxing the medical system as it works to respond to the COVID-19 crisis.

79.     Further complicating matters, there are only two clinics in the entire state who provide abortion care past 15 weeks LMP, and they only provide care up to 19 days, 6 weeks LMP. Accordingly, even when the Executive Order is lifted (assuming it is not extended), there will be a severe backlog of patients who were prevented from obtaining a procedural abortion.  In all likelihood, a rush of patients will all be trying to schedule abortions at the same time, all of whom have been delayed to a later point in pregnancy, and all of whom will need to be scheduled for both the counseling visit and the procedural visit before they reach the point in pregnancy when abortions are no longer available in Tennessee. This will create a crush of demand that clinics are unlikely to be able to meet. It will also result in patients at earlier stages in pregnancy being delayed so that patients who would otherwise be denied care entirely can be treated first. These backlogs, combined with limited provider capacity due to the pandemic and increased wait times imposed by the Delay Requirement, will cause serious and irreparable harm. Some patients will be delayed to the point at which they are forced to undergo a more complicated and costly D&E procedure, or a two-day D&E procedure, which requires greater use of PPE and places greater strain on the healthcare system. Others will lose the option of choosing an abortion altogether, despite the fact that forcing people to remain pregnant against their will does nothing to further Tennessee's interest in combatting the COVID-19 pandemic.

## CLAIMS FOR RELIEF

## COUNT I
### (Substantive Due Process)

80.     Plaintiffs reallege and incorporate by reference the allegations contained above.

81.     By banning procedural abortion after eleven weeks of pregnancy, and, in particular, by allowing no exception for patients who will be unable to obtain an abortion entirely; who will be forced to have a lengthier and more complex abortion procedure; and who will be forced to have a two-day rather than a one-day procedure; the Executive Order, as applied to procedural abortion, violates Plaintiff's patients' rights to privacy, liberty, and bodily integrity and autonomy guaranteed by the Fourteenth Amendment to the U.S. Constitution.

82.     Unless enjoined, the Executive Order will subject Plaintiffs' patients to irreparable harm for which no adequate remedy at law exists by preventing and/or delaying them from obtaining an abortion in Tennessee, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.     Immediately issue a temporary restraining order, followed by a preliminary injunction, and ultimately a permanent injunction, restraining Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them, from enforcing or requiring compliance with the Executive Order, as applied to procedural abortions. In particular, the Providers seek injunctive relief on behalf of those patients who are most gravely harmed by EO-25 because of the time-sensitive nature of abortion care, including: (1) patients who, in the good faith professional judgment of the provider, will likely lose their ability to obtain an abortion in Tennessee if their procedures are delayed until after April 30, 2020; (2) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a

28

lengthier and more complex abortion procedure, which is only available at two clinics in Nashville and Memphis, if their procedures are delayed until after April 30, 2020; or (3) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a two-day procedure—which is only available at two clinics in Nashville and Memphis, and which requires at least three separate visits to the provider—if their procedures are delayed until April 30, 2020. In making such determinations, providers must be allowed take into account all of the factors bearing on an individual patient's ability to timely access abortion care and medical risk, including the patient's medical history, familial circumstances, and any logistical and financial obstacles faced by the patient;

B.    Enter a judgment declaring that the Executive Order as applied to Plaintiffs' provision of procedural abortion is enjoined;

C.    Grant Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988; and/or

D.    Grant such other and further relief as this Court may deem just, proper, and equitable, including that, during the pendency of the Order,  Defendants and their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them be temporarily enjoined from enforcing the Delay Requirement's in-person counseling requirement.

Respectfully submitted,

*/s/ Thomas Castelli*
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorney for Plaintiffs*

Scott P. Tift
David W. Garrison

BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202
Fax: (615) 252-3798
stift@barrettjohnson.com
dgarrison@barrettjohnson.com

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605
Tel: (423) 928-7175
jjlaw@jesseeandjessee.com

Michael J. Dell*
Jason M. Moff*
Irene Weintraub*
Timur Tusiray*
Catherine Hoge*

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: 212-715-9129
Tel: 212-715-9113
mdell@kramerlevin.com
jmoff@kramerlevin.com
iweintraub@kramerlevin.com
ttusiray@kramerlevin.com
choge@kramerlevin.com

*Attorneys for Plaintiffs Adams & Boyle, P.C., Memphis Center for Reproductive Health, and Planned Parenthood of Tennessee and North Mississippi*

Autumn Katz*
Genevieve Scott**
Michelle Moriarty*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3600
Fax: (917) 637-3666
akatz@reprorights.org

gscott@reprorights.org
mmoriarty@reprorights.org

*Attorneys for Plaintiffs Adams & Boyle, P.C. and Memphis Center for Reproductive Health*

Maithreyi Ratakonda*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4405
Fax: (212) 247-6811
mai.ratakonda@ppfa.org

*Attorney for Plaintiffs Planned Parenthood of Tennessee and North Mississippi and Dr. Kimberly Looney*

Julia Kaye**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633

*Attorney for Plaintiff Knoxville Center for Reproductive Health*

*Admitted *pro hac vice*
**Application for admission *pro hac vice* forthcoming