**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ADAMS & BOYLE, P.C.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 3:15-cv-0705** |
| | ) | **Judge Friedman / Frensley** |
| **HERBERT H. SLATERY III, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

---

The novel coronavirus ("COVID-19") pandemic is a public health crisis unlike anything Tennessee residents have experienced. The illness was first diagnosed in China—more than 7,500 miles from Tennessee—on December 31, 2019. In the weeks that followed, the number of infected individuals soared. Then, on January 14, 2020, only two weeks after the disease was first diagnosed, the United States had its first case. A mere six weeks later, on March 4, 2020, the Tennessee Department of Health confirmed that a Tennessee resident had contracted the disease. And the spread of the disease in the State continues. As of April 14, 2020, there are 5,823 confirmed cases of COVID-19 in Tennessee—a 40% increase from only a week ago.[1] And as of that same date, 124 people have died from COVID-19 statewide.[2]

---

[1] *See* Ex. A, Tenn. Dep't. of Health, *Tennessee COVID-19-April 14, 2020 Epidemiology and Surveillance Data*, https://www.tn.gov/health/cedep/ncov.html (last updated Apr. 14, 2020); *see also* Ex. B, Tenn. Office of the Governor, *COVID-19 Bulletin #14 – April 7, 2020*, https://www.tn.gov/governor/covid-19/covid-19-daily-bulletin/2020/4/7/covid-19-bulletin--14---april-7--2020.html (April 7, 2020, 5:00 PM).

[2] *See* Ex. C, Tenn. Dep't. of Health, *Coronavirus Disease (COVID-19)*, https://www.tn.gov/health/cedep/ncov.html (last updated Apr. 14, 2020).

1

This serious and rapidly evolving situation required an equally serious and rapid response. Tennessee's Governor responded by implementing necessary emergency measures to protect Tennessee's communities, hospitals, healthcare providers, and patients. At issue here, Executive Order 25 preserves personal protective equipment ("PPE") for emergency needs and prevents the community spread of COVID-19 by ordering healthcare professionals and healthcare facilities to postpone elective and non-urgent surgical and invasive procedures. Not only is this order well within the Governor's authority and consistent with longstanding precedent, it reflects the recommendations of the American College of Surgeons and the federal Centers for Medicaid & Medicare Services to minimize unnecessary use of PPE and to limit non-essential planned surgeries and procedures. (*See* D.E. 230-2, Ex. T.)

No one disputes the seriousness of the COVID-19 outbreak. Likewise, no one disputes the need for serious—and even unprecedented—measures to slow the spread of the virus. Plaintiffs do, however, dispute whether the measures the State has taken with respect to all other healthcare professionals and healthcare facilities may be applied to abortion providers. Plaintiffs argue that abortion is entitled to treatment different from that afforded to any other elective medical procedure—even where the threat posed by COVID-19 necessitates that all other elective procedures be postponed or cancelled. Apparently oblivious to the risks their position presents to public safety, Plaintiffs ask this Court to issue a temporary restraining order and, ultimately, a preliminary injunction allowing abortion procedures in Tennessee to carry on as if COVID-19 never happened.

This Court should deny their request for four reasons. First, Plaintiffs cannot establish a likelihood of success on the merits because Tennessee has broad authority and discretion to implement emergency measures in response to the COVID-19 public health crisis, including

2

measures that may curtail constitutional rights. Second, Plaintiffs have failed to allege irreparable harm because they—as providers, not patients—have failed to identify even a single patient that will not be able to receive an abortion before the expiration of Executive Order 25 on April 30, 2020. Third, if exceptions are granted and Tennessee is prohibited from minimizing use of PPE and postponing non-urgent procedures to limit unnecessary contact, COVID-19 may continue to spread and inflict irreparable harm on Tennessee's citizens. Finally, the public interest weighs heavily in favor of postponing non-urgent surgical and invasive procedures to curtail community spread of COVID-19 and to preserve PPE that could save lives.

## BACKGROUND

COVID-19 is part of a "large family" of coronaviruses.[3] Typically, these viruses only infect species of animals, but on rare occasions, the viruses can infect humans.[4] Once this initial jump occurs, the virus can spread further between humans.[5] It is suspected that COVID-19 made this jump and has spread rapidly in the months since.[6]

On March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic.[7] And as of April 14, 2020, there have been 579,005 confirmed cases of COVID-

---

[3] *See* Ex. D, Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/summary.html (last updated Apr. 7, 2020).

[4] *See id.*

[5] *See id.*

[6] *See id.*

[7] Ex. E, World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020*, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last updated Mar. 11, 2020).

