UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ADAMS & BOYLE, P.C., et al.,

  Plaintiffs,             Civil Action No. 3:15-cv-00705

vs.                    HON. BERNARD A. FRIEDMAN

HERBERT H. SLATERY, III, et al.,

  Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

This matter is presently before the Court on the motion to file a supplemental complaint [docket entry 229] and the motion for a temporary restraining order ("TRO") and/or preliminary injunction [docket entry 231] filed by plaintiffs and proposed plaintiffs (collectively "plaintiffs"). Defendants and proposed defendants (collectively "defendants") have responded to both motions, and plaintiffs have replied. On April 17, 2020, at 11:00 a.m., the Court held a ninety-minute telephonic hearing with counsel for both sides, and oral argument was heard. For the reasons stated below, the Court shall grant plaintiffs' motion to file a supplemental complaint, and it shall grant plaintiffs' motion for a TRO and/or preliminary injunction to the extent plaintiffs seek a preliminary injunction enjoining the enforcement of Tennessee Executive Order 25 ("EO-25") as applied to procedural abortions.[1]

---

[1] Procedural abortions are one type of abortion. Plaintiffs explain that

> [t]here are two methods of abortion care available in Tennessee: medication abortion or in-office procedural abortion (also referred to as "surgical abortion"). Tr. Vol. 2, 57:18-22 (Young); Looney Decl. ¶ 11. For a medication abortion, the patient takes mifepristone in the clinic and then, 24 to 48 hours later, takes misoprostol at a location of her choosing,

*Background*

Plaintiffs are providers of reproductive healthcare, including abortion services, in Tennessee. Plaintiffs challenge Tennessee Senate Bill 1222, Tenn. Code Ann. § 39-15-202(a)-(h), requiring women seeking an abortion to receive certain information beforehand in person from the attending physician performing the abortion, or a referring physician, and to then wait at least forty-eight hours after receiving the information before undergoing the procedure. Plaintiffs allege that the statute's "forty-eight-hour delay requirement" unduly burdens their patients' right to obtain an abortion. Plaintiffs, suing on their own behalf and also on behalf of their patients, assert due process and equal protection claims under the Fourteenth Amendment. In September 2019, the Court conducted a week-long bench trial in this matter.

---

> typically at home. Looney Decl. ¶ 11. The pregnancy is then passed in a process similar to miscarriage. *Id.*; Tr. Vol. 1, 39:15-11 (Wallett). The use of mifepristone in combination with misoprostol is safe and effective to terminate pregnancies up to 11 weeks LMP [last menstrual period] (or 77 days). Looney Decl. ¶ 12.
>
> Although procedural abortion is sometimes referred to as "surgical abortion," it is not what is commonly understood to be surgery, as a procedural abortion involves no incision or general anesthesia. Looney Decl. ¶ 14. In the majority of cases, a procedural abortion is performed using the "aspiration" technique, which involves the use of gentle suction to empty the uterus, typically takes about 5-10 minutes, and may at times involve local anesthesia or conscious sedation. *Id.*; Tr. Vol. 1, 40:12-20 (Wallett); Tr. Vol. 2, 58:9-59:1 (Young). Starting at 14-16 weeks, physicians typically use the dilation and evacuation ("D&E") technique, which requires additional skills and equipment to perform, and takes longer, including longer time spent by the patient in the recovery room. Looney Decl. ¶ 14; Tr. Vol. 1, 40:21-8 (Wallett). Starting around 18 weeks LMP, procedural abortion may be performed as a two-day procedure because a patient receives medications to dilate her cervix the day before the procedure itself. Looney Decl. ¶ 14. For some patients, procedural abortion is safer or medically indicated over medication abortion, such as for patients at increased risk of bleeding. *Id.* ¶ 13.

Pls.' Br. in Support of Mot. for TRO and/or Prelim. Inj. at 7-8.

On March 23, 2020, Governor William Lee issued Tennessee Executive Order 18, entitled "An Order to Reduce the Spread of COVID-19 by Limiting Non-Emergency Healthcare Procedures." This order provides in part:

> 2. All hospitals and surgical outpatient facilities in the State of Tennessee shall not perform non-essential procedures, which includes any medical procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient, as determined by a licensed medical provider. . . . Medical procedures excluded from postponement include . . . pregnancy-related visits and procedures, including labor and delivery . . . .
>
> * * *
>
> 5. This Order shall be effective and enforceable at 12:01 a.m., Central Daylight Time, on March 24, 2020, and shall remain in effect until 12:01 a.m., Central Daylight Time, on April 13, 2020, at which time the suspension of any state laws and rules and the other provisions of this Order shall cease and be of no further force or effect.

