# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 24, 2020

Mr. Matthew D. Besser
5885 Landerbrook Drive
Suite 302
Cleveland, OH 44124

Ms. Sarah Campbell
Mr. Matthew Daniel Cloutier
Mr. Steven Ashley Hart
Mr. Alexander Stuart Rieger
Office of the Attorney General of Tennessee
320 Sixth Avenue, N., First Floor
Nashville, TN 37243

Mr. Thomas Hauser Castelli
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212

Ms. Melissa Cohen
Planned Parenthood Federation of America
123 William Street
10th Floor
New York, NY 10038

Mr. Michael J. Dell
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Ms. Laura Etlinger
Office of the Attorney General of New York
Albany, NY 12224

Mr. David W. Garrison
Barrett, Johnston, Martin & Garrison
414 Union Street
Suite 900
Nashville, TN 37219

Ms. Autumn Chandra Katz
Michelle Katz Moriarty
Ms. Genevieve Elizabeth Scott
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038

Julia Kaye
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Mr. Stephen Chad Meredith
Office of the Attorney General of Kentucky
700 Capitol Avenue
Suite 118
Frankfort, KY 40601

Mr. Richard Muniz
Planned Parenthood Federation of America
1110 Vermont Avenue
Suite 300
Washington, DC 20005

Ms. Maithreyi Ratakonda
Planned Parenthood Federation of America
123 William Street
10th Floor
New York, NY 10038

Ms. Lisa T. Simpson
Orrick, Herrington & Sutcliffe
51 W. 52nd Street
New York, NY 10019

Mr. Kevin H. Theriot
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Scott P. Tift
Barrett, Johnston, Martin & Garrison
414 Union Street
Suite 900
Nashville, TN 37219

Mr. Edward Lawrence White
American Center for Law and Justice
3001 Plymouth Road
Suite 203
Ann Arbor, MI 48105

                  Re:  Case No. 20-5408, *Adams & Boyle, P.C., et al v. Herbert Slatery, III, et al*
                        Originating Case No. : 3:15-cv-00705

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                      Yours very truly,

                                      Deborah S. Hunt, Clerk

                                      Cathryn Lovely
                                      Deputy Clerk

cc:  Mr. Kirk L. Davies

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ADAMS & BOYLE, P.C. et al.,

        *Plaintiffs-Appellees,*

    *v.*

HERBERT H. SLATERY III et al.

        *Defendants-Appellants.*

No. 20-5408

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:15-cv-00705—Bernard A. Friedman, District Judge.

Decided and Filed:  April 24, 2020

Before:  MOORE, WHITE, and THAPAR, Circuit Judges.

---

### COUNSEL

**ON MOTIONS AND REPLY:**  Sarah K. Campbell, Steven A. Hart, Alexander S. Rieger, Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  **ON RESPONSE:**  Thomas H. Castelli, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TENNESSEE, Nashville, Tennessee, Genevieve Scott, Autumn Katz, Michelle Moriarty, CENTER FOR  REPRODUCTIVE RIGHTS, New York, New York, Maithreyi Ratakonda, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, Richard Muniz, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., Scott P. Tift, BARRETT JOHNSTON MARTIN & GARRISON, LLC, Nashville, Tennessee, Michael J. Dell, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Julia Kaye, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees. **ON BRIEF:** Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, S. Chad Meredith, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Laura Etlinger, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, Albany, New York, Lisa T. Simpson, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, Kevin H. Theriot, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Amici Curiae.

       MOORE, J., delivered the opinion of the court in which WHITE, J., joined.  THAPAR, J. (pp. 23–33), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge.  This case arises at the intersection of two essential constitutional rights:  the right of a woman to control her pregnancy, on the one hand, and the right of the state to exercise its "police power" during an emergency, on the other.  More specifically, we ask, does the Constitution permit a state to bar doctors from performing abortion procedures for a three-week period—as part of a widespread temporary ban on "elective" and "non-urgent" surgeries—based solely on the state's assertion that such a bar is necessary to combat effectively an ongoing public health crisis?  The Governor of Tennessee thought so, and accordingly adopted such a temporary ban on April 8, 2020, in response to the ongoing COVID-19 global pandemic.  The district court, however, disagreed, and accordingly issued a preliminary injunction on April 17, enjoining Tennessee from enforcing its general ban on elective and non-urgent surgeries against doctors performing abortion procedures.  The State then filed this emergency appeal, and also requested that we immediately stay the district court's injunction pending review.

We do not uphold an injunction against state action lightly, much less during a public health crisis like the one our nation is experiencing now.  It is imperative in such circumstances that judges give legislatures and executives—the more responsive branches of government—the flexibility they need to respond quickly and forthrightly to threats to the general welfare, even if that flexibility sometimes comes at the cost of individual liberties.  Affording flexibility, however, is not the same as abdicating responsibility, especially when well-established constitutional rights are at stake, as the right to an abortion most assuredly is.  And, here, although we have great respect for the challenges Tennessee faces as it responds to this novel public health crisis, we agree with the district court that the State's response, in this one respect, unduly curtailed constitutional liberty, and that judicial intervention was thus warranted.  By the same token, however, we also conclude that, when it comes to the precise scope of the district court's injunction, the district court went too far in asserting its authority.  Consequently, we **AFFIRM** the district court's order issuing

a preliminary injunction but direct the district court to **MODIFY** the preliminary injunction in the manner described below.  We also **DENY** the State's request for a stay pending appeal as **MOOT**.

## I.  BACKGROUND

Generally speaking, a Tennessee woman wishing to exercise her constitutional right to a pre-viability[1] abortion, in a legal manner, may do so in one of three ways:  (1) receive a "medication abortion" within the first 11 weeks from her last menstrual period ("LMP"); (2) receive a "procedural abortion" within the first 20 weeks LMP, meaning either (a) an "aspiration" abortion (which is a relatively quick clinical procedure, and can be performed up to approximately 15 weeks LMP), or (b) a "dilation and evacuation" ("D&E") abortion (which is a more time-consuming procedure—albeit one that generally takes place in a clinical setting, too— and is performed up to approximately 20 weeks LMP); or (3) travel to a state with more lenient abortion regulations.  *See generally* R.232-5 (Looney Dec.) (Page ID #5876–77).[2]  Tennessee law also imposes a variety of other state-specific regulations, such as a 48-hour waiting period and mandatory in-person visitation requirements.  *See, e.g.*, Tenn. Code Ann. §§ 39-15-202(a)–(h).  Moreover, if a Tennessee woman wishes (or needs) to have a procedural abortion in-state, there are just a handful of providers in a handful of cities where she may do so.  *See* R.232-6 (Terrell Dec.) (Page ID #5908–09) (noting that "[a]ccess to abortion care in [Tennessee] is limited to begin with, with only eight providers in four cities").  And of these clinics, only Planned Parenthood performs abortions after 15 weeks LMP.  *See* R.232-5 (Looney Dec.) (Page ID #5877).

Still, abortion in general, and procedural abortion in particular, remains relatively commonplace in Tennessee, with hundreds of Tennessee women exercising their right to seek an abortion in any given month.  *See, e.g.*, *id.* at Page ID #5878 (stating that, "[i]n January through March 2020, [Planned Parenthood] performed 1,700 abortions in Tennessee, 917 of which were

---

[1]As the Supreme Court clarified in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the constitutional right to an abortion ends (with some limited exceptions) once the fetus would be "viable" outside the womb.  505 U.S. 833, 860, 870 (1992).

[2]For context, Tennessee bans abortion altogether at "viability," which it presumes to occur at 24 weeks LMP.  *See* Tenn. Code Ann. § 39-15-211(b)(5) (setting this as a "rebuttable presumption").  Plaintiffs do not make clear, however, if any recognized in-state clinics or doctors provide abortion services between 20 and 24 weeks LMP.

No. 20-5408          *Adams & Boyle, P.C. et al. v. Slatery et al.*          Page 4

procedural abortions and 536 of which occurred beyond eleven weeks LMP, when medication abortion is not an option").