3

19 and 22,252 deaths in the United States alone.[8]  As of that same date, Tennessee had 5,823 confirmed cases and 124 deaths.[9]  These numbers are likely to grow—and are almost certainly an underestimate.[10]  COVID-19 is extremely contagious; it "can remain viable and infectious in aerosols for hours and on surfaces up to days."[11]  What is more, the virus may be transmitted by asymptomatic or minimally symptomatic patients.[12]  A data brief and statistical model created by Vanderbilt University's School of Medicine "suggests that the Tennessee epidemic could have been sparked by as few as 10 people."[13]

Because COVID-19 is a new coronavirus, its severity is not fully known.[14]  A preliminary report by the Center for Disease Control ("CDC")'s COVID-19 Response team has estimated that 20.7–31.4 percent of reported COVID-19 cases required hospitalization.[15]  4.9–11.5 percent of

---

[8]  Ex. F, Centers for Disease Control and Prevention, *Coronavirus Disease 2019*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Apr. 14, 2020).

[9]  *See* Ex. A, Tenn. Dep't. of Health, *Tennessee COVID-19-April 14, 2020 Epidemiology and Surveillance Data.*

[10]  *See* Ex. G, John Graves, *Vanderbilt Health Policy COVID-19 Modeling for Tennessee*, https://www.vumc.org/healthpolicy/sites/default/files/public_files/COVID%20Modeling%20Rel ease%204-10%20FINAL2.pdf (last accessed Apr. 14, 2020) (explaining that "because there are asymptomatic individuals as well as individuals who may be symptomatic who have not yet received a test or a test result," the total reported number of cases is likely an underestimate).

[11]  Ex. H, Correspondence, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS CoV-1*, New England Journal of Medicine (2020).

[12]  Ex. I, Zou, Lirong et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, 382 New England Journal of Medicine 12 (2020).

[13]  *See* Ex. G, John Graves, *Vanderbilt Health Policy COVID-19 Modeling for Tennessee*.

[14]  Ex. J, Centers for Disease Control and Prevention, *Morbidity and Mortality Weekly Report, Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19)—United States, February 12-March 16, 2020.*

[15]  *See id.*

4

reported cases required admission to an intensive care unit.[16]  And 1.8-3.4 percent of reported cases were fatal.[17]

Because of COVID-19's characteristics—namely its rapid transmission and potential to be carried without symptoms—it is critical to act decisively to combat its spread.  The CDC recommends that "[s]ince people can spread the virus before they know they are sick, it is important to stay away from others when possible, even if you have no symptoms."[18]  Indeed, the CDC has concluded that "[l]imiting face-to-face contact with others is the best way to reduce the spread of [COVID-19]."[19]  Decisive measures must also be taken to ensure the safety of healthcare professionals.  In Spain, for example, approximately 14% of the country's 40,000 confirmed COVID-19 cases were medical professionals.[20]  A shortage of qualified healthcare professionals during this outbreak could prove disastrous.  To prevent a similar situation here, the CDC recommends that healthcare professionals use PPE, including face shields or goggles, N95 or higher respirators, clean, non-sterile gloves, and an isolation gown.[21]

---

[16] *See id.*

[17] *See id.*

[18] Ex. K, Centers for Disease Control and Prevention, *Coronavirus Disease 2019*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed Apr. 14, 2020).

[19] *Id.*

[20] Ex. L, The New York Times, *Virus Knocks Thousands of Health Workers Out of Action in Europe*, https://www.nytimes.com/2020/03/24/world/europe/coronavirus-europe-covid-19.html (Mar. 24, 2020).

[21] Ex. M, Centers for Disease Control and Prevention, *Use Personal Protective Equipment (PPE) When Caring for Patients with Confirmed or Suspected COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/A_FS_HCP_COVID19_PPE.pdf (last accessed Apr. 14, 2020).

5

In light of the CDC's recommendations—as well as the recommendations of other authorities—Tennessee has taken action to limit the spread of COVID-19 within the State. On March 12, 2020, Governor Lee declared a state of emergency to facilitate the response to COVID-19.[22] The Governor thereafter required Tennesseans to remain at home—unless engaging in essential activities or services—to limit the spread of COVID-19 and to preserve health care resources.[23] The Governor also limited participation in public gatherings, closed schools, closed in-restaurant dining, closed entertainment and recreational gathering venues, and closed businesses that perform close-contact personal services.[24]

The Governor also limited non-emergency healthcare procedures. On March 23, 2020, the Governor issued Executive Order 18 prohibiting "hospitals and surgical outpatient facilities" from "perform[ing] non-essential procedures, which include[d] any medical procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient."[25] Because "the spread of COVID-19 throughout Tennessee continue[d] to intensify" and "unnecessary person-to-person contact within the healthcare community increases the risk of COVID-19 spreading to providers and patients throughout our healthcare system," the Governor

---

[22] Ex. N, Exec. Order 14, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee14.pdf.

[23] Ex. O, Exec. Order 22, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf; *see also* Ex. P, Exec. Order 23, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee23.pdf.

[24] Ex. Q, Exec. Order 17, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee17.pdf; *see also* Exec. Ex. R, Order 21, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee21.pdf.

[25] Ex. S, Exec. Order 18, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee18.pdf.

issued a new executive order on April 8, 2020, that "amend[ed] and supersede[d] the provisions" of Executive Order 18.[26] That order—Executive Order 25—is the subject to Plaintiffs' challenge.