On April 8, 2020, Governor Lee issued Tennessee Executive Order 25, entitled "An Order to Reduce the Spread of COVID-19 by Limiting Non-Emergency Healthcare Procedures." This order provides in part:

> 2. All healthcare professionals and healthcare facilities in the State of Tennessee shall postpone surgical and invasive procedures that are elective and non-urgent. Elective and non-urgent procedures are those procedures that can be delayed until the expiration of this Order because they are not required to provide life sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider.
>
> 3. In order to conserve personal protective equipment [("PPE")], healthcare providers and facilities in Tennessee must limit attendance to essential personnel in the rooms where surgeries and invasive procedures are being performed.
>
> 4. Non-hospital healthcare providers impacted by this Order are requested and encouraged to provide necessary personal protective equipment in their possession and not required for the emergency care exempted in the Order,

including, but not limited to, medical gowns, N95 masks, surgical masks, TYVEK suits, boot covers, gloves, and/or eye protection to the Tennessee Emergency Management Agency by delivering such equipment to the nearest open Tennessee National Guard Armory listed on the TEMA website (www.tn.gov/tema) between the hours of 9:00 a.m. and 2:00 p.m.

* * *

6. This Order shall take effect at 12:01 a.m., Central Daylight Time, on April 9, 2020, and shall remain in effect until 12:01 a.m., Central Daylight Time, on April 30, 2020, at which time the suspension of any state laws and rules and the other provisions of this Order shall cease and be of no further force or effect.

7. Upon becoming effective, this Order amends and supersedes the provisions of Executive Order No. 18, dated March 23, 2020.

An April 10, 2020, letter signed by defendant State of Tennessee Department of Health Commissioner Lisa Piercey that is addressed to "Health Care Providers" states that

> [t]he intent of Executive Order 25 is to protect the health care providers, staff, patients, and the community from the transmission of COVID-19 and prevent the unnecessary use of the PPE resources that are in extremely short supply, especially N95 masks. Specifically, the Executive Order addresses the following:
>
> - Helps ensure that PPE is preserved, and community spread through close medical interaction is limited during the upcoming weeks in which cases/hospitalizations are expected to increase;
>
> - Expands Executive Order 18 to more specifically cover all procedures that are elective and non-urgent and can be delayed until after the Order without risking serious adverse consequences to a patient; and
>
> - Limits attendance at surgeries and invasive procedures to essential personnel to preserve PPE to the greatest extent possible[.]

Pls.' Mot. to File Suppl. Compl. Ex. B. The letter advises that the "failure to comply [with EO-25] is a Class A misdemeanor and may result in possible disciplinary action by your respective board." *Id.*

On April 13, 2020, plaintiffs filed a motion to file a supplemental complaint and a

4

motion for a TRO and/or preliminary injunction [docket entries 229 and 231]. As noted above, on April 17, 2020, the Court held a ninety-minute telephonic hearing on these motions in which both sides presented extensive oral argument.

*Motion to File a Supplemental Complaint*

Plaintiffs seek leave to file a supplemental complaint, a copy of which is attached to their motion as Exhibit 1, pursuant to Fed. R. Civ. P. 15(d). The proposed supplemental complaint alleges that EO-25, as applied to procedural abortions, violates plaintiffs' patients' substantive due process rights under the Fourteenth Amendment. Plaintiffs assert this constitutional challenge on their own behalf and on behalf of their patients.[2] The proposed supplemental complaint names two new plaintiffs – Knoxville Center for Reproductive Health and Dr. Kimberly Looney (Chief Medical Officer of plaintiff Planned Parenthood of Tennessee and North Mississippi) – and two new defendants – Governor Lee and Dr. Rene Saunders (Chair of the Board of Licensing Health Care Facilities). Plaintiffs indicate that one of the proposed plaintiffs "previously appeared as a plaintiff in the action" and that the proposed defendants "will be represented by the same counsel as the other Defendants and share substantially the same interests in this matter as the other Defendants." Pls.' Br. in Support of Mot. to File Suppl. Compl. at 9; Pls.' Reply in Support of Mot. to File Suppl. Compl. at 5.