With this background in mind, we now turn to the ongoing COVID-19 public health crisis, an event with which all but the most secluded of readers should be familiar.  Suffice it to say, COVID-19 is the virus at the root of an ongoing global pandemic, which, in just a few short months, has killed tens of thousands of people worldwide and infected hundreds of thousands more.  *See, e.g.*, *Friends of DeVito v. Wolf*, --- A.3d ---, 2020 WL 1847100, at *2 (Pa. Apr. 13, 2020).  The virus has also upended American economic and social life, causing schools and businesses to shutter, and even the nominally unaffected to wear masks and stand six feet apart in public.

Unsurprisingly, then, medical providers, including Tennessee's abortion clinics, have had to modify their way of doing business, for the safety of both staff and patients.  As three of the abortion providers involved in this litigation have attested, for instance, COVID-19 has caused them to put at-risk staff on furlough, bar patients from bringing companions with them to the clinic, cut back work days, curtail the number of personnel staffed on any given procedure, and eliminate non-essential wellness appointments, among other social-distancing measures.  *See* R.232-5 (Looney Dec.) (Page ID #5881–82) (Planned Parenthood of Tennessee and North Mississippi); R.232-6 (Terrell Dec.) (Page ID #5911–12) (Memphis Center for Reproductive Health); R.232-7 (Rovetti Dec.) (Page ID #5922–23) (Knoxville Center for Reproductive Health).

Still, to the Governor of Tennessee's eye, voluntary measures like these were not enough to limit effectively the spread of the virus; more compulsory measures were required.  So, in addition to instituting a variety of sweeping "shelter-in-place" orders throughout the month of March, on April 8, 2020 the Governor issued a targeted directive to "[a]ll healthcare professionals and healthcare facilities in the State of Tennessee," requiring that they "postpone surgical and invasive procedures that are elective and non-urgent," at least until April 30, when the order would expire on its own terms.  R.240-20 (Order) (Page ID #6115–16).  This Order, titled Executive

No. 20-5408          *Adams & Boyle, P.C. et al. v. Slatery et al.*          Page 5

Order 25 ("EO-25"), had the twin goals of "preserving personal protective equipment ["PPE"][3] for emergency and essential needs and preventing community spread of COVID-19 through nonessential patient-provider interactions." *Id*. at Page ID #6115.  Its most relevant portion read as follows:

> All healthcare professionals and healthcare facilities in the State of Tennessee shall postpone surgical and invasive procedures that are elective and non-urgent. Elective and non-urgent procedures are those procedures that can be delayed until the expiration of this Order because they are not required [1] to provide life sustaining treatment, [2] to prevent death or risk of substantial impairment of a major bodily function, or [3] to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider.

*Id*. at Page ID #6115–16 (alterations added).

The Order did not contain any provision specifically exempting abortion procedures, or suggesting that medical professionals would have leeway to perform a procedure that, in their clinical judgment, "would not deplete the hospital capacity or the [PPE] needed to cope with the COVID-19 disaster." *Compare with In re Abbott*, 954 F.3d 772, 780 (5th Cir. 2020) (describing this "important" caveat contained in an analogous Texas COVID-19-related surgery ban).

Plaintiffs—more specifically, Adams & Boyle, P.C.; Memphis Center for Reproductive Health; Planned Parenthood of the Greater Memphis Region; Planned Parenthood of Tennessee and North Mississippi; Knoxville Center for Reproductive Health; and Dr. Kimberly Looney—subsequently interpreted EO-25 as barring the performance of *any* procedural[4] abortions between April 8 and April 30 (and potentially beyond that, if the Order was extended), enforceable by criminal sanction. *See, e.g.*, R.232-7 (Rovetti Dec.) (Page ID #5921).  And, as a result of this understanding, Plaintiffs temporarily cancelled all procedural abortions scheduled for that period. *See, e.g.*, *id*. at Page ID #5924 (describing four "devastated," "crying" clients scheduled for procedural abortions on April 9 that the clinic had to turn away because of EO-25); R.232-6

---

[3]The Order defined PPE as "including, but not limited to, medical gowns, N95 masks, surgical masks, TYVEK suits, boot covers, gloves, and/or eye protection." *Id*. at Page ID #6116.

[4]The parties agree that EO-25 has no effect on medication abortions, which may continue to be performed.

(Terrell Dec.) (Page ID #5915–16) (describing similar incident at a different clinic, and also noting that the clinic had "156 patients scheduled for their mandatory [pre-abortion] in-person counseling appointments between [April 13] and April 22"). At the same time, fearing that EO-25 might cause their patients to lose their constitutional right altogether, or at least impose an "undue burden" on that right, *Casey*, 505 U.S. at 876, as well as cause them (the providers) to face criminal prosecution if they attempted to help their patients procure a procedural abortion, Plaintiffs sought in the federal district court a "temporary restraining order and/or preliminary injunction," barring the State from enforcing "EO-25 as applied to procedural abortions." R.232 (Pls.' Preliminary Inj. Br.) (Page ID #5782–83).[5]

Tennessee opposed the request. And notably, in its brief in opposition, the State appeared to concede that EO-25 operated just as Plaintiffs thought it would: as a three-week criminal prohibition on procedural abortions, albeit with the exception that the provider could perform an abortion if it is required to "prevent rapid deterioration or serious adverse consequences to a patient's physical condition" (which the State did not explain in any greater detail). R.240 (Defs.' Opp. Br.) (Page ID #6022).

The district court accordingly held an emergency telephonic conference, which lasted 90 minutes, and at which both sides explained the evidence undergirding their respective positions.

* * *

---

[5] Plaintiffs then highlighted the three groups of patients who most urgently needed protection:

(1) patients who, in the good faith professional judgment of the provider, will likely lose their ability to obtain an abortion in Tennessee if their procedures are delayed until after April 30, 2020; (2) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a lengthier and more complex abortion procedure, which is only available at two clinics in Nashville and Memphis, if their procedures are delayed until after April 30, 2020; [and] (3) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a two-day procedure—which is only available at two clinics in Nashville and Memphis, and which requires at least three separate visits to the provider—if their procedures are delayed until April 30, 2020.

R.232 (Page ID #5783).

Plaintiffs' evidentiary showing was as follows:

*Harm to Patients*.  Plaintiffs first pointed out multiple ways in which their patients would be harmed by even a three-week bar on procedural abortions, all turning on the basic fact that pregnancy, unlike many other medical conditions, progresses on a rapid, and inevitable, timeline. *First*, there were procedural abortion patients who would not be able to obtain an abortion at all, either because their pregnancy would advance past 20 weeks LMP by April 30 (when Plaintiffs could last provide the procedure), or because overburdened waiting lines following April 30 and/or travel limitations would effectively prevent the patient from receiving the procedure.  *See, e.g.*, R.232-5 (Looney Dec.) (Page ID #5887–88).  *Second*, there were procedural abortion patients who would be forced against their will to undergo the more time-consuming, invasive, and expensive D&E procedure because, by April 30, they would have "aged out" of the more common aspiration procedure.  *See, e.g.*, *id*. at Page ID #5889.  And, *third*, there were procedural abortion patients who, even if ultimately able to obtain the same type of abortion procedure they would have sans EO-25, would be forced either to travel out-of-state, and face the accordant COVID-19 transmission risks, *see, e.g.*, *id.* at 5890, *or* maintain their pregnancy substantially longer than they otherwise would have, and bear the resulting health risks, *see, e.g.*, *id*. at Page ID #5888–89 (noting that, "[w]hile abortion is extremely safe throughout pregnancy, the risks increase as pregnancy progresses, and the later in pregnancy a patient accesses a procedural abortion the more likely she is to experience a rare complication").  Plaintiffs further pointed out that their patients, like most abortion patients nationwide, are predominantly "poor or low-income," and hence "already struggle to raise the money to afford an abortion, and to afford transportation, childcare, and lost wages for missed work."  *Id*. at Page ID #5878, 5890–91.

*Harm to the State*.  Plaintiffs also emphasized the corresponding *lack* of harm procedural abortions posed to the State's interests in preserving PPE and minimizing person-to-person contact.  For instance, Plaintiffs observed, because procedural abortions generally are performed at clinics—not hospitals—and with limited personnel, they require "minimal" amounts of PPE and interpersonal interaction.  *See, e.g.*, R.232-6 (Terrell Dec.) (Page ID #5913–14).  Indeed, Plaintiffs

added, their staff do not even use the (much-coveted) N95 respirator masks.[6]  *Id*.  If anything, Plaintiffs continued, requiring a woman either to receive a D&E procedure instead of an aspiration procedure, or carry her child all the way to pregnancy (with the accordant mandatory maternal care visits), would result in far *more* PPE usage and interpersonal interaction than simply permitting abortions to go forward at an appropriately maintained clinic.  *See, e.g.*, R.232-5 (Looney Dec.) (Page ID #5882–83).