Executive Order 25 follows recommendations from the federal Centers for Medicaid & Medicare Services, the American Dental Association, and the American College of Surgeons to limit non-urgent surgical and invasive procedures. (*See* D.E. 230-2, Ex. T.) The relevant portions of the Order read:

> 2. *All healthcare professionals and healthcare facilities* in the State of Tennessee *shall postpone surgical and invasive procedures that are elective and non-urgent.* Elective and non-urgent procedures are those procedures that can be delayed until the expiration of this Order because they are not required to provide life sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider.
>
> 4. Non-hospital healthcare providers impacted by this Order are requested and encouraged to provide necessary personal protective equipment in their possession and not required for the emergency care exempted in the Order, including, but not limited to, medical gowns, N95 masks, surgical masks, TYVEK suits, boot covers, gloves, and/or eye protection to the Tennessee Emergency Management Agency.

(D.E. 230-2, Ex. T.) Executive Order 25 is a temporary measure and is currently set to expire on April 30, 2020. (*See id.*)

The measures taken by Tennessee have yielded positive results. Social distancing has proven to be an effective method of reducing COVID-19's spread. Indeed, the Vanderbilt model estimates that in mid-March each COVID-19 case infected more than five new people with the disease.[27] But, "[a]s a result of social distancing now being practiced by many Tennesseans," each COVID-19 case now infects only 1.4 new people.[28]

---

[26] Ex. T, Exec. Order 25, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee25.pdf.

[27] *See* Ex. G, John Graves, *Vanderbilt Health Policy COVID-19 Modeling for Tennessee*
[28] *Id.*

7

While these measures have been successful, it is vitally important that they not be relaxed or undermined. To stop COVID-19 from spreading, each case must infect less than 1 new person.[29] As the Vanderbilt model concludes, "the state will need further progress over the coming weeks to bring the number below 1."[30] What is more, COVID-19 infections in Tennessee have not yet reached their peak. Executive Order 25 is a necessary tool to "flatten the curve" of COVID-19 transmissions and preserve critical PPE for our first responders, health care professionals, and their patients as the State weathers the peak of this storm.

## ARGUMENT

Plaintiffs seek a temporary restraining order and, ultimately, a preliminary injunction to create an abortion-specific exception to the Governor's generally applicable executive order. In this Circuit, the standard for these two forms of relief is the same. *See Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007). Under that standard, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). The granting of preliminary injunctive relief is an extraordinary remedy—especially here, where all four of these factors counsel against granting Plaintiffs' requested relief and an injunction would have the drastic effect of curbing a temporary, limited executive order designed narrowly to protect public safety in a national emergency.

---

[29] *Id.*

[30] *Id.*

I. **Plaintiffs Are Not Entitled to Preliminary Injunctive Relief Prohibiting Application of Executive Order 25 to Procedural Abortions.**

   A. **Plaintiffs are unlikely to succeed on the merits.**

Plaintiffs repeatedly note that the Supreme Court has recognized a constitutional right to pre-viability abortion. (*See, e.g.*, D.E. 232 at 21, PageID # 5770.) But that right it is not without limits. *See Roe v. Wade*, 410 U.S. 113, 153–54 (1973). Indeed, since the right was first recognized, courts have acknowledged that States may regulate abortion to further their legitimate interests. *See id.* at 154, 163. Tennessee has a compelling interest in combatting the spread of COVID-19 and may thus regulate abortion to further that interest.

   1. **Plaintiffs do not have standing to seek relief from Executive Order 25.**

It is a well-settled rule that a plaintiff's standing to sue is never assumed—it must instead be proven. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). A plaintiff, then, must establish the "irreducible constitutional minimum" of standing by showing that three elements are met. *See Lujan*, 504 U.S. at 560. First, "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotation marks omitted). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Id.* (internal quotation marks omitted). And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561 (internal quotation marks omitted).

9

Plaintiffs cannot demonstrate standing of their own here—doctors and other abortion providers have no constitutional right to perform abortions. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 913 (6th Cir. 2019) (*en banc*). Thus, Plaintiffs themselves do not suffer any deprivation that could afford them standing to sue.

There are, of course, cases in which a plaintiff may sue on behalf of a third party. But these cases are the "exception rather than the rule." *See South Carolina v. Regan*, 465 U.S. 367, 380 (1984). A plaintiff may assert the rights of a third party only when (1) they have a "close" relationship with the third party; and (2) some "hindrance" affects the third party's ability to protect their own interests. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Plaintiffs here can meet neither requirement.