Fed. R. Civ. P. 15(d) provides in relevant part: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

---

[2] "In [third-party standing] cases, the Supreme Court [has] held that abortion providers have standing to bring due process challenges on behalf of their patients." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 914 (6th Cir. 2019) (citing *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality); *Diamond v. Charles*, 476 U.S. 54, 65-66 (1986)).

5

"A supplemental pleading may include new facts, new claims, new defenses, and new parties." *Brian A. v. Bredesen*, No. 3:00-0445, 2009 WL 4730352, at *2 (M.D. Tenn. Dec. 4, 2009) (citing *Stewart v. Shelby Tissue, Inc.*, 189 F.R.D. 357, 361 (W.D. Tenn. 1999)). "Generally, [a motion to supplement under Rule 15(d)] can be brought at any time the action is before the trial court." *Id.* at *1 (citing *Stewart*, 189 F.R.D. at 362). "The granting of a motion to file a supplemental pleading is within the discretion of the trial court and, as a general rule, applications for leave to file a supplemental pleading are normally granted." *Id.* (*Stewart*, 189 F.R.D. at 362); *see also Bostic v. Biggs*, No. 3:14-1068, 2016 WL 4177094, at *1 (M.D. Tenn. Aug. 8, 2016) ("[T]he granting or refusing of leave to file a supplemental pleading rests in the discretion of the trial court." (citing *Schuckman v. Rubenstein*, 164 F.2d 952 (6th Cir. 1947))), *R&R adopted*, No. 3:14-CV-01068, 2016 WL 8730550 (M.D. Tenn. Sept. 9, 2016).

The Court finds that allowing plaintiffs to file a supplemental complaint will promote judicial economy. The Court is familiar with the subject matter of the proposed supplemental complaint from having presided over the September 2019 trial. The second amended complaint and the proposed supplemental complaint contain overlapping factual and legal issues, and they involve overlapping parties and counsel. The Court has considered defendants' arguments with respect to prejudice and finds them unpersuasive. A supplemental complaint will not prejudice defendants, who have been given notice and have had an opportunity to respond, and the gains in terms of judicial economy outweigh any possible prejudice to them. Therefore, the Court shall grant plaintiffs' motion to file a supplemental complaint.

*Motion for a Temporary Restraining Order and/or Preliminary Injunction*

Plaintiffs seek the issuance of a TRO and/or preliminary injunction pursuant to Fed. R. Civ. P. 65(b) to enjoin the enforcement of EO-25 insofar as that order prohibits all procedural

6

abortions except those necessary "to provide life sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider." EO-25 ¶ 2.

As this Court has noted, a preliminary injunction is "extraordinary relief." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *3 (M.D. Tenn. Nov. 15, 2019) (citing *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972)). In determining whether to issue a TRO or a preliminary injunction the Court must weigh the following factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017) (internal citations omitted). These "are factors to be balanced, not prerequisites that must be met," and "[n]o single factor will be determinative as to the appropriateness of equitable relief." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997) (citing *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994), and *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). However, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

Having read all of the parties' written submissions and considered all of their arguments carefully, and being mindful of the fact that such relief is extraordinary, the Court finds

7

that all four factors weigh in favor of granting a preliminary injunction.[3] As to plaintiffs' likelihood of success on the merits of their constitutional challenge to EO-25,

> [t]he fundamental right to privacy contained in the Due Process Clause of the Fourteenth Amendment includes the right to choose to have an abortion, subject to certain limitations. *See Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). *Casey* confirmed that a woman has the right to choose to have an abortion prior to viability and to obtain an abortion without "undue interference from the State." 505 U.S. at 846, 112 S.Ct. 2791.

*Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006). A state regulation is constitutionally invalid if it places an "undue burden" on a woman's right to decide to have an abortion. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (citing *Casey*, 505 U.S. at 878). An undue burden exists if the "state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877.