*Statements from Medical Organizations*.  Plaintiffs also cited statements from prominent medical organizations in which those organizations emphasized that, as serious a threat to public health as COVID-19 presents, abortion nonetheless remains an "essential," "time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely unavailable."  *Id*. at Page ID #5879 (alteration in original) (citing statement signed by the American College of Obstetricians and Gynecologists, among others).[7]

*Likelihood that EO-25 Would Last Past April 30*.  Finally, Plaintiffs offered some evidence that their fear that EO-25 would last past April 30—thus turning a three-week postponement of procedural abortions into something more draconian—was warranted.  *See, e.g.*, R.232-5 (Looney Dec.) (Page ID #5892) (citing statement from the Surgeon General saying that he expected social-distancing measures to "be in place beyond April").

\* \* \*

---

[6]Per the Food & Drug Administration, an "N95 respirator is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles."  N95 masks are not, however, recommended for public usage, as they constitute "critical supplies that must continue to be reserved for health care workers and other medical first responders."  *See*  https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-and-surgical-masks-face-masks (last accessed Apr. 21, 2020).

[7]Moreover, after the onset of this appeal, over a dozen leading medical organizations—including the American Public Health Organization and (again) the American College of Obstetricians and Gynecologists—signed onto amicus briefs asserting, in no uncertain terms, (1) that abortion is an essential health service, and (2) that restricting access to that service will *not* "save lives," or otherwise meaningfully halt the spread of COVID-19.  *See* App. R. 30 (Amicus Br. for Am. Public Health Ass'n and Experts in Public Health); App. R. 42 (Amicus Br. for Am. College of Obstetricians and Gynecologists and Other Nationwide Organizations of Medical Professionals); *see also* Appellee Br. at 1 n.1 (citing similar guidance from the American College of Surgeons and the World Health Organization).

The State, for its part, pointed to the following countervailing evidence in response:

*Harm to the State*.  The State first emphasized that, as of April 14, 2020, there were nearly 6,000 cases of COVID-19 in Tennessee, along with 124 deaths, *see* R.240-1 (Apr. 14 Count) (Page ID #6029), and that, given the intensely contagious nature of the virus, social distancing was necessary to prevent those numbers from growing at an exponential rate, especially among healthcare professionals themselves, *see, e.g.*, R.240-11 (CDC Release) (Page ID #6076–77) (discussing social distancing); R.240-12 (NYT Article) (Page ID #6079–82) (discussing risks to health workers).  The State also noted that, per guidance from the Centers for Disease Control and Prevention ("CDC"), the State needed to preserve as much PPE for its front-line hospital employees as possible, *i.e.*, those dealing with COVID-19 patients, and that EO-25 was an essential element of that plan.  *See, e.g.*, R.240-13 (CDC PPE Tips) (Page ID #6083–84).  The State further pointed out that, although there was evidence that its various social-distancing measures had successfully lowered the virus's growth rate, that evidence simply underscored the importance of maintaining those measures to the maximum extent possible.  *See, e.g.*, R.240-7 (Vanderbilt Health Policy COVID-19 Modeling for Tennessee) (Page ID #6059–65).  And, in response to Plaintiffs' contention that their PPE usage was minimal, the State observed that, even if procedural abortions constituted a relatively small number of delayed medical procedures, and even if the resulting PPE usage was "minimal," "[e]very procedure that is postponed, and every item of PPE that is preserved, furthers the State's compelling interests in halting the spread of COVID-19 and ensuring our healthcare system is equipped to treat—and prevent the death of—those who are infected."  R.240 (Defs.' Opp. Br.) (Page ID #6019–20).

*Harm to Patients*.  In response to Plaintiffs' statements that EO-25 would inhibit their patients' ability to obtain abortions, the State essentially attempted to show that Plaintiffs' evidentiary showing was a paper tiger.  The State first emphasized that, because Plaintiffs had neither identified any "actual patient[s] who would be denied an abortion before the order expires in two weeks," nor "estimated what fraction of women could be allegedly denied an abortion by operation of [EO-25]," there were presumably very few abortion patients who would be materially harmed by the Order.  *Id*. at Page ID #6022.  The State then generally asserted that, to the extent EO-25 posed any "serious adverse health consequences" to an abortion patient, the clinic could

perform that abortion "without delay" (although, again, without explaining what that exception meant). *Id.*

*Statements from Medical Organizations*.  The State did not cite any countervailing statements suggesting that abortions procedures are not "essential" procedures, or that limiting such procedures is necessary to fight COVID-19.

*Likelihood that EO-25 Would Last Past April 30*.  Although the State repeatedly cited EO-25's limited duration as a reason injunctive relief was unnecessary, the State did not appear to offer any assurances, in its brief or otherwise, that EO-25 would in fact end on April 30.  If anything, the general tone of the State's evidentiary showing—which emphasized the severe consequences portended by COVID-19—suggested the opposite.

* * *

The parties also provided the district court with thorough and thoughtful briefing, in which they addressed not only the major abortion cases, such as *Casey*, but also Supreme Court precedent concerning the expanded scope of a state's police power during times of public health crisis, most notably *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (affirming the state's power to make vaccination compulsory).

On Friday, April 17—just a few hours after the evidentiary hearing—the district court issued a short, but thoughtful, order granting Plaintiffs' request for a preliminary injunction.[8]  *See Adams & Boyle, P.C. v. Slatery*, No. 3:15-cv-705, 2020 WL 1905147 (M.D. Tenn. Apr. 17, 2020). In this order, the district court acknowledged that preliminary injunctions are "extraordinary relief," but ultimately found, after considering the evidence, that such an injunction was warranted here.  *Id.* at \*4.  Most importantly, the district court emphasized that because EO-25 was "likely" to last past April 30, and because "[d]elaying a woman's access to abortion even by a matter of days can result in her having to undergo a lengthier and more complex procedure that involves progressively greater health risks . . . or can result in her losing the right to obtain an abortion

---

[8]Although the district court's order at times references Plaintiffs' alternative request for a temporary restraining order, read in context, the court clearly granted Plaintiffs a preliminary injunction.  Indeed, neither party argues to the contrary on appeal.

altogether," the Plaintiffs were likely to succeed on the merits of their constitutional claim, per the *Casey* "undue burden" test.  *Id*. at *5–6 (citation omitted).  The district court also concluded that, "[w]hile the stated goal of EO-25 to preserve PPE [was] unquestionably laudable," the State "presented no evidence that any appreciable amount of PPE would actually be preserved if EO-25 is applied to procedural abortions."  *Id*. at *6.  To the contrary, the court noted, "procedural abortion[s] use[] less PPE and involve[] significantly less patient interaction than carrying a pregnancy to term and giving birth."  *Id*.  The court further added that making women travel out-of-state for abortion only increased the risks of person-to-person transmission of COVID-19, again in contradiction of EO-25's goals.

The district court accordingly concluded its opinion with the following, brief preliminary injunction order:  "Defendants are hereby immediately enjoined from enforcing EO-25 as applied to procedural abortions."  *Id*. at *7.  And, as a result of this order, Plaintiffs have presumably begun providing, and scheduling, procedural abortions again.

In response, the State filed immediately with the district court a request that the court stay its injunction pending appeal, followed by a notice of appeal.  And, before the district court had a chance to respond to the State's stay request, the State filed a brief in this court entitled, "Combined Emergency Motion for Stay Pending Appeal and Merits Brief," in which the State requested that we, as an initial matter, issue "a temporary administrative stay while [we] consider[] the stay motion," and then that we "grant an emergency stay of the preliminary injunction while [we] consider[] the merits of the State's appeal, and then reverse the district court."  Appellant Br. at 3 n.1, 27.

On Monday April 20, we denied the State's request for an administrative stay (with one judge dissenting), and asked the parties to provide expedited briefing so that we could consider the issues raised in the State's appeal with the benefit of argument from both sides.  App. R. 9.[9]  The parties have now provided that briefing, and the question of whether the district court acted properly in enjoining the State's enforcement of EO-25 is ripe for our review.