First, Plaintiffs have not shown that they have a "close" relationship with the individuals whose rights they attempt to assert. *See id.* at 129. Indeed, Plaintiffs do not identify a single individual (or even provide numbers of individuals) who will be harmed by Executive Order 25. Rather, Plaintiffs claim that "some patients" will be unable to obtain an abortion, (*see* D.E. 232 at 13, PageID # 5762), that the Order "will delay access" to abortion, (*see id.* at 17, PageID # 5766), that "some patients" may attempt to travel out of state to obtain an abortion, (*see id.* at 19, PageID # 5768), and that "some" other patients will find ways to obtain abortions outside of the healthcare system. (*see id.*) These abstract, hypothetical scenarios, however, cannot give rise to close and real relationships required to establish third-party standing. *See Kowalski*, 543 U.S. at 131 (concluding that the requirement of a "close relationship" was not met where attorney plaintiffs sought to assert the rights of "unascertained" future clients); *see also id.* ("The attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all."). Moreover, Plaintiffs' interests in this case are likely to conflict with the interests of their

10

patients insofar as continuing to perform procedures could expose their patients to COVID-19 transmission.

And second, Plaintiffs have not shown that any "hindrance" affects the third parties' ability to protect their own interests. *See id.* at 129. Nor could they. Individual plaintiffs can and do challenge abortion regulations. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) (per curiam); *Doe v. Parson*, 368 F. Supp. 3d 1345 (E.D. Mo. 2019).

At bottom, the Supreme Court has been clear: standing is a "threshold requirement" that a plaintiff must prove in every case. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018); *see also Kowalski*, 543 U.S. at 129 (addressing the "threshold question whether [Plaintiffs] have standing to raise the rights of others"). Indeed, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561. Plaintiffs here have not carried their burden. They have not alleged—much less proven—that they have the requisite "close relationship" to establish third-party standing. Nor have they alleged or proven that some "hindrance" prevents individual patients from bringing suit themselves. In short: Plaintiffs do not have standing.

## 2. The right to abortion is not absolute and may be regulated in times of crisis.

The Supreme Court has long held that States have broad police powers which enable them to act to protect the health and welfare of their citizens. *See, e.g.*, *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 25 (1905). Indeed, the Supreme Court has explained that these powers grant States the authority to "enact quarantine laws and health laws of every description." *Id.* Recognizing this authority, the Supreme Court upheld Massachusetts' compulsory vaccination law—enacted to combat a growing smallpox epidemic—against a Fourteenth Amendment challenge. *See id.* at 26. The "liberty secured by the Constitution," the Court observed, "does not

11

import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27; *see also Compagnie Francaise de Navigation a Vapeur v. Bd. of Health, La.*, 186 U.S. 380 (1902) (upholding quarantine law against Commerce Clause and procedural due process challenges).

In the century since *Jacobson* was decided, the Supreme Court has continued to affirm the broad nature of States' powers in times of crisis. *See Kansas v. Hendricks*, 521 U.S. 346, 356–57 (1997) (relying on *Jacobson* and acknowledging that Fourteenth Amendment liberties may be restrained even in civil contexts); *United States v. Caltex*, 344 U.S. 149, 154 (1952) (recognizing that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved"); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (noting that "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease").

Thus, when confronted with a public health crisis, a State has authority to implement emergency measures that may curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. And while courts may consider whether the State's chosen emergency measures are arbitrary or oppressive, they may not "second-guess the wisdom or efficacy of the measures." *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *7 (5th Cir. Apr. 7, 2020) (citing *Jacobson*, 197 U.S. at 28, 30). Here, Tennessee—and indeed the entire world—is facing a public health crisis of unprecedented proportions. Tennessee's Governor has chosen to respond to this crisis by, among

12

other things, issuing Executive Order 25. (*See* D.E. 230-2, Ex. T.) This Order passes *Jacobson*'s two-prong test.

First, Executive Order 25 has a "real and substantial relation" to the current public health crisis. *Jacobson*, 197 U.S. at 31. The Governor issued Executive Order 25 to combat the spread of COVID-19 by reducing "unnecessary person-to-person contact within the healthcare community" and by preserving PPE. (*See* D.E. 230-2, Ex. T.) To achieve these goals, the Order requires "[a]ll healthcare professionals and healthcare facilities" in the State to postpone "surgical and invasive procedures that are elective and non-urgent"—that is, "procedures that can be delayed until the expiration of [the] Order because they are not required to provide life-sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition." (*See id.*) The Order also encourages "[n]on-hospital healthcare providers" to "provide necessary personal protective equipment in their possession and not required for emergency care exempted in the Order" to the Tennessee Emergency Management Agency. (*See id.*) In short, the Order asks healthcare providers across the state to take several concrete steps to reduce person-to-person contact and to conserve PPE. It cannot be reasonably argued that Executive Order 25 bears "no real or substantial relation" to Tennessee's goal of combating the spread of COVID-19. *Jacobson*, 197 U.S. at 31. And given that Plaintiffs concede that procedural abortions require the use of "gloves, a surgical mask or reusable plastic face shield, and . . . a disposable gown or smock" (D.E. 232 at 13, PageID # 5762)—the very PPE that is needed to prevent the spread of COVID-19—the application of Executive Order 25 to Plaintiffs likewise bears a "real [and] substantial relation" to the State's goals.