In the present case, plaintiffs have shown that they are likely to succeed on the merits of their claim because the enforcement of EO-25 creates an undue burden on the right of women in Tennessee to choose to have a pre-viability abortion. EO-25 has caused plaintiffs to cancel all procedural abortions to avoid risking criminal and other penalties. Looney Decl. ¶¶ 5, 43; Terrell Decl. ¶¶ 36-37; Rovetti Decl. ¶¶ 5, 14. As a result, since EO-25 took effect on April 9, procedural abortions have been unavailable in Tennessee for women who are more than eleven

---

[3] The Court notes that the same issue has been decided by five other courts, all of which issued a TRO in those cases at plaintiffs' request. *See Robinson v. Marshall*, No. 2:19-cv-00365 (M.D. Ala. Mar. 30, 2020); *Preterm-Cleveland v. Att'y Gen. of Ohio*, No. 1:19-cv-00360 (S.D. Ohio Mar. 30, 2020); *Planned Parenthood Ctr. for Choice v. Abbott*, No. A-20-CV-323-LY, 2020 WL 1815587 (W.D. Tex. Apr. 9, 2020); *S. Wind Women's Ctr. LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020), *appeal dismissed*, No. 20-6045, 2020 WL 1860683 (10th Cir. Apr. 13, 2020); *Little Rock Family Planning Servs. v. Rutledge*, No. 4:19-cv-00449-KGB (E.D. Ark. Apr. 14, 2020).

weeks pregnant, as measured from the first day of their last menstrual period ("LMP"),[4] and for women of any gestational age for whom a medication abortion is contraindicated.[5] Procedural abortions made up approximately fifty to sixty percent of the abortions that plaintiffs performed in 2019 and/or 2020. Looney Decl. ¶¶ 16-17 (2,390 procedural abortions out of 4,742 abortions performed in 2019; 917 procedural abortions out of 1,700 abortions performed in January to March 2020); Terrell Decl. ¶ 10 (1,654 procedural abortions out of 2,792 abortions performed in 2019); Rovetti ¶ 15 (827 procedural abortions out of 1,366 abortions performed in 2019). EO-25 currently expires on April 30, but plaintiffs have provided evidence that the order is likely to be renewed or extended beyond that date. Pls.' Br. in Support of Mot. for TRO and/or Prelim. Inj. at 4 n.5, 11, 23-24; Looney Decl. ¶ 58; Terrell Decl. ¶¶ 15, 45; Rovetti Decl. ¶¶ 21-22; Pls.' Reply in Support of Mot. for TRO and/or Prelim. Inj. at 1. Defendants do not dispute the likelihood of a renewal or extension of EO-25, and they acknowledge that Tennessee's COVID-19 infections "have not yet reached their peak." Defs.' Resp. to Mot. for TRO and/or Prelim. Inj. at 8, 21. Therefore, the Court finds that, for purposes of seeking a preliminary injunction, plaintiffs have shown that EO-25 "plac[es] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877.

Plaintiffs have also shown that they would suffer irreparable harm if defendants are not enjoined from enforcing EO-25 as it relates to procedural abortions. Plaintiffs argue that EO-25, as applied to procedural abortions, "prevents Tennessee patients from exercising their

---

[4] Medication abortions are available in Tennessee through eleven weeks, zero days LMP. Looney Decl. ¶¶ 2, 15; Terrell Decl. ¶ 9. "After 11 weeks, 0 days LMP, patients will generally need a procedural abortion." Looney Decl. ¶ 13.

[5] "[S]ome patients with pregnancies less than 11 weeks, 0 days LMP will have a procedural abortion for various reasons, including because of an underlying medical condition, such as an increased risk of bleeding, that makes this the safer option." Looney Decl. ¶ 13 (footnote omitted).

9

fundamental constitutional right to terminate a pregnancy" guaranteed by the Fourteenth Amendment. Pls.' Br. in Support of Mot. for TRO and/or Prelim. Inj. at 30. Plaintiffs also argue that "[f]orcing patients to forgo abortion care and remain pregnant against their will inflicts serious physical, emotional, and psychological consequences that alone constitute irreparable harm." *Id.* at 31. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984)). "[T]o establish irreparable harm based upon the denial of a constitutional right, the plaintiff must first show a substantial likelihood of success on the underlying constitutional claim." *Bokhari v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:11-00088, 2012 WL 1165907, at *8 (M.D. Tenn. Apr. 9, 2012) (citing *Overstreet*, 305 F.3d at 578). As noted above, plaintiffs have made this required showing of success on their substantive due process claim. Moreover, abortion is a time-sensitive procedure. *See* Looney Decl. ¶¶ 20, 43. Delaying a woman's access to abortion even by a matter of days can result in her having to undergo a lengthier and more complex procedure that involves progressively greater health risks, *see id.*; Rovetti Decl. ¶ 22, or can result in her losing the right to obtain an abortion altogether. Therefore, plaintiffs have demonstrated that enforcement of EO-25 causes them irreparable harm.