---

[9] Two days after we issued this order the district court denied the State's request for a stay.  *See* R.252.

No. 20-5408          *Adams & Boyle, P.C. et al. v. Slatery et al.*          Page 12

## II. DISCUSSION

Because the parties have sufficiently briefed the merits questions before us, and because time is of the essence, we forgo consideration of the State's stay request and instead proceed straight to the preliminary injunction analysis.[10]

### A.

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, the party seeking the injunction must prove: (1) that they are likely to succeed on the merits of their claim, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Id*. at 20. A court considering whether to grant a preliminary injunction must therefore "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Moreover, when crafting an injunction, a district court must take care to "limit the solution to the problem," for example, by "enjoin[ing] only the unconstitutional applications of a [policy] while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006). We review a district court's application of these principles for abuse of discretion. *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015).

---

[10]We acknowledge the State's alternative argument that Plaintiffs do not have proper "third-party standing" to bring this suit on behalf of their patients. Appellant Br. at 22. But because Plaintiffs unquestionably have standing to sue on their *own* behalf (because EO-25 potentially threatens them with criminal prosecution) we need not address third-party standing. *See In re Abbott*, 954 F.3d at 782 n.17 ("[The plaintiff abortion providers] have standing to sue on their own behalf because [the at-issue Executive Order] 'directly operates' against them." (citing *Planned Parenthood of Cen. Mo. v. Danforth*, 428 U.S. 52, 62 (1976))).

### 1.

We begin by asking whether Plaintiffs have shown that they are likely to succeed on the merits of their constitutional claim. We conclude that they are.

In *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court held that the provision of the Fourteenth Amendment establishing that no state "shall . . . deprive any person of life, liberty, or property, without due process of law," includes within it a substantive guarantee of reproductive liberty, that is, a promise that no state shall prevent a woman from terminating her pregnancy if she so chooses (subject to certain limitations, depending on the trimester of pregnancy). The Court then narrowed this right in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, clarifying that states could ban abortion after "viability," *see supra* n.1, and could also regulate the practice of abortion before then, so long as those regulations did not impose an "undue burden," which the Court defined as a "provision of law" whose "purpose or effect [was] to place a substantial obstacle in the path of a woman seeking an abortion." 505 U.S. at 878. Still, the *Casey* court was careful to distinguish between regulation and prohibition, emphasizing that, "[r]egardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879.

*Casey*'s undue burden framework, and the accordant distinction between regulation and prohibition, has not always been easy to apply. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016) (discussing differing interpretations). But in the context of "time regulations" like the three-week measure at issue here, courts appear to have readily distinguished between the imposition of a short waiting period, *see, e.g.*, *Casey*, 505 U.S. at 885–86 (upholding state law requiring 24-hour waiting period prior to abortion); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 372–73 (6th Cir. 2006) (same), and the outright curtailment of the abortion right, *see, e.g.*, *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019) (rejecting state law prohibiting abortions, with limited exceptions, after 15 weeks LMP); *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015) (same, with respect to a law prohibiting abortions after 20 weeks LMP). And, notably, although *Casey* upheld a 24-hour waiting period, the Court described the question as "close[]," and noted that the potential of such a policy to prevent low-income women from seeking an abortion at all was "troubling." 505 U.S. at 885–86.

Were there no public health crisis, then, the analysis would be relatively straightforward: by banning *all* procedural abortions for a *three-week* period—limited by only a vague, undefined exception for women who needed the abortion to avoid facing "serious adverse health consequences"—EO-25 placed "a substantial obstacle in the path of" Tennessee women attempting to obtain a procedural abortion during that time period, and thus constituted an undue burden. *Casey*, 505 U.S. at 878. Indeed, as the evidence presented in the district court elucidated, depending on the stage of a woman's pregnancy, EO-25 functioned not just as a "delaying regulation," the likes of which are generally reviewed under *Casey*'s undue burden standard, but also as an outright ban on pre-viability abortion, which would unquestionably be verboten under *Casey* and *Roe*. And if that weren't enough, the women affected by EO-25 (and the Plaintiff providers) do not know if EO-25 will even end on April 30, thus making the burden of "planning ahead"—a necessity for a time-sensitive procedure like abortion—all the more crushing. Suffice it to say, in normal times there is no way that a measure like EO-25 would pass constitutional muster.[11]

But, of course, we are not living in normal times; we are living in pandemic times. And so the State points us to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), a century-old case in which the Supreme Court held that a city faced with the risk of a viral outbreak could require all of its adult residents to be vaccinated against that virus. *See* Appellant Br. at 12 (contending that "*Jacobson* establishes the legal framework for judicial review of the State's exercise of its police power during public-health emergencies"). *Jacobson* is an important case, and it is unfortunate that the district court did not address it until it issued its order denying Tennessee's request for a stay. *See* R.252 at Page ID #6267–68 (analyzing *Jacobson* in denying stay). But we are not convinced that this matters because even if *Jacobson*'s more state-friendly standard of review is

---

[11]True, the Supreme Court has long permitted states to enact parental consent regulations, which can sometimes have the *effect* of delaying an abortion for a weeks-long period. *See, e.g.*, *Garza v. Hargan*, 874 F.3d 735, 755 (D.C. Cir. 2017) (en banc) (Kavanaugh, J., dissenting) (making this point). But to the extent parental consent laws have a delaying effect, that is for reasons *outside* a state's control. The permissibility of such regulations in no way suggests that the Supreme Court would countenance a *state-mandated* three-week delay period, at least in ordinary circumstances.

the test we should be applying here—rather than the usual *Roe/Casey* standard—we still think that Plaintiffs are likely to succeed on the merits of their constitutional claim.

In *Jacobson*, the Supreme Court affirmed the imposition of a five-dollar criminal fine[12] on a Cambridge, Massachusetts resident who refused to comply with the city's mandatory vaccination regime, which Cambridge had enacted in response to a smallpox outbreak. The resident then appealed his conviction to the Supreme Court, arguing that the mandatory vaccination statute was unconstitutional. Although the Court acknowledged that the statute unquestionably impinged on the resident's individual autonomy, *cf. Guertin v. State*, 912 F.3d 907, 918–22 (6th Cir. 2019) (discussing the Fourteenth Amendment right to bodily integrity), the Court ultimately found that the statute was justified on public health grounds, and emphasized that the safety and importance of vaccines "[w]hile not accepted by all," were "accepted by the mass of the people, as well as by most members of the medical profession." 197 U.S. at 34 (citation omitted). And in explaining the standard of review courts should employ when confronted with such a public health measure, the Court held as follows:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no *real or substantial relation* to those objects, *or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law*, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id*. at 31 (emphasis added).

Leave aside the myriad factual differences between this case and *Jacobson*—asking a person to get a vaccination, on penalty of a small fine, is a far cry from forcing a woman to carry an unwanted fetus against her will for weeks, much less all the way to term—and the challenge of reconciling century-old precedent with the Supreme Court's more recent constitutional jurisprudence. The bottom line is that, even accepting *Jacobson* at face value, it does not substantially alter our reasoning here. As of today, a woman's right to a pre-viability abortion is

---

[12]Approximately $140, adjusted for inflation.

a part of "the fundamental law." And, for the reasons set forth above, EO-25, at least in *some* applications—most notably, those that would prevent a woman from exercising her right in-state altogether, or would require her to undergo a more invasive and costlier procedure that she otherwise would have—constitutes "beyond question, a plain, palpable invasion of rights secured by [that] fundamental law."

More still, although mandatory vaccination clearly had a "real" and "substantial" relation to the state's public health goals in *Jacobson*—indeed, as the Supreme Court emphasized, the importance of vaccination was widely accepted by the medical community—it is much harder to discern that relation here, given the paltry amount of PPE saved, and limited amount of in-person contact avoided, by halting procedural abortions for a three-week period (not to mention the lack of expert medical opinion in support of the State's position). And although the State cites language in *Jacobson* stating, "[i]t is no part of the function of a court or a jury to determine which one of two [responses] [is] likely to be most effective for the protection of the public against disease," *id.* at 30—and suggests that this means we must defer uncritically to the State's *ipse dixit* that a three-week bar on procedural abortions is necessary to save critical PPE and preclude risky interpersonal contact, *see supra* at 9—neither *Jacobson* in particular, nor Supreme Court abortion precedent in general, requires such abdication. *See, e.g.*, *Jacobson,* 197 U.S. at 34–38 (discussing the voluminous medical evidence in support of vaccination); *Hellerstedt*, 136 S. Ct. at 2310 (noting that uncritical deference to a legislature's factual findings regarding abortion is inappropriate).