13

Second, Executive Order 25 is not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, U.S. at 31. Whether abortion regulations "inva[de] rights secured by the fundamental law," *id.*, is determined under the Supreme Court's undue burden framework.[31] A regulation may be an undue burden when it is a "substantial obstacle to a woman's choice to undergo an abortion" in a "large fraction of the cases in which [it] is relevant." *Id.* at 925. But this is only part of the analysis; courts must also consider the benefits that the challenged regulation confers. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (citing *Casey*, 505 U.S. at 887–98, 899–901).

The relevant question for this Court, in applying the undue burden standard within the applicable *Jacobson* framework, is whether Plaintiffs have shown that Executive Order 25 "imposes burdens on abortion that 'beyond question' exceed its benefits in combating the epidemic" that Tennessee faces. *In re Abbott*, 2020 WL 1685929, at *11 (quoting *Jacobson*, 197 U.S. at 31). Plaintiffs have not carried their burden.

The Supreme Court and the Sixth Circuit have applied the undue burden standard to uphold state abortion regulations where they delayed abortions and even prevented some abortions from occurring altogether. In *Casey*, a plurality of the Supreme Court applied the undue burden framework to uphold a waiting period law requiring that "at least 24 hours before performing an abortion a physician inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth," and the "probable gestational age of the unborn child." *Casey*, 505

---

[31] Plaintiffs erroneously characterize Executive Order 25 as a "ban" on pre-viability abortions. (D.E. 232 at 20, PageID # 5769). To the contrary, the Order is a temporary postponement of surgical and invasive abortion procedures that are elective and non-urgent. *See In re Abbott*, 2020 WL 1685929, at *9 (holding that district court's characterization of Texas's healthcare executive order as "an 'outright ban' on all pre-viability abortions" was "plainly wrong" and warranted mandamus relief).

14

U.S. at 881. The Court acknowledged that "because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor." *Id.* The Court also accepted that "the waiting period ha[d] the effect of increasing the cost and risk of delay of abortions," especially for low income women. *Id.* Still, the Court concluded that the law was not an undue burden. *Id.* at 887.

And in *Cincinnati Women's Services, Inc. v. Taft*, the Sixth Circuit applied the undue burden framework to uphold a law that required women seeking abortions to "attend an in-person meeting with a physician for informed-consent purposes." 468 F.3d 361, 364 (6th Cir. 2006). This law, coupled with Ohio's existing 24-hour waiting period, meant that a woman must make two visits—at least 24 hours apart—to obtain an abortion. *See id.* at 364–65. But while the law required a waiting period of only 24 hours, the court noted that it could have the effect of delaying abortions for weeks. *Id.* at 366. The court also observed that the appellants in *Taft* had "improved on the *Casey* record" by showing that the challenged statute would deter "approximately 6 to 12.5" out of every 1,000 women "from procuring an abortion as surely as if [Ohio] has outlawed abortion in all cases." *Id.* at 373 (alteration in original). But even though Ohio's law required two visits, had the effect of delaying abortions for weeks, and in some cases prevented women from obtaining abortions altogether, the Sixth Circuit held that the law "survive[d] constitutional scrutiny." *Id.* at 366, 372–74.

If the laws challenged in *Casey* and *Taft*, which delayed and in some cases altogether prevented abortions, did not unduly burden abortion rights, then neither does Executive Order 25. Certainly, Executive Order 25 does not impose burdens that "beyond question" exceed its benefits in combating COVID-19. *See In re Abbott*, 2020 WL 1685929, at *11 (quoting *Jacobson*, 197

U.S. at 31).  Plaintiffs allege that Executive Order 25 delays abortions and may even prevent some abortions from occurring altogether, but they have failed to plead that there are any particular, identifiable patients who will lose access to abortion during the two-week lifespan of the Order. Plaintiffs do not even estimate how many of these patients could exist to permit the Court to apply the large-fraction test.  (*See generally* D.E. 232 at 13–20, PageID # 5762–69.)[32]

In any event, whatever burdens Executive Order 25 imposes on abortion rights are clearly outweighed by the benefits it achieves for the COVID-19 response.  Recall that "the Tennessee epidemic could have been sparked by as few as 10 people."[33]  Each patient who undergoes a non-urgent surgical or invasive procedure risks exposing others to a disease that can remain aerosolized for hours.[34]  Each procedure forces a healthcare provider to expend PPE, such as masks and gloves, at a time when hospitals urgently need those supplies for COVID-19.  Plaintiffs' only response to these clear benefits is their assertion that procedural abortions use "minimal" PPE.  (D.E. 232 at 13, PageID # 5762).  But even assuming that assertion is factually accurate, "minimal" is not "none."  Executive Order 25 contains no exception for procedures that use "minimal" PPE because such an exception would thwart the collective response that is needed to effectively respond to this unprecedented challenge.  Every procedure that is postponed, and every item of PPE that is preserved, furthers the State's compelling interests in halting the spread of COVID-19 and

---

[32] If such patients exist, they may seek as-applied relief.  *See in re Abbott*, 2020 WL 1685929, at *11 (noting that, "if competent evidence shows that a woman is in th[e] position" of her pregnancy reaching the gestational cutoff for abortion before the executive order expires, then "nothing prevents her from seeking as-applied relief").