In terms of balancing the harm to others, plaintiffs argue convincingly that the irreparable harm they would suffer without injunctive relief, which includes violation of their constitutional rights, "vastly outweigh[s]" any "temporary reduction of PPE" resulting from the enforcement of EO-25. Pls.' Br. in Support of Mot. for TRO and/or Prelim. Inj. at 32. Plaintiffs

claim that injunctive relief "will simply preserve 'the status quo that has been in place for more than 40 years since *Roe* was decided, and some 25 years since *Casey* followed.'" *Id.* (quoting *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 803 (S.D. Ohio 2019)). Defendants argue that granting the requested relief would "irreparably harm Tennessee's authority to protect the safety and health of its citizens" and that it would "also harm the public by hindering the State's otherwise comprehensive efforts to respond to the COVID-19 pandemic." Defs.' Resp. to Mot. for TRO and/or Prelim. Inj. at 21. But plaintiffs have provided evidence, which the Court accepts as accurate, that they have implemented sanitation procedures, as well as procedures to minimize the use of PPE, that they do not use N95 masks or other hospital resources needed to respond to COVID-19, and that a procedural abortion uses less PPE and involves significantly less patient interaction than carrying a pregnancy to term and giving birth. In addition, plaintiffs state that women may travel out-of-state to obtain an abortion while EO-25 is in effect, risking infection of COVID-19 and transmission to others when they return to Tennessee. *See* Rovetti Decl. ¶ 17 (stating that four patients with appointments on the day EO-25 went into effect were referred to an abortion clinic in Atlanta because the patients were not eligible for medication abortion care). While the stated goal of EO-25 to preserve PPE is unquestionably laudable, defendants have presented no evidence that any appreciable amount of PPE would actually be preserved if EO-25 is applied to procedural abortions. Plaintiffs, on the other hand, offered convincing evidence demonstrating the contrary. The balancing of harms therefore favors plaintiffs.

The fourth factor the Court must consider in deciding whether to issue a preliminary injunction also favors plaintiffs because "it is always in the public interest to prevent violation of a party's constitutional rights." *Thomas v. Schroer*, 116 F. Supp. 3d 869, 879 (W.D. Tenn. 2015) (citing *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d

11

377, 400 (6th Cir. 2001)); *see also Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (stating that protection of constitutional rights "is always in the public interest").

In seeking injunctive relief, plaintiffs ask that the Court waive the bond requirement of Fed. R. Civ. P. 65(c). Defendants do not oppose this request. Rule 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security," *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (internal citation omitted), and "a court has no mandatory duty to impose a bond as a condition for issuance of injunctive relief." *Stooksbury v. Ross*, No. 3:09-CV-498, 2012 WL 12841901, at *6 (E.D. Tenn. Aug. 1, 2012) (citing *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 952 (6th Cir. 2007)). "When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present." *I Love Juice Bar Franchising, LLC*, 2019 WL 6050283, at *14 (citing *Moltan Co.*, 55 F.3d at 1176). In light of these factors, the Court declines to impose a bond requirement in this case.

*Conclusion*

Accordingly,

IT IS ORDERED that plaintiffs' motion to file a supplemental complaint is granted. Within seven days of the date of this order, plaintiffs shall file a version of the supplemental

12

complaint that is identical to the one attached to plaintiffs' motion as Exhibit 1.

IT IS FURTHER ORDERED that plaintiffs' motion for a TRO and/or preliminary injunction is granted to the following extent: Defendants are hereby immediately enjoined from enforcing EO-25 as applied to procedural abortions.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE
SITTING BY SPECIAL DESIGNATION

Dated: April 17, 2020
      Detroit, Michigan