The dissent disagrees with us on this last point, arguing that the State's three-week bar on procedural abortions *does* have a "real and substantial relationship to the current pandemic," and, indeed, that, if we don't allow that bar to go into effect, "doctors, nurses, and first responders will die . . . ." Dissent at 29, 31. But the dissent roots these bold assertions in nothing more than the State's say-so. The Center for Disease Control and Prevention ("CDC") webpage the dissent cites certainly does not support the State's position. That webpage simply recommends that U.S. healthcare facilities preserve PPE and cancel "elective and non-urgent procedures/appointments"; it says absolutely nothing about abortion. *Id*. at 29. And the State has never, at any point in this litigation, attempted to support its policy choice with expert or medical evidence. *See supra* at 10. This is unsurprising because, as far as we can tell, every serious medical or public health

No. 20-5408          *Adams & Boyle, P.C. et al. v. Slatery et al.*          Page 17

organization to have considered the issue has said the opposite. *See, e.g.*, *supra* at 8 n.7 (citing statements signed by over a dozen leading medical organizations). So, in our view, the dissent's position is not so much deference as it is abdication.

Of course, we do not mean to suggest that abortion rights during a public health crisis are *identical* to abortion rights during normal times. If *Jacobson* teaches us anything, it is that context matters. And as noted in Section B, *infra*, we have tried to accommodate for that context here. What we will not countenance, however, is the notion that COVID-19 has somehow demoted *Roe* and *Casey* to second-class rights, enforceable against only the most extreme and outlandish violations. Such a notion is incompatible not only with *Jacobson*, but also with American constitutional law writ large. *See generally, e.g.*, *Ex Parte Milligan*, 71 U.S. 2, 76 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.").

We conclude by acknowledging that orders analogous to EO-25 have generated a flood of litigation the past few weeks, and that judges across the country have reached differing conclusions as to the orders' legality. *Compare, e.g.*, *In re Rutledge*, No. 20-1791 (8th Cir. Apr. 22, 2020); *In re Abbott*, ---F.3d ---, 2020 WL 1911216 (5th Cir. Apr. 20, 2020); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), *with Robinson v. Attorney General*, --- F.3d ---, 2020 WL 1952370 (11th Cir. Apr. 23, 2020); *In re Abbott*, 2020 WL 1911216, at *18–30 (Dennis, J., dissenting); *In re Rutledge*, No. 20-1791, slip op. at 24 (Loken, J., dissenting); *South Wind Women's Ctr., LLC v. Stitt*, 2020 WL 1932900 (W.D. Okla. Apr. 20, 2020) (Goodwin, J.). Given the speed at which this issue is developing, we decline to address these other opinions in detail; suffice it to say, it is clear that there exists profound, but good faith, disagreement as to the constitutional questions involved. We will note, however, that the Texas executive order underlying the recent Fifth Circuit decision—a decision the State cites repeatedly in its brief here—is fundamentally different than EO-25. This is because the Texas order contains an important caveat permitting doctors to perform procedures that, in their clinical judgment, "would not deplete the hospital capacity or the [PPE] needed to cope with the COVID-19 disaster." *In re Abbott*, 954 F.3d at 780; *see also In re Abbott*, 2020 WL 1911216, at *30 (Dennis, J., dissenting) (noting that the plaintiff abortion providers there had

"represented that all of their abortion care will fall" under this exception).  EO-25, by contrast, contains no such caveat, other than the "serious adverse health consequences" exception mentioned above.  But because a woman could plainly have her right to an abortion undermined without her suffering "serious adverse health consequences"—indeed, if a woman is forced to undergo an unwanted, but otherwise healthy, pregnancy as a result of EO-25 she would presumably fall outside the exception's scope—this narrow provision does not save EO-25's constitutionality.

In sum, Plaintiffs are likely to succeed on the merits of their constitutional claim.

## 2.

We now address the remaining three preliminary injunction factors, in turn.

*Irreparable Harm.*  This is not a case that can be remedied with money damages, or a post-hoc apology.  Rather, if Tennessee is allowed to enforce EO-25 in the sweeping manner that it desires, any woman in Tennessee who wishes to have a procedural abortion during the relevant time period stands at risk of losing her constitutional rights, or at least of incurring substantial physical, emotional, and financial harms en route to exercising those rights; this is especially so for the low-income women who disproportionately seek out abortions and who have been disproportionately harmed by the economic downturn generated in COVID-19's wake.  And Plaintiffs are at risk of criminal prosecution if they attempt to help their patients exercise that right.[13]

---

[13]To be sure, as the State emphasized in the district court, and as the dissent hammers home here, Plaintiffs have not pointed to *specific* patients who would be irreparably harmed by EO-25.  *But cf.* R.248-1 (Chism Aff.) (Page ID #6168–72) (affidavit filed after the district court issued its injunction, in which a Knoxville woman who was 13 weeks LMP at the time EO-25 went into effect explained how she risked losing her ability to obtain *any* abortion in Tennessee as a result of the Order).  But given the rapid timeline under which Plaintiffs were operating, and the obvious reality that any Tennessee woman who would like to have a procedural abortion during the month of April would be impacted by EO-25, we can forgive Plaintiffs for not being hyper-specific.  And, in any event, Plaintiffs provided evidence that hundreds of women in any given month seek procedural abortions because they are past the point where medication abortion is an option, and that they (Plaintiffs) had to cancel specific procedural abortion appointments because of EO-25, including some where the woman was literally at the clinic.  *See supra* at 3–4, 5–6.  All of this is to say, there is no reason to think that, in April 2020, Tennessee women suddenly stopped deciding to have procedural abortions.  Moreover, as Plaintiffs' amici make clear, the medical risks at stake are anything but speculative.  *See, e.g.*, Br. of Am. Public Health Ass'n at 2–7.

*Balance of Harms*.  That Plaintiffs have pointed to concrete threats to constitutional liberty and bodily autonomy does not guarantee them an injunction, of course.  Rather, we must "balance the *competing* claims of injury and must consider the effect on *each* party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (emphasis added) (quoting *Amoco*, 480 U.S. at 542).  Here, though, we find the "competing claims of injury" cited by the State to be speculative and abstract; they do not outweigh the tangible harms EO-25 risks wrecking on Plaintiffs and their patients.

Most potently, the State raises the specter of further COVID-19 contamination—and the accordant risk of yet more Tennesseans dying from the disease—saying that such harms are "certain to occur" if procedural abortions are allowed to take place.  Appellant's Br. at 24; *see also* R.240 (Defs.' Opp. Br.) (Page ID #6019–20) ("Every procedure that is postponed, and every item of PPE that is preserved, furthers the State's compelling interests in halting the spread of COVID-19 and ensuring our healthcare system is equipped to treat—and prevent the death of—those who are infected.").  We cannot gainsay the threat posed by COVID-19; as we stated at the outset of the opinion, these are extraordinary times calling for extraordinary measures.  But, with respect to *just* those procedural abortions affected by the district court's injunction (as modified below), the State's proffered harm is purely speculative.  As the district court noted, the State presented "no evidence that any appreciable amount of PPE would actually be preserved if EO-25 is applied to procedural abortions," and the State has not remedied that shortcoming on appeal.  *Adams & Boyle, P.C.*, 2020 WL 1905147, at *6; *see also supra* at 16–17 (further discussing the lack of medical evidence in support of the State's position).