[33] *See* Ex. G, John Graves, *Vanderbilt Health Policy COVID-19 Modeling for Tennessee*.

[34] Ex. H, Correspondence, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS CoV-1*, New England Journal of Medicine (2020).

16

ensuring that our healthcare system is equipped to treat—and prevent the death of—those who are infected. These benefits easily outweigh the abstract burdens alleged by Plaintiffs.

Importantly, Plaintiffs do not contend that the application of Executive Order 25 to abortion procedures is arbitrary or pretextual. *See Jacobson*, 197 U.S. at 28 (noting that the power of a community to "protect itself against an epidemic threatening the safety of all might be exercised" in an impermissibly "arbitrary, unreasonable manner"). Nor could they, given that it applies across the board to all elective and non-urgent surgical and invasive procedures. To the extent that Plaintiffs quibble about whether any delays caused by Executive Order 25 will "ultimately require[] increased use of PPE" (D.E. 232 at 26, PageID # 5775), they are asking this Court to engage in precisely the kind of judicial "second-guess[ing]" of the "[S]tate's policy choices in crafting emergency public health measures" that *Jacobson* forbids. *In re Abbott*, 2020 WL 1685929, at *6; *see also Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease."). The Governor's determination that the emergency measures put in place by Executive Order 25 are needed *now* to effectively respond to the COVID-19 pandemic is reasonable and entitled to deference.

It is Plaintiffs' burden to demonstrate entitlement to the extraordinary remedy of preliminary injunctive relief. But they have failed to show that the burdens imposed by Executive Order 25 "beyond all question" exceed its benefits, either as applied to procedural abortions generally or as applied to a particular patient. *Jacobson*, 197 U.S. at 31. Because they cannot establish a likelihood of success on the merits, their motion for preliminary relief should be denied.[35]

_____

[35] Even if Plaintiffs could establish that the burdens of applying Executive Order 25 in a particular

17

**B.      Plaintiffs are unlikely to suffer irreparable injury absent the injunction.**

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is *likely* in the absence of the requested injunction. *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). This demonstration is perhaps the single most important prerequisite for issuance of a preliminary injunction. *See* 11A C. Wright, A. Miller, & M. Kane, *Fed. Practice and Procedure* § 2948.1 (3d ed.). As a result, speculative injury is not sufficient. *Id.* A preliminary injunction, then, will not be issued simply to prevent the possibility of some remote future injury—a presently existing actual threat must be shown. *Id.* As the Supreme Court has explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To demonstrate irreparable harm, each and every plaintiff must show that they "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). A specific finding of immediate and irreparable injury to the movant is considered the most important prerequisite that a court must examine and find when ruling upon a motion for a preliminary injunctive relief. In fact, the absence of irreparable injury must end the court's inquiry. *See City of Los Angeles v. Lyons*, 461 U.S. at 111–12, 103 (1983); *Warner v. Central Trust Co.*, *N.S.*, 715 F.2d 112, 123–24 (6th Cir. 1983);

---

case "beyond all question" outweigh the benefits, Plaintiffs still would not be entitled to the broad relief they seek (D.E. 231 at 3, Page ID # 5740 (asking this Court to "[i]ssue a TRO enjoining enforcement of EO-25 as applied to procedural abortions"). Any injunctive relief awarded by the Court must be narrowly tailored to the specific applications of Executive Order 25, if any, that present a constitutional problem. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 331 (2006).

*Aluminum Workers Int'l Union v. Consolidated Aluminum Corp.*, 969 F.2d 437, 444 (6th Cir. 1982).

Plaintiffs cannot demonstrate irreparable harm here. Doctors and abortion clinics have no right to perform abortions. *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 913 (6th Cir. 2019) (*en banc*). Thus, Plaintiffs themselves will not suffer any constitutionally cognizable harm—much less the irreparable harm necessary to obtain injunctive relief.

As for Plaintiffs' patients, their alleged harm is limited to a two-week delay in obtaining an abortion. Plaintiffs have not identified even one actual patient who would be denied an abortion before the order expires in two weeks. Nor have they estimated what fraction of women could be allegedly denied an abortion by operation of Executive Order 25. While Plaintiffs speculate in their declarations that the Order could cause a parade of horribles that might cumulatively deprive some patients of access to abortion, that speculation is insufficient to entitle Plaintiffs to the extraordinary remedy of preliminary relief.

Plaintiffs have also failed to identify any patient for whom postponement of an abortion would cause physical harm. Nor could they, because Executive Order 25 expressly permits procedures that cannot be delayed without causing serious adverse consequences for a patient's physical health:

> Elective and non-urgent procedures are those procedures that can be delayed until the expiration of this Order because they are not required to provide life sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider.