In response, the State suggests that if we permit this one exemption, surely the joint-replacement surgeons, the cataract-removal specialists, and every other medical provider affected by EO-25's bar on elective procedures will follow, with similar "minimal impact" arguments in tow.  *Cf. Pre-Term Cleveland v. Attorney General of Ohio*, 2020 WL 1673310, at *4 (6th Cir. Apr. 6, 2020) (Bush, J., concurring) (deeming this "a serious free rider" problem).  But this contention fails to appreciate that abortion is fundamentally different than a hip replacement or a cataract removal:  not only is abortion entitled to explicit constitutional protection, but also, as the district court appropriately recognized, it is a uniquely "time-sensitive procedure," both as a biological

matter and a regulatory matter. *Adams & Boyle, P.C.*, 2020 WL 1905147, at *6. After all, how many other elective procedures have mandatory 48-hour waiting periods beforehand, and are available in only four cities state-wide? So if there is a slippery slope here, we fail to see it.

Tennessee also emphasizes that a state's "sovereignty is irreparably harmed anytime action taken by its democratically elected leaders is enjoined," and argues that we should take account of that harm here. Appellant Br. at 24 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). But as we stressed at the outset of this opinion, we *have* taken that harm into account. And, in the particular circumstances of this case, we find that the affront the Governor of Tennessee will suffer from having one small part of a limited-duration executive order enjoined (which itself is just one piece of a much more comprehensive state policy) is far outweighed by the harm the individual Tennessee women affected by that order will suffer if it is given full effect.

*The Public Interest*. We need not say much on this point. As the district court correctly observed, "it is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

* * *

For these reasons, the district court did not abuse its discretion in granting a preliminary injunction.

## B.

This leaves one final matter: the scope of the district court's injunction. As noted above, the district court's order is just one sentence long: "Defendants are hereby immediately enjoined from enforcing EO-25 as applied to procedural abortions." The State argues that this perfunctory order is overbroad, and that the district court failed to "tailor its injunctive relief" to the burdensome situations actually identified by Plaintiffs. Appellant Br. at 21; *compare with, e.g.*, *Robinson*, 2020 WL 1952370, at *8 (in the course of denying state's request for a stay on appeal,

citing with approval the district court's "narrowly tailored" preliminary injunction); *cf. Pre-Term Cleveland*, 2020 WL 1673310, at *1 (similar conclusion, in TRO context).

On this point, we agree with the State. As explained earlier, because a preliminary injunction is an extraordinary remedy, a district court must be careful to "limit the solution to the problem." *Ayotte*, 546 U.S. at 328–29. And, here, the undue burden problem identified by Plaintiffs encompassed three classes of patients, which Plaintiffs helpfully identified in their district court brief seeking injunctive relief:

> (1) patients who, in the good faith professional judgment of the provider, will likely lose their ability to obtain an abortion in Tennessee if their procedures are delayed until after April 30, 2020;
>
> (2) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a lengthier and more complex abortion procedure, which is only available at two clinics in Nashville and Memphis, if their procedures are delayed until after April 30, 2020; [and]
>
> (3) patients who, in the good faith professional judgment of the provider, will likely be forced to undergo a two-day procedure—which is only available at two clinics in Nashville and Memphis, and which requires at least three separate visits to the provider—if their procedures are delayed until April 30, 2020.

R.232 (Pls.' Preliminary Inj. Br.) (Page ID #5783).

Consequently, we direct the district court to modify its injunction so that it enjoins the State from enforcing EO-25 against Plaintiffs to the extent they provide procedural abortions to these three categories of patients. And, to be clear, this second category of patients includes women who, in the good faith professional judgment of the provider, will likely be forced to undergo a D&E procedure instead of an aspiration procedure if their procedures are delayed until after April 30, 2020.

To the extent that Plaintiffs work with patients who can safely delay their procedural abortions past EO-25's April 30 expiration date, in a manner commensurate with the aforementioned criteria, however, Plaintiffs must comply with EO-25 and delay those particular procedures. To rule otherwise would be to grant Plaintiffs a wholesale exemption from the public health dictates of EO-25, which, per our earlier discussion, *Jacobson* cautions against.

No. 20-5408          *Adams & Boyle, P.C. et al. v. Slatery et al.*          Page 22

### III.  CONCLUSION

For these reasons, we **AFFIRM** the district court order issuing a preliminary injunction but direct the district court to **MODIFY** the preliminary injunction in the manner set forth above. We leave it to the district court to address any further developments in the first instance.

————————————

**DISSENT**

————————————

THAPAR, Circuit Judge, dissenting.  Even in ordinary times, the district court's injunction in this case would be deeply flawed.  But these are no ordinary times.  In the midst of a once-in-a-century pandemic, the district court broadly enjoined the State of Tennessee from enforcing a measure at the heart of the State's response.  In doing so, the court committed numerous legal errors, made hardly any factual findings, issued an overly broad injunction, and brazenly substituted its own policy views for those of the elected officials who are actually fighting the pandemic.  All because the district court thought that a three-week delay for certain abortions might prevent *some unidentified person* from having an abortion.  Most cases of judicial aggrandizement have costs.  But in few are the potential costs so great.  I would reverse.

I.

Two weeks ago, the Governor of Tennessee issued an executive order—based on guidance from various medical organizations—in response to the COVID-19 pandemic.  The Governor's order explains the critical importance of conserving what's known as "personal protective equipment" (*e.g.*, face masks, gloves, protective clothing) and therefore directs "[a]ll healthcare professionals and healthcare facilities" in the State to "postpone surgical and invasive procedures that are elective and non-urgent."  The order defines "elective and non-urgent" procedures as those that "are not required to provide life sustaining treatment, to prevent death or risk of substantial impairment of a major bodily function, or to prevent rapid deterioration or serious adverse consequences to a patient's physical condition if the surgical or invasive procedure is not performed, as reasonably determined by a licensed medical provider."  The order will expire just after midnight on April 30, 2020—less than six days from now and exactly three weeks after it took effect.

Within days of the Governor's announcement, the plaintiffs in this case—abortion providers in Tennessee—moved to "supplement" a five-year old complaint (six months after trial) to seek a temporary restraining order or preliminary injunction.  The plaintiffs argued that the

executive order prohibits most "surgical abortions" in the state and thus will prevent their clients from obtaining an abortion.

A mere four days later, the district court granted the motion to supplement and entered a preliminary injunction, enjoining the enforcement of the executive order as to *all* surgical abortions in Tennessee. The court's analysis of why the plaintiffs were likely to succeed on the merits consisted of two paragraphs. The State then appealed. (Despite the breadth of its ruling, the district court recently denied a stay pending appeal.)

## II.

The State now asks us to stay the district court's decision pending appeal and ultimately to reverse the preliminary injunction. Both requests involve the same basic factors: (1) who is likely to prevail on the merits; (2) whether the moving party is likely to suffer irreparable harm in the interim; (3) what is the balance of harms; and (4) where does the public interest lie. *See Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (per curiam). The plaintiffs' failure to show a likelihood of success on the merits would itself warrant reversal. *See, e.g.*, *Fowler*, 924 F.3d at 259–60. But the other factors counsel the same outcome. And *even if* the district court was correct to grant a preliminary injunction (it was not), these same factors show that the injunction was much broader than permitted under the law.

*Success on the Merits.* Start with the plaintiffs' likelihood of success on the merits. The basic question is whether the executive order places an "undue burden" on a woman's ability to have an abortion. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 874 (1992). As the modifier "undue" suggests, not just any "incidental effect . . . making it more difficult or more expensive" to have an abortion will do. *Id.* Rather, the state regulation must create a "substantial obstacle" for women seeking an abortion. *Id.* at 877. But importantly, we do not consider any burden in isolation. Instead, we must consider "the burdens a law imposes on abortion access *together* with the benefits those laws confer" and then "weigh[] the asserted benefits against the burdens." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309, 2310 (2016) (emphasis

added).  In short, the plaintiffs must show that the order imposes a burden and that this burden outweighs the order's asserted benefits.

Given this framework, the district court committed two fundamental errors.  First, it failed to make the necessary factual findings to show that the executive order imposes a burden on anyone's rights.  Second, the court failed even to acknowledge the benefits of the executive order and thus necessarily failed to balance its speculative burden against these benefits.  Either error would warrant reversal.  Together, they certainly do.