(*See* D.E. 230-2, Ex. T.) If delaying an abortion for the duration of the Order would in fact, in the reasonable determination of a medical provider, cause "serious adverse consequences to a patient's physical condition," then that procedure may occur without delay.

19

**C.** **The issuance of an injunction is likely to cause substantial harm and the public interest would not be served by the issuance of an injunction.**

The wrongful enjoining of a valid state action always qualifies as irreparable harm. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted). The Sixth Circuit has recognized this rule, explaining that:

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, or more dangerous in doubtful cases, than the issuing of an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. *The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction*; but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it. *It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act;* . . ..

*Detroit Newspaper Publisher Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied*, 411 U.S. 967 (1973) (emphasis added and internal citations omitted). *See also MLZ, Inc. v. Fourco Glass Co.*, 470 F.Supp. 273, 278 (M.D. Tenn. 1978).

Executive Order 25 is a good faith effort to address the COVID-19 pandemic. Judicial intervention into the activities of state officers discharging in good faith their official duties should be exercised with great restraint. *Integrity Int'l Security Servs., Inc. v. U.S. Dep't of the Army*, 870 F. Supp. 787, 789 (E.D. Tenn. 1994); *Roseboro v. Fayetteville City Bd. of Educ.*, 491 F. Supp. 110, 113 (E.D. Tenn. 1977) (citing *Hawks v. Hamill*, 288 U.S. 52, 60 (1933)). Federal courts presume that public officials and agencies "properly discharge[] their official duties" and "act in good faith and in accordance with applicable law." *United States v. Hughley*, 1:04-cr-14-002, 2007 WL 9706622, at *4 (E.D. Tenn. Oct. 1, 2007) (citing *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *Bracy v. Gramley*, 520 U.S. 899, 909 (1997); *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). As

20

described *supra*, Executive Order 25 is Tennessee's good-faith effort to postpone unnecessary medical procedures to preserve PPE and slow the community spread of COVID-19. An injunction would irreparably harm Tennessee's authority to protect the safety and health of its citizens.

But the harm here is not limited to infringing on Tennessee's exercise of its sovereign authority. The injunctive relief Plaintiffs seek—a special exception from the generally applicable Executive Order 25 for abortion providers—would also harm the public by hindering the State's otherwise comprehensive efforts to respond to the COVID-19 pandemic. COVID-19 infections in Tennessee have yet to reach their peak. If the State is prevented from uniformly enforcing Executive Order 25 now—at this critical juncture—the consequences for the public could be dire.

Tennesseans across the State are making enormous sacrifices in response to the COVID-19 crisis. Schools and many businesses are closed, public gatherings are prohibited, nursing homes are sealed off from visitors, and individuals are staying at home except for essential activities, just to name a few examples.[36] The temporary postponement of elective and non-urgent surgical and invasive procedures that is required under Executive Order 25 is undoubtedly a sacrifice too, but one that, like others being made across the State and country, is necessary to protect the greater good. "[C]onstitutional rights," including the "right to peaceably assemble, to publicly worship, to travel, and even to leave one's home," may be "reasonably restricted 'as the safety of the general public may demand.'" *In re Abbott*, 2020 WL 1685929, at *1 (quoting *Jacobson*, 197 U.S. at 29) (alteration in original). "The right to abortion is no exception" to that settled rule. *Id.*

The evidence presented by Plaintiffs at this stage provides no basis to treat procedural abortions any differently from the other surgical and invasive procedures that are subject to delay

---

[36] Ex. Q, Exec. Order 17; *see also* Ex. R, Exec. Order 21; Ex. O, Exec. Order 22; Ex. P, Exec. Order 23.

under Executive Order 25. Because continued enforcement of Executive Order 25 with respect to procedural abortions would protect the public interest without irreparably harming Plaintiffs, preliminary relief should be denied.

## II. Plaintiffs Are Not Entitled to Preliminary Relief Suspending the In-Person Notice Requirement.

Tennessee's Notice and Waiting Period Law applicable to abortions, Tenn. Code Ann. § 39-15-202(a)-(h),[37] provides that a potential patient receive appropriate notice of the potential risks, benefits, and alternatives in-person by the referring or treating physician during the initial visit prior to the waiting period. It is in the public interest to maintain this *status quo*, which currently does not allow for this necessary information to be provided by telephone, video conference, or other healthcare technologies.[38] In their Motion for a Temporary Restraining Order And/Or Preliminary Injunction (D.E. 231 at 3–4, PageID # 5740-41), Plaintiffs do *not* move for a temporary restraining order as to the in-person notice provision, although they do seek a preliminary injunction of that provision. Plaintiffs' memorandum is focused almost exclusively on the applicability of Executive Order 25 to procedural abortions and fails to establish any of the criteria necessary to warrant an injunction of the in-person requirement.

Plaintiffs have not explained, in either their motion or memorandum, why the State is constitutionally required to suspend the in-person notice requirement during the pendency of Executive Order 25. At most, they have articulated why allowing the required notice to be

---

[37] No abortion shall be performed "until a waiting period of forty eight (48) hours has elapsed after the attending physician or referring physician has provided the information required [by the statute]." Tenn. Code Ann. § 39-15-202(d)(1).