Begin with the burden.  The district court failed to make specific findings about whether the executive order creates a "substantial obstacle" for women seeking an abortion.  *See Casey*, 505 U.S. at 874.  At most, the district court pointed out that the executive order will *delay* certain abortions for three weeks.  But that doesn't take the plaintiffs very far.  Both the Supreme Court and our court have upheld laws that have the effect of delaying abortions for days or even weeks. *See, e.g.*, *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990) (up to three-week delay); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 366, 372–74 (6th Cir. 2006) (up to two-week delay).  Indeed, for the last forty years, the Supreme Court has "repeatedly upheld a wide variety of abortion regulations that entail some delay in the abortion." *Garza v. Hargan*, 874 F.3d 735, 755–56 (D.C. Cir. 2017) (en banc) (Kavanaugh, J., dissenting) (collecting cases).  The district court failed to grapple with any of these precedents.  Its silence speaks volumes.

(For its part, the majority tries to distinguish these cases by saying those delays were outside the state's control.  It doesn't offer any support for this distinction.  But more importantly, the distinction seems to assume that a once-in-a-century pandemic *is* within a state's control.)

To be clear, the district court enjoined a version of the order that didn't exist.  It acted as if the State had banned most pre-viability abortions.  But that's just not the case.  Tennessee law generally allows women to seek an abortion until the twentieth week of their pregnancy.  *See* Tenn. Code Ann. §§ 39-15-211, -212.  So any woman who was less than seventeen-weeks pregnant when the order went into effect would still have time to seek an abortion after the order expires.

The plaintiffs speculate that there *might* be women out there who were more than seventeen-weeks pregnant when the order was issued and who will now be unable to obtain an

abortion in Tennessee.  (Or who otherwise would be unable to obtain an abortion for some reason.)
But speculation usually doesn't count for much.  *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968,
972–74 (1997) (per curiam).  And there's no reason it should have counted for so much here.  Make
no mistake—the burden was on *the plaintiffs* to bring forward concrete evidence (1) that such
women exist, (2) that they want an abortion, and (3) that they would be unable to obtain one.  *See
Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The majority claims a snippet of
evidence supports this concern—an affidavit that vaguely states that "some patients" will be
prevented from obtaining an abortion under the executive order.  R. 232-5, Pg. ID 5887.  But the
district court didn't make any factual findings on this front.  Nor do the plaintiffs even cite this
evidence on appeal.

Not only that.  No one—not the plaintiffs, not the district court, not even the majority—
has made any effort to quantify how this hypothetical pool of women relates to the broader pool
of women affected by the order—as binding precedent requires.  *See Gonzales v. Carhart*, 550
U.S. 124, 167–68 (2007); *Cincinnati Women's Servs.*, 468 F.3d at 367–68 (explaining that courts
must consider whether a restriction will operate as a "substantial obstacle" in "a large fraction of
the cases in which the abortion restriction is relevant" (cleaned up)).  In fact, the State points out
that the vast majority of abortions in Tennessee occur before the seventeenth week of pregnancy.
The plaintiffs haven't offered any evidence in response.  So even if speculation were the stuff of
winning legal claims, plaintiffs still haven't made the proper showing.

But we aren't even done with speculation.  The plaintiffs (and now the majority) say that
the Governor of Tennessee *might* extend the executive order beyond the current three-week period.
This is a smart move—it makes a short, finite burden look like an indefinite one, exaggerating its
severity.  The problem is that the Governor hasn't said he will impose *any* restrictions on medical
procedures after April 30, which is when the order in this case expires.  If the Governor issues a
*new* order limiting surgeries beyond that date, it is *possible* that he will extend the existing
restrictions—but it is just as likely that the new order will contain a different and perhaps more
tailored set of restrictions.  The majority simply assumes it will be the former.  Based on what?
The plaintiffs and majority point to a statement by the Surgeon General *of the United States* about
extending certain public-health measures.  But in this country, federal officials don't speak on

behalf of state leaders.  And again, the plaintiffs haven't pointed to any evidence about what the Governor *of Tennessee* will do.  As the crisis facing our country continues to develop, so too will government responses.  And those who have problems with those responses must wait until actual and imminent harms arise.  *See, e.g.*, *D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).  Federal courts are not in the business of issuing advisory opinions, let alone advisory injunctions.

All that is reason enough to reverse.  But the district court also committed another fundamental error:  it entirely failed to balance these purported burdens against the executive order's benefits.  *See Whole Woman's Health*, 136 S. Ct. at 2309.  The court didn't even mention the benefits of the order in its "undue burden" analysis.  That flatly contradicts Supreme Court precedent, which "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.*  Count that as another error warranting reversal.

Perhaps the district court didn't perform this balance because it *couldn't* do so.  How does one balance a harm to some unspecified number of people?  The district court didn't tell us and the majority doesn't either.

One could stop there.  But in fact, Tennessee's interests in protecting its citizens from the pandemic cannot be overstated.  All agree that these are far from ordinary times.  Over the past few weeks, our entire nation has come together to combat a generation-defining crisis.  Many have done so at great personal sacrifice.

In Tennessee, as in so many other states, the Governor has taken extraordinary steps to fight the pandemic.  He declared a state of emergency, required all residents to remain at home except in limited circumstances, and ordered the closure of most businesses.  As part of that effort, he also signed the generally applicable order at issue here.  The Governor's order allowed the state to conserve valuable personal protective equipment for those fighting the coronavirus.  The order protects those who have undertaken perhaps the greatest personal sacrifice in protecting the citizens of Tennessee.  There's no reason to doubt that the Governor took these measures because "the safety of the general public" demanded it.  *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905).

No. 20-5408        *Adams & Boyle, P.C. et al. v. Slatery et al.*        Page 28

Our law has long-protected just these types of decisions from judicial interference based on purported violations of substantive due process. In times of emergency, elected officials need room to do what they were elected to do—to govern. Sometimes their actions will incidentally impact a person's liberty interests. But the Supreme Court has upheld such actions anyway, explaining that "[r]eal liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own [person or property], . . . regardless of the injury that may be done to others." *Id.* at 26. And there's no abortion exception to this well-settled principle. To the contrary, the Supreme Court has made clear from the beginning that the ability to obtain an abortion is neither "absolute" nor "unlimited." *Roe v. Wade*, 410 U.S. 113, 154 (1973) (citing *Jacobson*, 197 U.S. 11).

Of course, this does not mean that the courts should rubber stamp emergency measures— far from it. *See Jacobson*, 197 U.S. at 28–29. But it does mean that judges should act with care during such times, recognizing the limits of our knowledge, institutional capacity, and lawful authority. *See id.* at 30–31; *cf. Gonzales*, 550 U.S. at 163 (explaining that the Supreme Court has "given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty").

Remarkably, the district court failed to acknowledge—let alone apply—these principles before it granted the injunction. Nor did it acknowledge the State's heightened interests during times of emergency. Based on its decision, one might think that the executive order would be unconstitutional no matter how many lives it could save and no matter how few—if *any*— abortions it might prevent. Even the majority calls this omission "unfortunate."

In a subsequent order denying a stay pending appeal, the district court seems to have recognized that it erred by ignoring the State's primary legal authority for its position, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). But rather than correct its mistake, the court doubled down, finding the facts of *Jacobson* to be readily "distinguishable" from the facts of this case. In doing so, the district court overlooked the basic principle of *Jacobson*: that states may respond to emergencies in the face of substantive-due-process rights, so long as they act reasonably and don't single out specific rights or persons for disfavored treatment. *See id.* at 28–30.

No one claims that the State of Tennessee has singled out specific rights or persons in its response to the current pandemic. The executive order in this case applies to *all* non-essential medical procedures. And again, the Governor has issued several other orders that apply to *all* persons and that affect every aspect of daily life across the state.

Nor have the plaintiffs shown that the State has acted unreasonably in requiring its residents to postpone non-essential medical procedures for a three-week period. Just contrast this case with the facts of *Jacobson*, where the Supreme Court upheld a state's authority to forcibly vaccinate individuals. *See id.* at 27–30. If the State can *physically invade* a person's body in response to an emergency, then it surely may require people to *delay* certain medical procedures for the same purpose.

On these points the majority, for its part, is conclusory: it does little more than assert that the executive order "is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Given that plaintiffs haven't established a constitutional violation in the first place, they certainly haven't done so "beyond all question."