[38] In passing the challenged provision, the legislature considered the fact that abortion is a unique, serious, and irreversible medical procedure that carries risk of physical and psychological harm. (*See* DX5, 7, ln. 25–8, ln. 6; DX5, 88, ln. 3–11; DX5, 97, ln. 25–98, ln. 3; DX5, 162, ln. 25–163, ln. 1.)

22

provided by telephone, video conference, or other healthcare technologies would be their policy preference. Moreover, Plaintiffs have not established any immediate or irreparable harm from continued enforcement of the in-person notice requirement, or whether providing the required notice remotely would even be feasible or effective.[39]

Generally, abortion is available in Tennessee up to 20 weeks past the patient's last menstrual period, and the appropriateness of medication and the differing types of surgical abortions depends on gestational age. (*See Adams & Boyle,* I, 111, ln. 16–21; II, 9, ln. 8–10; II, 16, ln. 25–17, ln. 1; II, 131, ln. 12–14.) Because gestational age must be accurately determined to provide the required notice necessary for informed consent (D.E. 216-1, 40, ln. 4–6), abortion providers in Tennessee generally use ultrasounds to determine gestational age at the initial visit. (*See* D.E. 216-1, 39, ln. 25–40, ln. 3; *see also* I, 60, ln. 1–9.) By their nature, ultrasounds require that the patient be present in-person with the ultrasound operator, which is normally at the abortion provider. (I, 236, ln. 23–237, ln. 5.) In addition to conducting the ultrasound to determine if someone is eligible for a medication abortion, there are other factors to be reviewed by the abortion provider in determining whether a medication abortion may be appropriate—but those factors cannot be predetermined prior to actually examining the patient at the initial visit. (D.E. 216-1, 55, ln. 6–25.) This in-person determination of gestational age and any other relevant medical conditions occurring at the initial visit is necessary to provide the patient with full and correct information, regarding the risks, benefits, and alternatives available to a particular patient, as required by Tennessee's Notice and Waiting Period Law. Accordingly, Plaintiffs have not

---

[39] Research shows that typically a woman coming to an abortion facility does not have a pre-existing relationship with the attending physician. (IIIa, 59, ln. 4–13.)

demonstrated they are entitled to a temporary restraining order prohibiting enforcement of the in-person notice provision

## CONCLUSION

COVID-19 is the greatest public health crisis that Tennessee and the nation have experienced in nearly a century. Defeating COVID-19 and protecting Tennesseans requires vigilance and discipline, and the overbroad exception for abortion that Plaintiffs seek will unnecessarily expend PPE and undermine the social distancing necessary to lessen the virus transmission rate, flatten the curve, and ensure the ongoing provision of medical care in Tennessee. Plaintiffs have thus not established that they are entitled to the extraordinary remedy of preliminary injunctive relief prohibiting application of Executive Order 25 to all procedural abortions. Further, Plaintiffs have not established that they are entitled to preliminary injunctive relief suspending the in-person notice requirement. Defendants respectfully request that this Court deny Plaintiffs' motion.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

*/s/Alexander S. Rieger*
ALEXANDER S. RIEGER (BPR# 029362)
STEVEN A. HART (BPR # 07050)
MATTHEW D. CLOUTIER (BPR # 036710)
Office of Tennessee Attorney General
P. O. Box 20207
Nashville, Tennessee 37202
(615) 741-2408
alex.rieger@ag.tn.gov
steve.hart@ag.tn.gov
matt.cloutier@ag.tn.gov

24

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing Notice has been served on the following counsel of record through the Electronic Filing System on this 15th day of April, 2020:

Scott P. Tift
David W. Garrison
Barrett Johnston Martin & Garrison, LLC,
Bank of America Plaza,
414 Union Street, Suite 900
Nashville, TN 37219
stift@barrettjohnson.com
dgarrison@barrettjohnson.com

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605
jjlaw@jesseeandjessee.com

Autumn Katz
Hailey Flynn
Michelle Moriarty
Marc Hearron
Genevieve Scott
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
akatz@reprorights.org
hflynn@reprorights.org
mmoriarty@reprorights.org
gscott@reprorights.org

Maithreyi Ratakonda
Melissa Cohen
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
mai.ratakonda@ppfa.org
Melissa.cohen@ppfa.org

Michael J. Dell
Jason M. Moff
Irene Weintraub
Timur Tusiray
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
mdell@kramerlevin.com
jmoff@kramerlevin.com
iweintraub@kramerlevin.com
ttusiray@kramerlevin.com

Thomas H. Castelli
American Civil Liberties Union
PO Box 120160
Nashville, TN 37212
tcastelli@aclu-tn.org

Julia Kaye
American Civil Liberties Union Foundation
125 Broad St. Floor 18
New York, NY 10004
jkaye@aclu.org

*s/Alexander S. Rieger*_____
ALEXANDER S. RIEGER