The majority also dismisses the State's interests on the ground that the executive order has no "real" and "substantial" relationship to the current pandemic. *Id.* That claim is remarkable given that the order follows recommendations from our nation's leading public-health institution. *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Strategies to Optimize the Supply of PPE and Equipment* (last visited Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html (explaining that equipment "shortages are currently posing a tremendous challenge to the US healthcare system" and recommending the cancellation of "elective and non-urgent procedures/appointments"). Plus, *Jacobson* clearly tells us that it's "no part of the function of a court or a jury to determine which one of two modes [is] likely to be the most effective for the protection of the public against disease." 197 U.S. at 30. The majority doesn't explain why *our* court is an exception to that rule. And the amicus briefs the majority cites to discredit the State's rationale for the executive order "are more formidable by their number than by their inherent value." *Id.* One need only open a newspaper to appreciate the importance of preserving medical equipment at this time. So if nothing else, *Jacobson* forecloses the plaintiffs' claim.

*Irreparable Harm.*  Consider next what (if any) irreparable harm the plaintiffs will suffer without an injunction.  To be clear, the plaintiffs don't claim that they themselves will suffer any irreparable harm.  Rather, the plaintiffs assert that the women they purport to represent will suffer irreparable harm without an injunction.  *But cf. Gee v. June Med. Servs. L.L.C.*, 140 S. Ct. 35 (2019) (Mem.) (granting certiorari to consider whether traditional third-party standing rules apply in abortion cases).

The district court reasoned that the plaintiffs had established an irreparable injury because it thought that the executive order would prevent some women in Tennessee from having an abortion.  But again the district court failed to make *any* factual findings showing that the order would prevent *any* particular woman from obtaining an abortion.  To satisfy the irreparable-injury requirement, parties must demonstrate "*likely*" harm.  *Winter*, 555 U.S. at 22.  And the plaintiffs offer only speculation.

The district court also asserted that *delays* in the provision of abortions might irreparably harm some women by making their abortions more dangerous.  But this argument stands in stark contrast with the claim that "[a]bortion is one of the safest medical procedures performed in the United States."  *Whole Woman's Health*, 136 S. Ct. at 2320 (Ginsburg, J., concurring) (citation omitted).  In fact, the plaintiffs themselves say that "abortion is extremely safe throughout pregnancy."  Plaintiffs Br. at 5.  Is it an irreparable injury for a medical procedure to be *only* "extremely safe"?  But again the district court addressed none of these facts on its way to its destination.

Meanwhile, the executive order allows doctors to perform an abortion when a woman would suffer "serious adverse consequences to [her] physical condition" without the surgery "as reasonably determined by a licensed medical provider."  The plaintiffs haven't made any effort to explain why this exception (which contains built-in deference to medical professionals) would not give them the flexibility they need during this time of national crisis.  And again, it was *the plaintiffs'* burden to show that the executive order (with its exception) causes an irreparable injury. They failed to do so.

*Balance of Harms.*  Consider also the irreparable harms *created* by the district court's injunction.  Of course, a state always suffers irreparable injury when it's wrongfully enjoined from enforcing one of its laws.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 & n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  But that's far from the only harm here.  The Governor issued the executive order to preserve critical medical equipment.  Every piece of equipment used for something besides the pandemic response could cost a life—the life of someone who acts selflessly to help others in a time of crisis.  Simply put: doctors, nurses, and first responders will die without proper equipment.  And that's to say nothing of their family members, whose lives will be put at risk too.  Given the twin risks of exponential community spread and hospital overload, every additional infection among first responders represents a significant threat to public health.  It's hard to imagine a scenario in which the harm imposed by an injunction would be greater.

The district court brushed off these concerns, saying the plaintiffs have already taken measures to reduce their use of medical equipment during surgical abortions.  The district court apparently thought that the State would be harmed only if surgical abortions used an "appreciable amount" of medical equipment.  (The Majority seems to think the same.)  But neither the district court nor the Majority is in any position to second-guess the Governor's judgment as to the amount of equipment that is *really* necessary to keep healthcare workers alive.

The district court also asserted that the executive order would be counterproductive for various policy reasons.  Again the district court's (and now the majority's) willingness to constitutionalize its own policy judgments—in the midst of a national emergency no less—is remarkable.  If anything has remained constant over the past hundred years of constitutional law, it's that courts aren't supposed to second guess policymakers based on their own subjective judgments of what makes for good policy.  *See, e.g.*, *Perry v. Perez*, 565 U.S. 388, 394 (2012) (per curiam) (noting that courts must exercise care not to displace "legitimate state policy judgments with the court's own preferences").  All the more when our elected officials are tasked with making difficult decisions under conditions of uncertainty, risk, and imperfect information.  *See Jacobson*, 197 U.S. at 30–31.

The district court and majority also note that some women *might* travel to other states to have an abortion and that this might further aggravate the current pandemic. But neither the plaintiffs nor the district court nor the majority have pointed to a single person who said she would need to travel to another state to get an abortion. So again this is nothing more than speculation.

*Public Interest*. This factor points in the same direction. *See Nken v. Holder*, 556 U.S. 418, 435–36 (2009); *Winter*, 555 U.S. at 24–26. Plainly the public interest is served by a state's ability to enforce a regulation whose purpose and effect is to save the lives of healthcare workers. The district court and majority assert that the public interest *favors* a preliminary injunction because it's always in the public interest to prevent the violation of constitutional rights. *See, e.g.*, *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (per curiam). That reasoning would have more force if the plaintiffs or district court had shown that the regulation actually violates any constitutional rights. But again the majority's reasoning is only conclusory.

*Scope of the Injunction*. Finally, the district court plainly erred in defining the injunction's scope. Preliminary injunctions are an "extraordinary remedy." *Winter*, 555 U.S. at 24. That means courts that shouldn't grant them based on speculative harms, which is what the district court did here; and that "the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires." *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (citation omitted). As the Supreme Court put it, "[i]t is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." *Gonzales*, 550 U.S. at 168. And an injunction's proper scope becomes all the more important in cases involving government officials—and especially in cases where, as here, federal courts enjoin them. *See Rizzo v. Goode*, 423 U.S. 362, 378–80 (1976); *see also Gonzales*, 550 U.S. at 168 ("It would indeed be undesirable for [courts] to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." (cleaned up)).

But again the district court disregarded these well-settled legal principles. The district court's injunction doesn't just apply to women who might lose their ability to have an abortion before Tennessee's twenty-week deadline; it applies to *all* women who seek a surgical abortion—

no matter their ability to obtain an abortion after the order expires.  Injunctions should be aimed with rifle-scope precision.  The district court here used a twelve-gauge.

The majority does acknowledge at least *this* error and tries to remedy it on appeal.  But in doing so, the majority doesn't fix the problem and also creates a problem of its own:  it creates three "classes" of women—all of them amorphous, and thus likely to sow confusion going forward.  In effect, the majority has certified a class under Rule 23(b)(2) without any request to do so or any effort to comply with the Federal Rules.  Nor does the majority explain why the executive order unduly burdens most of the putative class.  It simply announces that the injunction will apply to them.

The district court's errors here are not unprecedented:  Two other circuits have recently encountered similar district court decisions, and both circuits promptly corrected them—in one case *twice*.  *See In re Rutledge*, No. 20-1791, 2020 WL 1933122 (8th Cir. Apr. 22, 2020); *In re Abbott*, No. 20-50296, 2020 WL 1911216 (5th Cir. Apr. 20, 2020); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020).  *But cf. Robinson v. Att'y Gen.*, No. 20-11401-B, 2020 WL 1952370, at *4 (11th Cir. Apr. 23, 2020) (denying a stay pending appeal in "an atypical case" because, among other things, the state "concede[d] that the substance of the district court's preliminary injunction is consistent with its own . . . interpretation of [its executive order]").  We should have done the same.

***

To sum up:  the district court granted an injunction without much effort to apply the relevant law, without specific factual findings, and without any attempt to tailor the remedy to the purported constitutional violation.  If that doesn't count as an abuse of discretion, I don't know what would.  I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-5408

ADAMS & BOYLE, P.C. et al.,

    Plaintiffs - Appellees,

      v.

HERBERT H. SLATERY III et al.

    Defendants - Appellants.

**FILED**
Apr 24, 2020
DEBORAH S. HUNT, Clerk

Before:  MOORE, WHITE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was submitted to the court on the motion and reply of Appellants, the response of Appellees, and the briefs of Amici Curiae.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's order issuing a preliminary injunction is AFFIRMED with the MODIFICATION set forth in the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk